UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | | |
|---|---|---|
| MARY COMANS, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No. 1:25-cv-01237-MSN-WEF |
| | * | |
| EXECUTIVE OFFICE OF THE | * | |
| PRESIDENT, *et al.*, | * | |
| | * | |
| Defendants. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

**PLAINTIFF'S MEMORANDUM IN OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS FOR LACK OF JURISDICTION**

**Table of Contents**

ARGUMENT ........................................................................................................................ 2

I. APPLICATION OF THE FIRST PRONG OF THE *THUNDER BASIN* TEST REQUIRES
   THIS COURT TO RETAIN JURISDICTION .................................................................. 4

   A.  The Lynchpin of the CSRA Was an Independent MSPB ...................................... 4

   B.  The MSPB Is No Longer Independent .................................................................. 9

      1.  The President Has Fired a Member of the MSPB Without Cause ...................... 9

      2.  The President Asserts the Right to Fire MSPB Administrative Judges Without Cause ..... 9

      3.  The President Asserts the Authority to Instruct the MSPB and Its Administrative Judges
          on How to Construe and Apply the Law, Including in Specific, Pending Cases Involving
          His Exercise of Claimed Article II Authority to Fire Employees ...................... 11

      4.  This Case Involves a Direct Assertion of Presidential Power to Fire Employees, At the
          Same Time the President Has Assumed Control of the MSPB ......................... 12

   C.  Resort to the MSPB Would Be Futile For Ms. Comans ..................................... 14

   D.  Defendants' Arguments to the Contrary Are Unavailing .................................... 15

II. APPLICATION OF THE SECOND PRONG OF THE *THUNDER BASIN* TEST REQUIRES
   THIS COURT TO RETAIN JURISDICTION ............................................................. 16

   A.  Congress Did Not Intend Broad, Structural, Constitutional Challenges to the MSPB's
      Organic Statute to Be Reviewed by the MSPB ................................................. 17

   B.  *Free Enterprise Fund* Is Controlling ................................................................ 18

III. FORCING MS. COMANS TO PROCEED BEFORE THE MSPB WOULD SUBJECT HER
   TO A "HERE AND NOW INQUIRY" UNDER *AXON* ...................................... 21

IV. THIS COURT MUST RETAIN JURISDICTION OVER MS. COMANS' LIBERTY
   INTEREST CLAIM ...................................................................................................... 22

   A.  Ms. Comans' Liberty Interest Claim ................................................................ 23

   B.  Application of the Second Prong of the *Thunder Basin* Test Requires This Court to Retain
      Jurisdiction Over the Liberty Interest Claim ..................................................... 26

   C.  Defendants Wholly Fail to Address the Liberty Interest Claim ......................... 30

CONCLUSION ................................................................................................................... 30

**Table of Authorities**

**CASES**

*Axon Enterprises, Inc. v. FTC*, 598 U.S. 175 (2023) ......................................................... 19, 21-22

*Board of Regents v. Roth*, 408 U.S. 564 (1972) ...................................................................... 23, 29

*Brooks v. OPM*, 59 M.S.P.R. 207 (1993) ...................................................................................... 18

*Cannon v. Village of Bald Head Island,* 891 F.3d 489 (4th Cir. 2018) ................................... 25-26

*Carr v. Saul*, 593 U.S. 83 (2021) ............................................................................................ 14, 18

*Cohens v. Virginia*, 6 Wheat. 264 (1821) ....................................................................................... 3

*Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976) ........................... 2-3

*Cox v. N. Va. Transp. Comm'n*, 551 F.2d 555 (4th Cir. 1976) ...................................................... 25

*Elgin v. Department of the Treasury*, 567 U.S. 1 (2012) ...................................................... passim

*Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010) .. 19

*Harris v. Bessent*, (D.C. Cir. 2025) ................................................................................................. 9

*Heckler v. Ringer*, 466 U.S. 602 (1984) ....................................................................................... 28

*Houghton v. Shafer*, 392 U.S. 639 (1968) .................................................................................... 15

*Humphrey's Executor v. United States*, 295 U.S. 602 (1935) ...................................................... 22

*Jaroch v. Department of Justice*, Case No.
     DA-0752-25-0328 –I-1 (MSPB Aug. 22, 2025) ...................................................... 11, 12, 20, 26

*Kerns v. United States*, 585 F.3d 187 (4th Cir. 2009) .................................................................. 30

*Leedom v. Kyne*, 358 U.S. 184 (1958) .......................................................................................... 28

*Lyons v. Barrett*, 851 F.2d 406 (D.C. Cir. 1988) .......................................................................... 26

*Malone v. Dep't of Justice*, 14 M.S.P.R. 403 (1983) .................................................................... 17

*Mathews v. Eldridge*, 424 U.S. 319, 331 (1976) .......................................................................... 27

*McCarthy v. Madigan*, 503 U.S. 140 (1992) .............................................................................. 2, 15

*McIntosh v. Dep't of Defense*, 53 F.4th 630, 640 (Fed. Cir. 2022) ......................................... 5, 10

*Nat'l Ass'n of Immigration Judges v. Owen*, 139 F.4th 293 (4th Cir. 2025), ...................... passim

*Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90 (D.C. Cir. 1986) ................... 15

*Ratliff v. City of Milwaukee*, 795 F.2d 612 627 n. 4 (7th Cir. 1986) ........................................... 29

*Riggin v. Off. of Senate Fair Emp. Pracs.*, 61 F.3d 1563 (Fed. Cir. 1995). ............................... 20

*Robertson v. Rogers*, 679 F.2d 1090 4th Cir. (1982) ................................................................... 25

*Sciolino v. City of Newport News*, 480 F.3d 642 (4th Cir. 2007) ................................................. 25

*Shievinski v. Coast Guard*, 673 F.3d 308, 315 (4th Cir. 2012)........................................................ 23

*Special Counsel v. Gallagher*, 44 M.S.P.R. 57, 73 (1990) .............................................................. 17

*Special Counsel v. Jackson*, 119 M.S.P.R. 175 (2013).................................................................... 18

*Thunder Basin Col Co. v. Reich*, 510 U.S. 200 (1994).............................................................. passim

*United States v. Fausto*, 484 U.S. (1988) ............................................................................ 5, 15, 16

*Wilson v. Off. of Pers. Mgmt.*, No. DC-0831-13-0423-P-1, 2015 WL 502974
(M.S.P.B. Feb. 6, 2015) ........................................................................................................... 27

**STATUTES**

5 U.S.C.§ 1201.................................................................................................................................... 6

5 U.S.C. § 1202(d) ........................................................................................................................ 5, 10

5 U.S.C. § 1204(a) .............................................................................................................................. 6

5 U.S.C. § 1204(j)........................................................................................................................... 6, 10

5 U.S.C. § 2301(8)(a)........................................................................................................................... 6

5 U.S.C. § 7501.................................................................................................................................. 29

5 U.S.C. § 7511.................................................................................................................................. 29

5 U.S.C. § 7513(a) .......................................................................................................................... 5, 10

5 U.S.C. § 7701(a) .............................................................................................................................. 29

5 U.S.C. § 7703(c)(3).......................................................................................................................... 21

28 U.S.C. § 1331................................................................................................................................... 2

**OTHER AUTHORITIES**

Carter, Jimmy, *Federal Civil Service Reform Message to the Congress*, The American
Presidency Project (March 2, 1978).......................................................................................... 6, 7

Civil Service Reform Act of 1978, S. Rep. 95-969 (July 10, 1978)..................................... 6, 7, 8

Cohen, Gabe, *"We're not preparing": As Trump officials vow to eliminate FEMA, the agency is already in turmoil*, CNNPOLITICS, (March 26, 2025).............................................................. 24

Executive Order 14215 (Feb. 18, 2025)...................................................................................... 11

Fed. R. Civ. P. 12(b)(1)....................................................................................................................... 2

Ferré-Sadurní, Luis, Top FEMA Official Is Fired Over Payments for N.Y.C. Migrant Shelters,
NEW YORK TIMES (Feb. 11, 2025) ........................................................................................ 24

Gaiser, Elliot T., *The Merit Systems Protection Board's Authority to Adjudicate Constitutional Questions within an Administrative Proceeding*, White House Office of Legal Counsel (Sept. 26, 2025)............................................................................................................................... 12

Harris Sara M., Multilayer Restrictions on the Removal of Administrative Law Judges, DOJ (Feb. 20, 2025), ................................................................................................................ 10

Lynch, Sarah N., Goudsward, Andrew, *US Justice Department Fires Several More Employees From Jack Smith's Team, Sources Say*, Reuters (July 14, 2025),............................................ 20

Ngo Emily, *Immigration courts thrown into chaos as Trump administration purges dozens of judges, Politico*, (Dec. 6, 2025)....................................................................................... 10-11

Office of Legal Counsel, U.S. Dep't of Justice, Opinion 79-65, Merit Systems Protection Board – Terms of Office, 3 Opinions of the OLC 351 (Sept. 8, 1979) ................................................. 6

Press Release, U.S. Dep't of Homeland Sec., Statement from a DHS Spokesperson on............. 23

*Statement of Justice Department Chief of Staff Chad Mizelle*, DOJ (Feb. 20, 2025)................... 10

Whistleblower Protection Enhancement Act of 2012, Pub. L. No. 112-199, 126 Stat. 1465 (2012) .......................................................................... 27

Plaintiff Mary Comans had an unblemished career as a federal employee that spanned over 20 years. Complaint ¶ 3. In 2017, she was elevated to the position of Chief Financial Officer ("CFO") at the Federal Emergency Management Agency ("FEMA"), a component of the Department of Homeland Security ("DHS"). She was a member of the Senior Executive Service ("SES") and therefore, by statute, could not be fired without just cause or notice and an opportunity to be heard. *Id*. ¶¶ 3, 9, 13, 19-22. Nevertheless, on February 11, 2025, she was fired without just cause, notice, or any due process. *Id*. ¶ 17. She was fired "at the direction of the President." Id.

The government defends the termination of Ms. Comans and those of a small number of other federal employees across several agencies who, for a variety of reasons having nothing to do with their performance, became specific targets of the President, *via* a novel assertion of the President's authority under Article II to fire employees without just cause, notice, or any due process despite clear congressional commands to the contrary. That assertion of Article II authority constitutes a broad challenge to the constitutionality of the Civil Service Reform Act ("CSRA"). At the same time, the President has (1) asserted his authority to fire Members of the Merit Systems Protection Board ("MSPB" or "Board"), the agency charged with enforcing the CSRA; (2) actually fired one Member of the Board without cause; (3) asserted his authority to fire MSPB Administrative Judges[1] without cause; (4) actually fired executive branch judges without cause, (5) asserted his authority to instruct the Board and its Administrative Judges on how they must construe federal law, including the CSRA, in specific, pending cases; and (6)

---

[1] The MSPB Administrative Judges function like Administrative Law Judges in other agencies but are called Administrative Judges.

1

actually instructed, via his Department of Justice, a MSPB Administrative Judge how to construe federal law in a case parallel to this one.

And now, in the subject Motion, Defendants assert Ms. Comans must proceed to challenge the President's direction to terminate her and his novel assertion of Article II authority before the very agency he now controls – the MSPB. That is wrong, at least in the limited pool of cases where the President, invoking his Article II authority, fired the employees. The President's unprecedented assertion of unilateral power to fire federal employees as well as over the agency Congress created to protect them from the President, mandates that this Court retain jurisdiction over this case.

## ARGUMENT

All Defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(1) on the grounds that this Court lacks subject matter jurisdiction. But the Complaint properly pleads jurisdiction under 28 U.S.C. § 1331, as all the causes of action arise under the Constitution or the laws of the United States – (1) deprivation of property without due process, (2) deprivation of liberty without due process, (3) violation of Article I and II of the U.S. Constitution, (4) violation of the Administrative Procedures Act ("APA") (ultra vires), (5) violation of the APA (contrary to law), (6) Declaratory Judgment Act, and (7) Mandamus. Complaint ¶¶ 1, 35-60. Therefore, the Motion to Dismiss should be denied.

The Supreme Court has made clear that "federal courts are vested with a 'virtually unflagging obligation' to exercise the jurisdiction given them" and "'have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.'" *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992) (quoting *Colo. River Water Conservation Dist.*

2

*v. United States,* 424 U.S. 800, 817–818 (1976) and *Cohens v. Virginia,* 6 Wheat. 264, 404 (1821)).

Defendants nevertheless argue that this Court lacks jurisdiction because Ms. Comans was obligated to bring all claims arising out of the termination of her employment to the MSPB. Yet, Defendants cannot point to any provision of the CSRA or any other statute that strips federal courts of jurisdiction over all cases arising out of the termination of federal employees. Rather, Defendants rely on three Supreme Court decisions that found congressional intent to "channel" ordinary claims arising out of adverse employment actions to the MSPB implicit in the CSRA.

Defendants' reliance on those prior precedents is misplaced for two reasons. One, as the Fourth Circuit has held, the central rationale of the prior decisions no longer applies given the President's unprecedented actions that have eliminated the independence of the MSPB. Two, Defendants' unprecedented claim that the CSRA is unconstitutional as applied to the President when he invokes his Article II authority is not the type of claim Congress intended to channel to the MSPB.

As Defendants acknowledge, the fountainhead of channeling jurisprudence is the Supreme Court's decision in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994). The parties agree that this Court must apply the "two-step inquiry" set forth in that case. *Id*. at 207. At the first step, the Court must determine if a congressional intent to strip District Courts of their ordinary jurisdiction to resolve federal questions is "fairly discernible in the statutory scheme." *Id*. Here, the Fourth Circuit has made that determination concerning Congress' intent: "Congress intended for the [CSRA] to strip district courts of jurisdiction *only if* federal employees were otherwise able to receive . . . independent review of their claims." *Nat'l Ass'n of Immigration Judges v. Owen*, 139 F.4th 293, 304 (4th Cir. 2025), *petition for cert. pending* ("*NAIJ*")

3

(emphasis added). That is no longer the case and *only* if step one favors channeling may the Court proceed to the second step and then, require proceeding before the agency only if the plaintiff's "claims are of the type Congress intended to be reviewed" by that agency. *Thunder Basin*, 510 U.S. at 212. Defendants' argument fails at step one. But, even if it did not, Defendants' argument also fails at step two.

I.    **APPLICATION OF THE FIRST PRONG OF THE *THUNDER BASIN* TEST REQUIRES THIS COURT TO RETAIN JURISDICTION**

At the first step, the Court must determine if a congressional intent to strip District Courts of their ordinary jurisdiction to resolve federal questions is "fairly discernible in the statutory scheme." *Id*. at 207. Defendants argue that such congressional intent is expressed in the CSRA, but they are wrong as the Fourth Circuit held and for the additional reasons set forth below.

**A. The Lynchpin of the CSRA Was an Independent MSPB**

The CSRA established a process through which federal employees may enforce their rights that is centrally premised on the independence of the MSPB and its Administrative Judges who adjudicate employee appeals. But now, unlike during the period when the three cases cited by Defendants were decided, those decision-makers are not independent. Both the MSPB Members and its Administrative Judges are being directed by and can be summarily fired by the President. That is particularly problematic when the question of whether the President, exercising his Article II authority, may fire Ms. Comans without just cause or any process is the sole issue here. Congress did not intend to relegate federal employees to a process controlled by the very individual whose authority is being challenged.

"[W]hether a statute is intended to preclude initial judicial review is determined from the statute's language, structure, and purpose, its legislative history, and whether the claims can be afforded meaningful review." *Id.*. at 207 (internal citation omitted). In the prior cases, the

4

Supreme Court relied on "the painstaking detail with which the CSRA sets out the method for covered employees to obtain review of adverse employment actions," to conclude that "it is fairly discernible that Congress intended to deny such employees an additional avenue of review in district court." *Elgin v. Dep't of the Treasury*, 567 U.S. 1, 11-12 (2012); *see also United States v. Fausto*, 484 U.S. 439, 443 (1988) (explaining CSRA "prescribes in great detail the protections and remedies applicable to such actions, including the availability of administrative and judicial review"). Since those decisions, however, key "detail[s]" of the CSRA have been altered. In fact, the centerpiece of the CSRA has been destroyed.

The system of administrative adjudication that the courts have previously held precluded district court jurisdiction was founded on the central role and corresponding independence of the MSPB. In *Fausto*, for example, the Court described "the primacy of the MSPB for administrative resolution of disputes over adverse personnel action." 484 U.S. at 449. Given that the MSPB was created to adjudicate appeals by employees of adverse personnel actions taken by federal departments and agencies (most of which are headed by officers who serve at the pleasure of the President), Congress created the MSPB as an *independent* agency insulated from influence by those entities and the President. The express terms of the Act, its structure, and its legislative history make that clear. *See id.* at 444.

First, the text of the CSRA was intended to prevent the President from removing Members of the MSPB without cause. *See* 5 U.S.C. § 1202(d). Similarly, the Board's Administrative Judges are statutorily protected from removal without cause. *See id.* at § 7513(a); *McIntosh v. Dep't of Defense*, 53 F.4th 630, 640 (Fed. Cir. 2022). The MSPB appoints its Administrative Judges, and the CSRA specifically insulates the MSPB's employment decisions

from "approval or supervision of the Office of Personnel Management or the Executive Office of the President." 5 U.S.C. § 1204(j).

Second, the structure of the CSRA reinforces the centrality of the independence of the MSPB. The Act established a bipartite structure, creating both the MSPB and the Office of Personnel Management ("OPM"). OPM serves as "the arm of the President in matters of personnel administration." Civil Service Reform Act of 1978, S. Rep. 95-969 at 24 (July 10, 1978). The MSPB, in contrast, plays a quasi-judicial role, adjudicating appeals from personnel actions taken by agencies on the advice of the OPM and thus the President. *Id.*; 5 U.S.C. § 1204(a). By statute, no more than two Members of the MSPB are permitted to be from the same political party, to ensure that federal employees are "protected against arbitrary action, personal favoritism, or coercion for partisan political purposes." *Id*. at §§ 1201, 2301(8)(a). MSPB Members notably serve staggered, seven-year terms—terms longer than that guaranteed to a newly-elected President, thereby preventing a new President from immediately appointing all Members of the Board. *Id.* at § 1202(a); Office of Legal Counsel, U.S. Dep't of Justice, Opinion 79-65, Merit Systems Protection Board – Terms of Office, 3 Opinions of the OLC 351, 355 (Sept. 8, 1979) ("Congress has consistently provided for the systematic staggering of the terms of the heads of the major multimember independent agencies.").

Third, the Act's legislative history further supports the conclusion that Congress premised any intention to displace district court jurisdiction on an independent MSPB. President Carter, in his Federal Civil Service Reform Message to Congress, which transmitted the package of reforms that became the CSRA, explained that the reforms were intended to "*ensure* that employees and the public are protected against political abuse of the system." Jimmy Carter, *Federal Civil Service Reform Message to the Congress*, The American Presidency Project (Mar.

2, 1978), https://www.presidency.ucsb.edu/documents/federal-civil-service-reform-message-the-congress. The message made clear that the President intended the reforms to insulate adjudication from direct control of the President. President Carter explained that the Civil Service Commission, whose functions the CSRA split between OPM and the MSPB, had "assumed . . . inherently conflicting responsibilities. It serves simultaneously both as the protector of employee rights and the promoter of efficient personnel management policy. It is a manager, rulemaker, prosecutor and judge." *Id*. President Carter "propose[d] to correct the inherent conflict of interest within the Civil Service Commission by . . . replacing it with a Merit Protection Board and Office of Personnel Management." *Id*. The Merit Board "will be headed by a bipartisan board of three members . . . removable only for cause." *Id*. "This structure will guarantee independent and impartial protection to employees." *Id*.

The Senate Report on what became the CSRA similarly explains that the legislation created an administrative system of adjudication that was to serve as "a vigorous protector of the merit system"—the centerpiece of which was "a strong and independent [MSPB]." S. Rep. 95-969 at 6–7. Congress intended to eliminate the "spoils" system of the 19th century, in which employees were hired and fired based on "political or personal favoritism." *Id.* at 2–3. "The lack of adequate protection [against partisan pressures] was painfully obvious during the civil service abuses" of the past. *Id.* at 6–7. Congress sought to ensure that employees were "hired and removed on the basis of merit" and "competence." *Id.* at 2–3.

An MSPB independent of the President was intended to be "'the Cornerstone' of Civil Service Reform." *Id.* at 7. In order to effectuate the purpose of preserving the merit system by preventing partisan intervention, the Senate Report recognized that the MSPB had to be "insulated from the kind of political pressures that [had] led to violations of merit principles in

7

the past." *Id.* at 7. The Report explained that "absent such a mandate for independence for the merit board, it is unlikely that [the bill] would have granted the Office of Personnel Management the power it has or the latitude to delegate personnel authority to the agencies." *Id.* The CSRA thus incorporated President Carter's recommendation by "provid[ing] for an independent merit systems protection board . . . to adjudicate employee appeals and protect the merit system." *Id.* at 2. Congress repeatedly stressed the centrality of a MSPB free from "*any control or direction by the President.*" *Id.* at 24 (emphasis added).

Reviewing the text, structure, and legislative history of the CSRA, the Fourth Circuit recently concluded that "[t]he CSRA's adjudicatory scheme was predicated on the existence of a[n] . . . independent MSPB." *NAIJ*, 139 F.4th at 304. "[T]he CSRA was designed to protect the independence of the agencies reviewing federal employees' claims." *Id.* at 305-06. The CSRA "requires a[n] . . . independent [MSPB]." *Id.* at 299. In particular, Congress "intended [the MSPB] to be fully independent from the president." *Id.* at 306. In a holding that applies directly to this case, the Court concluded, "Congress intended for the [CSRA] to strip district courts of jurisdiction *only if* federal employees were otherwise able to receive . . . independent review of their claims." *Id.* (emphasis added).

The facts that now exist indicate even more strongly than when *NAIJ* was decided that Congress did not intend to relegate Ms. Comans' claims to the MSPB. Notably, in questioning the independence of the MSPB, the Fourth Circuit at the time it decided *NAIJ* did not even consider several of the more recent changes described below, including (a) the D.C. Circuit upholding the President's removal of a Member of the MSPB without cause, (b) the President's assertion of authority to remove Administrative Law Judges and MSPB Administrative Judges, (c) the President's or his Attorney General's removal of almost 100 Immigration Judges via an

8

assertion of the President's Article II authority, and (d) the President's assertion of authority to inform all executive branch agencies how to construe federal law and the President, *via* the Justice Department, giving such instructions in specific, pending cases involving the assertion of Article II authority to fire employees. Moreover, the action under review in *NAIJ* did not involve the President's direct assertion of authority under Article II to fire an employee. For all of those reasons, this case presents an even more compelling case for a reassessment of congressional intent "in light of changing circumstances around the MSPB." *Id.*

### B. The MSPB Is No Longer Independent

Unlike when the three Supreme Court cases that addressed the channeling issue were decided, now, an independent MSPB no longer exists and thus there is no longer a discernable congressional intent to channel Ms. Comans' claims to the MSPB. This is true for three separate reasons.

#### 1. The President Has Fired a Member of the MSPB Without Cause

First, for the first time since the CSRA was enacted into law, nearly 50 years ago, the President has taken the position that he can remove Members of the MSPB without cause despite Congress' express statutory prohibition of such removals. In fact, President Trump removed a Member of the Board without cause, and the D.C. Circuit upheld the action. *See Harris v. Bessent*, 160 F.4th 1235 (D.C. Cir. Dec. 5, 2025).[2]

#### 2. The President Asserts the Right to Fire MSPB Administrative Judges Without Cause

Second, the President has also taken the unprecedented position that he can remove

---

[2] Even if the Supreme Court at some later time reverses the decision in *Harris*, and no cert petition is pending at this time, the agency would still not be independent for the second and third reasons explained in §§ I(B)(2) and (3) *infra*.

Administrative Judges who conduct hearings and issue preliminary decisions for independent agencies, including the MSPB, despite Congress' express statutory prohibition of such removals in 5 U.S.C. § 7513(a)[3] and the CSRA's novel, express insulation of the MSPB's employment decisions, including decisions about Administrative Judges, from "approval or supervision of the Office of Personnel Management or the Executive Office of the President." 5 U.S.C. § 1204(j). *See* Acting Solicitor General Sarah M. Harris to Hon. Charles Grassley, *Multilayer Restrictions on the Removal of Administrative Law Judges* (Feb. 20, 2025), https://iptp-production.s3.amazonaws.com/media/documents/2025.02.20_DOJ_letter_re_ALJs.pdf ("the Department of Justice has concluded that the multiple layers of removal restrictions for administrative law judges (ALJs) in 5 U.S.C. 1202(d) and 7521(a) violate the Constitution, that the Department will no longer defend them in court, and that the Department has taken that position in ongoing litigation"); *Statement of Justice Department Chief of Staff Chad Mizelle*, DOJ (Feb. 20, 2025), https://www.justice.gov/opa/pr/statement-justice-department-chief-staff-chad-mizelle (*"The Department of Justice determined that multiple layers of removal restrictions shielding administrative law judges (ALJs) are unconstitutional. Unelected and constitutionally unaccountable ALJs have exercised immense power for far too long. In accordance with Supreme Court precedent, the Department is restoring constitutional accountability so that Executive Branch officials answer to the President and to the people."*).[4]

---

[3] The Federal Circuit held that Section 7513(a) applies to MSPB Administrative Judges in *McIntosh*, 53 F.4th at 640.

[4] The President, *via* the Attorney General invoking the President's Article II authority, has, in fact, removed 98 immigration judges as of December 6, 2025. *See* Emily Ngo, *Immigration courts thrown into chaos as Trump administration purges dozens of judges*, POLITICO (Dec. 6, 2025), https://www.politico.com/news/2025/12/06/trump-immigration-court-judge-purges-00679376?utm_medium=twitter&utm_source=dlvr.it. Therefore, the specter of removal if an Administrative Judge disagrees with the President concerning his authority under Article II to summarily fire Ms. Comans is very real.

3. **The President Asserts the Authority to Instruct the MSPB and Its Administrative Judges on How to Construe and Apply the Law, Including in Specific, Pending Cases Involving His Exercise of Claimed Article II Authority to Fire Employees**

Finally, the President has taken the unprecedented position that he has the constitutional authority to direct all members of the Executive Branch, including Members of the MSPB and MSPB Administrative Judges, as to how they must interpret and apply federal law. In Executive Order 14215 (Feb. 18, 2025), https://public-inspection.federalregister.gov/2025-03063.pdf, the President declared:

> The President and the Attorney General, subject to the President's supervision and control, shall provide authoritative interpretations of law for the executive branch. The President and the Attorney General's opinions on questions of law are controlling on all employees in the conduct of their official duties. No employee of the executive branch acting in their official capacity may advance an interpretation of the law as the position of the United States that contravenes the President or the Attorney General's opinion on a matter of law.

*Id*. § 7. The Order is expressly applicable to formerly independent agencies such as the MSPB. *See id*. §§ 1, 2(b), 5.

And, in fact, the President, *via* the Office of Legal Counsel, has already informed MSPB judges that they must follow the President's construction of the law and, *via* the Department of Justice, directed judges in specific cases to do so.

On September 26, 2025, in direct response to the first MSPB Administrative Judge decision (adverse to the government) concerning the President's assertion of Article II authority to fire a federal employee, *Jaroch v. Dep't of Justice* No. DA-0752-25-0328-I-1 (MSPB Aug. 22, 2025) (Exhibit 7),  Counsel to the President requested and the Office of Legal Counsel at the Department of Justice issued an opinion addressing "The Merit Systems Protection Board's Authority to Adjudicate Constitutional Questions within an Administrative Proceeding," https://www.justice.gov/olc/media/1415466/dl ("OLC Opinion"). Whether the MSPB has

11

authority to adjudicate constitutional questions is a contested issue in a select number of cases pending before the MSPB, like this one, where the President invoked his authority under Article II to terminate employees without just cause or any due process. The OLC Opinion concluded, "MSPB administrative judges must adjudicate the constitutional issue raised by the Agencies." *Id*. at 12.

The Department of Justice immediately conveyed that direction to the Board and its Administrative Judges by filing the OLC Opinion in the two lead cases addressing the Article II issue. *Jackler v. Dep't of Justice*, No. DA-0752-25-0330-I-1 (MSPB), and *Jaroch v. Dep't of Justice* No. DA-0752-25-0328-I-1 (MSPB), and asserted that the OLC Opinion was binding on the Board and its Administrative Judges and therefore required that the contrary opinion of the Chief Administrative Judge be vacated "as it does not represent the legal position of the Executive Branch." Exhibit 1 at 3 (Agency's Motion for Leave to File Additional Pleading and Alternative Motion to Remand, *Jackler v. Department of Justice*, No. DA-0752-25-0330-I-1 (MSPB Sept. 27, 2025)). Thus, the President is taking the position that not only can he fire Members of the MSPB and MSPB Administrative Judges, but he can also instruct the Board Members and Administrative Judges on how to interpret and apply the law, including in specific pending cases challenging his personal assertion of power to fire an employee. He can then fire the Board Members or Administrative Judges without cause if they disobey. A more thoroughgoing rejection of the fundamental premise of the remedial scheme created by Congress in the CSRA – the independence of the MSPB – is hard to imagine.

4.  **This Case Involves a Direct Assertion of Presidential Power to Fire Employees, At the Same Time the President Has Assumed Control of the MSPB**

The President's actions depriving the MSPB of all independence are particularly problematic in cases where he is advancing a novel assertion of Article II authority to fire federal

12

employees, including Ms. Comans, without just cause or any due process. In other words, these are not cases where departments or agencies have made separate and independent decisions to fire or otherwise discipline particular employees. Here, the government asserts that the President invoked his Article II authority to fire Ms. Comans, and the government asserts that that permits her termination without cause or process. Complaint ¶¶ 13, 17.

Since the current President assumed office the second time, the government has asserted that there is a difference between ordinary terminations of federal employees by their employer agencies and terminations directed by the President using his Article II power. In parallel litigation, the government has taken the position that "Congress has granted *agencies* authority to remove employees pursuant to Chapter 75 [of 5 U.S.C., *i.e.*, for cause and after notice and due process] that statutory authority is separate and distinct from the President's inherent removal authority under Article II." Exhibit 2 at 4 (Agency Closing Brief and Motion to Dismiss, *Comans v. Dep't of Homeland Security*, No. DC-0752-25-1783-l-1 (MSPB)). The government has distinguished "the President's . . . constitutional removal authority, as opposed to, for example, routine administrative discipline procedures." Exhibit 3 at 20-21 (Agency's Petition for Review, *Jackler v. Dep't of Justice*, No. DA-0752,25-0330-I-1 (MSPB)). According to the government, what determines whether the dismissal is an ordinary agency action or an exercise of the President's constitutional authority is what the notice states. Exhibit 2 at 4 (Agency Closing Brief, *Comans*). Here, Ms. Comans' notice of termination states, "This action is being taken pursuant to Article II of the United States Constitution, at the direction of the President." Complaint ¶ 17.

Of course, the vast majority of terminations and other discipline of federal employees are not ordered by the President asserting his Article II authority. While there is no definitive source,

13

Plaintiff's counsel, who have extensive federal employment practices, represent that they believe the President's Article II authority has been invoked only with respect to particular targets of the President, such as Ms. Comans; employees who worked on the January 6th prosecutions or with Special Counsel Jack Smith; immigration judges perceived as hostile to the President's immigration agenda; and others who have, for whatever reasons, invoked the President's ire. Exhibit 5 (Burakiewicz Decl.) ¶ 2.[5]

Congress did not intend to force employees to challenge such presidential actions before an agency controlled and directly answerable to the President. Under the current circumstances, a congressional intent to displace general federal question jurisdiction is no longer "fairly discernible in the statutory scheme" at least as to adverse actions directed by the President invoking his Article II authority. Therefore, this Court should retain jurisdiction.

### C. Resort to the MSPB Would Be Futile for Ms. Comans

Retention of jurisdiction by this Court is not only commanded by step one of the *Thunder Basin* analysis but by traditional futility doctrine as well. Of course, the Supreme Court "has consistently recognized a futility exception to exhaustion requirements." *Carr v. Saul*, 593 U.S. 83, 93 (2021). "It makes little sense to require litigants to present claims to adjudicators who are powerless to grant the relief requested." *Id.* That is clearly the case here, where the President has directed the Plaintiff's termination and where the President has directed that the Board and its Administrative Judges must not only follow the President's construction of the law, but that they can be fired if they do not do so.

"Resort to the administrative process is futile if the agency will almost certainly deny any

---

[5] As explained in note 13 *infra*, this can be confirmed in discovery, if necessary to establish jurisdiction.

14

relief." *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 107 (D.C. Cir. 1986). Thus, for example, the Supreme Court concluded, "in view of [the] Attorney General's submission that the challenged rules . . . were 'validly and correctly applied to petitioner,' requiring administrative review through a process culminating with the Attorney General 'would be to demand a futile act.'" *McCarthy*, 503 U.S. at 148 (quoting *Houghton v. Shafer*, 392 U.S. 639, 640 (1968)). Here, the Defendants assert that the President had authority to terminate Ms. Comans without just cause or any due process. To require Ms. Comans to resort to a process in which the President can both dictate the outcome and remove the decision-makers if they disagree would therefore demand a futile act.

### D.  Defendants' Arguments to the Contrary Are Unavailing

Nothing in the three decisions cited by Defendants, all of which preceded the radical and unprecedented changes at the MSPB described above, contradicts this analysis. Defendants rely on the Supreme Court's decisions in *Elgin* and *Fausto*, but both of those decisions repeatedly emphasize the detailed process created by Congress as we have explained. The Court has consistently pointed to the "comprehensive nature of the CSRA," that the Act "prescribes in great detail the protections and remedies applicable to adverse personnel actions," that the Act "exhaustively details the system of review before the MSPB," the "CSRA's structure," the "painstaking detail with which the CSRA sets out the method for covered employees to obtain review of adverse employment actions," and the fact that the CSRA created an "integrated scheme of administrative and judicial review." *Elgin*, 567 U.S. 10-13; *Fausto*, 484 U.S. at 443, 445, 448. Critical "detail[s]" of the "comprehensive system" have now been unilaterally eliminated by the President. *Fausto*, 484 U.S. at 443; *Elgin*, 567 U.S. at 5.

Those decisions clearly would not have been the same if the Court had been aware that a central element of the "comprehensive" and "integrated" scheme of review Congress believed it was creating – the independence of the MSPB – was no longer in place. Indeed, one of the two "structural elements" of the Act that the Court found "important" in *Fausto* was "the primacy of the MSPB." 484 U.S. at 449. That "primacy" no longer exists after the President removed a Member without cause and instructed the Board and its Administrative Judges that they are bound to follow his construction of the law. And, correspondingly, Congress' intention to "enable[] the development, through the MSPB, of a unitary and consistent Executive Branch position on matters involving personnel action" has been equally frustrated by the President's assertion of authority over the development of the law. The logic of both *Elgin* and *Fausto* makes clear that the Court would not conclude that Congress intended to preclude district court jurisdiction under the current facts.

Congress never intended to force employees who were fired by the President asserting his Article II authority to take their appeals to an agency the President controls and where the effort would clearly be futile.

For this reason alone, this Court should exercise jurisdiction to adjudicate the merits of this dispute.

II.    **APPLICATION OF THE SECOND PRONG OF THE *THUNDER BASIN* TEST REQUIRES THIS COURT TO RETAIN JURISDICTION**

Even if consideration of the first prong was not dispositive, the second prong of the *Thunder Basin* test also requires that this Court retain jurisdiction. The second prong requires courts to consider "whether [the] claims are of the type Congress intended to be reviewed within this statutory structure." 512 U.S. at 212. That is not the case here where Defendants make the

16

unprecedented claim that the CSRA is unconstitutional as applied to the President when he invokes his Article II authority.

## A. Congress Did Not Intend Broad, Structural, Constitutional Challenges to the MSPB's Organic Statute to Be Reviewed by the MSPB

In *Thunder Basin* itself, the Court reaffirmed long-standing precedent holding "that [a]djudication of the constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies." *Id*. at 215. And that is exactly what is at issue here. Defendants argue that the CSRA is unconstitutional as applied to any personnel action taken by the President pursuant to his Article II powers. Lest there be any doubt about whether that is, in fact, Defendants' position, in a parallel case before the MSPB involving the termination of an immigration judge pursuant to Article II, the Department of Justice stated that the employees' "reading of the CSRA[, *i.e*., that it applies to the President and his Department heads even when they involve the President's Article II powers,] would render it unconstitutional under Article II." Exhibit 3 at 19 (Agency's Petition for Review, *Jackler v. Dep't of Justice,* No. DA-0752-25-0330-I-1 (MSPB)).

A claim that the CSRA is unconstitutional is not the type of claim Congress intended to be reviewed by the MSPB, as the MSPB itself has repeatedly held. *See, e.g.*, *Special Counsel v. Gallagher*, 44 M.S.P.R. 57, 73 (1990) ("the Board lacks authority to adjudicate the constitutionality of a statute"); *Malone v. Dep't of Justice,* 14 M.S.P.R. 403, 406 (1983) ("administrative agencies are without authority to determine the constitutionality of statutes").[6]

---

[6] In fact, the government initially moved to dismiss Ms. Comans' MSPB appeal on the grounds that the Board could not address the constitutional issues at stake because "it is well established that the Board has not been given jurisdiction through any law, rule or regulation over such constitutional law claims." Exhibit 4 at 6 (Agency Narrative Response and Motion to Dismiss for Lack of Jurisdiction, *Comans*). It also argued that the Board lacked jurisdiction over the appeals because the employees were removed "at the direction of the President pursuant to Article II."

To be sure, *Thunder Basin* makes clear that the existence of a constitutional question does not always preclude channeling, 510 U.S. at 215, as does *Elgin*, 567 U.S. at 10. But the government's argument in this case is not that the MSPB can adjudicate whether another agency violated the Constitution in the specific action it took concerning a single employee, as was the argument in cases in which the MSPB has considered constitutional claims and in *Elgin*,[7] but rather that the MSPB itself would violate the Constitution if it applied the CSRA in any way to an employment action directed by the President invoking his Article II authority. That is a broad challenge to the MSPB's own organic statute. The government argues that the MSPB is without authority under the Constitution to deem unlawful any adverse action taken by the President. This is a novel, structural, constitutional challenge to Congress' authority to constrain the President. The Supreme Court has made clear that "agency adjudications are generally ill suited to address structural constitutional challenges." *Carr*, 593 U.S. at 92.

### B. *Free Enterprise Fund* Is Controlling

The Supreme Court's decision in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010), which held a plaintiff did not have to proceed through an agency review process, is controlling here. In *Free Enterprise Fund*, the plaintiff objected to the

---

*Id*. The government did not withdraw these arguments until after Ms. Comans filed this action. *Compare* Complaint (July 24, 2025) *with* Exhibit 6 (Agency Withdrawal of Jurisdictional Objections, *Comans* (Sept. 4, 2025).

[7] *See, e.g., Special Counsel v. Jackson*, 119 M.S.P.R. 175, 179 (2013) (employee argued that agency "violated [employee's] due process and equal protection rights by selectively enforcing the Hatch Act"); *Brooks v. OPM*, 59 M.S.P.R. 207, 209, 215 n.7 (1993) (employees challenged agency construction of statute that caused them to be "denied military service credit for reduction-in-force (RIF) retention purposes and for accrual of annual leave" on the grounds that it deprived them of equal protection"). And, of course, *Elgin* also involved a constitutional challenge to discrete actions taken by an agency employer, *i.e.*, firing employees for failure to register for the draft (and the Court did not hold that the MSPB could or should address the argument). *See* 567 U.S. at 6-8.

Oversight Board's application of the law to the plaintiff, given the statutory insulation of Board Members from removal. The plaintiff, the Court observed, "[o]bjects to the Board's existence, not to any of its auditing standards." *Id*. at 490. Similarly, the government here objects to the MSPB's application of the law to the President, not to any of its constructions of the law. The government raises "a 'standard' issue of . . . constitutional law, relating not at all to 'considerations of [MSPB] policy" and "'outside the [MSPB's] competence and expertise.'" *Axon Enterprises, Inc. v. FTC*, 598 U.S. 175, 188 (2023)(quoting *Free Enterprise Fund*, 561 U.S. at 491).

That *Free Enterprise Fund* is controlling here is conclusively established by the Court's reasoning in *Axon*. There, the Court expressly posed the question as "whether the cases before us are more like *Thunder Basin* and *Elgin* or more like *Free Enterprise Fund*." *Axon*, 598 at 189. In reasoning that is directly on point here, the Court explained that the case was more like *Free Enterprise Fund* because the challenges "are not to any specific substantive decision. . . . [Rather the plaintiff] charge that an agency is wielding authority unconstitutionally in all *or a broad swath of its work*." *Id*. (emphasis added). Here, just as in *Axon* and *Free Enterprise Fund*, the argument is that the MSPB would "wield[] authority unconstitutionally in . . . a broad swath of its work" if it applies the CSRA to any employment decisions made or directed by the President invoking his Article II authority. This is most certainly not the form of discrete, specific, and as-applied constitutional argument advanced by an employee in respect to an employing agency's action that the MSPB must address in the first instance.

That the government's argument would effectively render the CSRA a nullity is made clear by the fact that the President and various Department heads have not limited their argument to inferior officers, Senior Executive Service ("SES") employees, or other high-ranking

19

employees. Rather, the administration has asserted the President's alleged Article II authority to fire any and all employees at any rank, including those at grade levels as low as GS-9. *See* Exhibit 5 (Burakiewicz Decl.) ¶ 4; Sarah N. Lynch & Andrew Goudsward, *US Justice Department Fires Several More Employees From Jack Smith's Team, Sources Say*, REUTERS (July 14, 2025), https://tinyurl.com/2fp8k9k6. In other words, while the government does not yet argue that the CSRA is unconstitutional in its entirety, it does argue that it cannot constitutionally be applied to any adverse actions directed by the President or a Department head invoking the President's Article II authority, thus effectively allowing the executive branch to do an end run around the Act in every case in which the President wishes to do so.

Addressing the government's argument that it can violate the CSRA so long as the President wishes to do so would require the Board "to question its own statutory authority" and "to disregard . . . instructions Congress has given it." *Riggin v. Off. of Senate Fair Emp. Pracs.*, 61 F.3d 1563, 1569–70 (Fed. Cir. 1995). And "[a] finding that the agency lacks jurisdiction to decide constitutional questions is especially likely when the constitutional claim asks the agency to act contrary to its statutory charter." *Id*. at 1569. Such a finding is appropriate here as the MSPB's Chief Administrative Judge concluded in *Jaroch* (Exhibit 7):

> These contentions are, in essence, a challenge to the constitutionality of the removal protections afforded by [the CSRA]. . . .[T]he agency is asking the Board to invalidate one or more of the provisions of the statute. . . . The Board has long recognized that administrative agencies are without authority to determine the constitutionality of statutes.

*Id*. at 6-7.

Therefore, this Court must retain jurisdiction under *Thunder Basin* step two as well as step one.[8]

---

[8] As explained above, this Court need not address the question of judicial review in order to retain jurisdiction under either step one or two of *Thunder Basin.* The Court observed in its

### III.    FORCING MS. COMANS TO PROCEED BEFORE THE MSPB WOULD SUBJECT HER TO A "HERE AND NOW INQUIRY" UNDER *AXON*

Not only are the Defendants wrong when the *Thunder Basin* test is applied to the current situation at the MSPB in a case where the President directed the termination, forcing Ms. Comans to proceed before the MSPB would inflict a "here and now injury" on her under *Axon*. Indeed, this case is the precise mirror image of *Axon* with the only difference being that the administrative tribunal's current procedures violate Article I and not Article II.

In *Axon*, plaintiffs brought actions in federal district court seeking to enjoin actions pending before Administrative Law Judges under the Securities and Exchange Act and Federal Trade Commission Act on the grounds that those agencies were unconstitutional in structure. As here, the agencies argued that the plaintiffs could only make those arguments before the agency and then in court but only on review of final agency action. But the Court rejected the channeling argument.

The Court found that later review of agency action by a court of appeal was insufficient because the plaintiffs would already have been harmed by "'being subjected' to 'unconstitutional agency authority.'" 598 U.S. at 191. That, the Court found, "is 'a here-and-now injury. . . . impossible to remedy once the proceeding is over, which is when appellate review kicks in.'" *Id*. What the Defendants argue for here is precisely what the Court concluded in *Axon* could not be done, forcing Ms. Comans into "an illegitimate proceeding, led by an illegitimate

---

discussion of step two that it had "previously . . . upheld district court jurisdiction over claims considered "wholly 'collateral'" to a statute's review provisions and outside the agency's expertise, . . . *particularly* where a finding of preclusion could foreclose all meaningful judicial review." 510 U.S. at 212-13 (emphasis added). "[P]articularly" most certainly does not mean "only." Moreover, here, while review in the Federal Circuit would be available after an adverse decision by the MSPB, that review would not be "meaningful" because of the deference the court would owe the now not-independent agency as the agency's findings of fact would be subject to a deferential "substantial evidence" standard under 5 U.S.C. § 7703(c)(3).

decisionmaker." *Id*.

The only difference between this case and *Axon* is in the manner in which the agencies' procedures violate the separation of powers. In *Axon*, the Court found that the statutes creating the agencies infringed on the President's authority under Article II. Here, the President's removal of a Member of the MSPB, threat to remove MSPB Administrative Judges, and assertion of authority to instruct both Members and Judges how to construe and apply the law in particular cases invades Congress' authority under Article I.[9] But *Axon*'s holding is still controlling. Ms. Comans cannot be forced to submit to "unconstitutional agency authority" and later judicial review cannot remedy the harm that would inflict on her.

## IV.    THIS COURT MUST RETAIN JURISDICTION OVER MS. COMANS' LIBERTY INTEREST CLAIM

Even if this Court determines that it may not retain jurisdiction over all of Ms. Comans' claims arising solely out Ms. Comans' termination, it must retain jurisdiction over her claim that Defendants deprived her of liberty without due process. Regardless of whether Ms. Comans was protected by the CSRA and whether she has a right to appeal her *termination* to the MSPB, (1) she undeniably had a liberty interest that could not be infringed without due process, (2) that liberty interest was infringed, (3) she was not and has not been accorded any form of hearing,

---

[9] While the D.C. Circuit upheld the President's termination of Board Member Harris, the Fourth Circuit has not and while the Supreme Court is currently considering whether the President can remove a Federal Trade Commissioner without cause despite the for cause protection afforded by the FTC Act in *Trump v. Slaughter*, No. 25-332, at this time, *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), remains the law and, even it is overturned as to the FTC in *Slaughter*, the decision will not govern the MSPB and its logic is unlikely to extend to the MSPB both because the MSPB is a purely adjudicatory agency (compared to the modern FTC) and because Congress created an independent MSPB precisely to check executive branch abuses. *See* Brief of Amicus Curiae Cathy Harris in Support of Neither Party, *Slaughter*. At this time, therefore, the Court must consider the well-established exception to the President's removal power for multi-member, bipartisan agencies to be fully applicable and thus must consider the President's removal of a Member of the MSPB unlawful.

22

and(4) her liberty interest claim is not cognizable by the MSPB.

### A.  Ms. Comans' Liberty Interest Claim

In *Board of Regents v. Roth*, 408 U.S. 564 (1972), the Court made clear that when a public employer makes charges against an employee related to the termination of the employee's employment that "might seriously damage his standing and associations in his community,"  for example, "that he had been guilty of dishonesty, or immorality[,]. . . . notice and an opportunity to be heard are essential." *Id.* at 573. "In such a case, due process would accord an opportunity to refute the charge." *Id.* The Fourth Circuit followed *Roth* in stating, "[W]e have recognized that a loss of government employment accompanied by a public employer's stigmatizing remarks constitutes a deprivation of a liberty interest." *Shievinski v. Coast Guard*, 673 F.3d 308, 315 (4th Cir. 2012).

Such "stigmatizing remarks" were made about Ms. Comans in relation to her termination but not cited as formal grounds for her discharge. The Complaint alleges:

> The same day [that Ms. Comans was terminated] . . . , Defendant DHS, publicly issued a press release[10] that falsely and in a defamatory manner stated Ms. Comans had been fired "for circumventing leadership to unilaterally make egregious payments for luxury NYC hotels for migrants." . . . The release also stated that "[u]nder President Trump and Secretary Noem's leadership, DHS will not sit idly and allow deep state activists to undermine the will and safety of the American people." Ms. Comans' actions were widely and publicly, and falsely, called "illegal" and "criminal" by . . . Elon Musk [who was then a member of the Administration.]

Complaint ¶ 18. This Court may also take judicial notice of additional stigmatizing remarks by the Defendants and other federal officials. Defendant DHS' spokesperson, Tricia McLaughlin,

---

[10] Press Release, U.S. Dep't of Homeland Sec., Statement from a DHS Spokesperson on Termination of 4 FEMA Employees Who Made Payments to Luxury Hotels for Migrants (Feb. 11, 2025), https://www.dhs.gov/news/2025/02/11/statement-dhs-spokesperson-termination-4-fema-employees-who-made-payments-luxury.

23

told *The New York Times* on the day of Ms. Comans' termination that four FEMA employees had been terminated "for circumventing leadership to unilaterally make egregious payments for luxury N.Y.C. hotels for migrants." She also told the paper that those fired included the agency's chief financial officer, Mary Comans. McLaughlin continued, "Under President Trump and Secretary Noem's leadership, D.H.S. will not sit idly and allow deep-state activists to undermine the will and safety of the American people." *See* Luis Ferré-Sadurní, *Top FEMA Official Is Fired Over Payments for N.Y.C. Migrant Shelters,* NEW YORK TIMES (Feb. 11, 2025), https://www.nytimes.com/2025/02/11/nyregion/fema-fired-nyc-migrant-hotels.html. A spokesperson for DHS also told CNN the fired workers "effectively laundered the forbidden funding" and "knowingly hid this information from legal counsel to manipulate the funding process and undermine the Secretary's order." *See* Gabe Cohen, *"We're not preparing": As Trump officials vow to eliminate FEMA, the agency is already in turmoil*, CNNPOLITICS, (March 26, 2025), https://www.cnn.com/2025/03/26/politics/fema-payments-staffing-stalled-turmoil. Also on the same day, Elon Musk, then an official of the federal government, retweeted a tweet containing a photograph of Ms. Comans and the statement, "FEMA CFO Mary Comans was just fired for funneling $58M to illegal migrant hotels in Manhattan," and called it a "criminal action." Elon Musk (@elonmusk), X (Feb. 11, 2025, 11:05 AM), https://x.com/elonmusk/status/1889375112001892414. The President himself posted on Truth Social on the same day "FEMA spent millions of dollars in Democrat areas, disobeying orders…"Donald J. Trump (@realdonaldtrump), Truth Social (Feb. 11, 2025, 10:29 AM) https://truthsocial.com/@realDonaldTrump/posts/113985962341531654.

There is no question that those statements, which "impl[y] the existence of serious character defects such as dishonesty or immorality," are the "type of communication that gives

24

rise to a protected liberty interest." *Robertson v. Rogers,* 679 F.2d 1090, 1092 (4th Cir. 1982).

Indeed, *Cox v. N. Va. Transp. Comm'n,* 551 F.2d 555 (4th Cir. 1976), is directly on point. In that

case, the employee was not charged with any misconduct in the notice of termination, but

employer representatives made statements to the press that she was fired after an investigation of

financial mismanagement. The Court concluded, "Commissioners who granted interviews to

newspaper reporters publicly attributed [Cox's] discharge to the results of an investigation of a

financial scandal at the commission. As a consequence, her ability to obtain other employment

was impaired." *Id*. at 558. "Nor did the absence of formal charges of wrongdoing lessen the

injury to her reputation that was caused by the interviews the commissioners granted the

press. The opportunity of a discharged public employee to get a new job may be hampered as

badly by official leaks to the press insinuating dishonesty as by a published official reprimand. In

either event, therefore, the employee is entitled to a hearing." *Id*.[11]

Those false and stigmatizing public statements by federal officials implicated Ms.

Comans' liberty interests and entitled her to a name-clearing hearing before they were made.

"[C]ourts have uniformly held "that this opportunity to be heard 'must be granted at a

meaningful time.' . . . This is because . . . 'an opportunity to clear your name after it has been

ruined by dissemination of false, stigmatizing charges is not 'meaningful.'" *Cannon v. Village of

Bald Head Island,* 891 F.3d 489 (4th Cir. 2018) (internal citations omitted) (quoting *Sciolino v.

City of Newport News*, 480 F.3d 642, 653 (4th Cir. 2007)). "[T]he Fourteenth Amendment

required Defendants to afford the [employees] a constitutionally adequate name-clearing hearing

before *publicly disclosing* false information regarding the basis for the [employees']

---

[11] *Cox* and other cases make clear that to establish a liberty claim, the false statements need to be made in connection with the employee's discharge but need not be in the termination notice or other formal charge against the employee. *See* 551 F.2d at 558.

termination." *Id*. at 506 (emphasis in original).

Ms. Comans was not accorded any form of name-clearing hearing before or after the stigmatizing statements were made. Complaint ¶¶ 17, 19, 22, 43. Ms. Comans has thus been deprived of liberty without due process since February 11, 2025, and the deprivation continues day-to-day, exacerbating Ms. Coman's injuries. *See Lyons v. Barrett*, 851 F.2d 406, 411 (D.C. Cir. 1988) ("By its very nature, a name-clearing hearing is something that loses value the longer it is delayed.").

### B. Application of the Second Prong of the *Thunder Basin* Test Requires This Court to Retain Jurisdiction Over the Liberty Interest Claim

Before applying the second prong of *Thunder Basin* to Ms. Comans' liberty interest claim, it is illuminating to imagine what would happen if she attempted to make the claim before the MSPB. If this case were to proceed before the MSPB, the sole issue would be whether Article II gave the President authority to fire Ms. Comans without just cause, notice, or any due process. That is the government's sole defense. *See* Exhibit 8 (Agency Closing Brief and Motion to Dismiss, *Comans*). If Ms. Comans prevails on that issue, she would prevail solely because Defendant DHS cited no cause for her discharge and did not accord her the procedural rights she was entitled to under the CSRA. (That was the result in the one parallel case that an MSPB Administrative Judge has decided, *see Jaroch (See* Exhibit 7*)*. The Board would not and could not address Ms. Comans' liberty interest claim. The Board would not and could not grant Ms. Comans a name-clearing hearing because the falsity of the statements made about Ms. Comans is not relevant to whether her termination violated the CSRA as the allegations in the statements were not formally cited as grounds for her discharge. The Board would not and could not assess the damage to Ms. Comans' reputation caused by the false statements because such damage is not relevant to the legality of her termination under the CSRA. The Board would not and could

26

not grant Ms. Comans the form of compensatory damages she is entitled to based on the damage to her reputation due to the deprivation of liberty because the Board lacks authority to award compensatory damages. *Wilson v. Off. of Pers. Mgmt.*, No. DC-0831-13-0423-P-1, 2015 WL 502974 (M.S.P.B. Feb. 6, 2015) ("consequential damages are only awarded where the Board orders corrective action in a whistleblower appeal or a Special Counsel complaint, and compensatory damages are only awarded based on a finding of unlawful intentional discrimination or a violation under the Whistleblower Protection Enhancement Act of 2012."). For these reasons, it is evident that Ms. Comans could not bring her liberty interest claim before the MSPB.

Considering each of the factors identified by the *Thunder Basin* Court at step two confirms that the liberty interest claim is not "of the type Congress intended to be reviewed within this statutory structure." 510 U.S. at 212.

First, the absence of district court jurisdiction would "foreclose all meaningful judicial review." *Id.* The MSPB cannot consider the liberty interest claim, order Defendants to provide a name-clearing hearing, or award the forms of compensatory damages necessary to remedy the deprivation of liberty at issue. The CSRA does not permit either the MSPB or the Federal Circuit to award compensatory damages of the type needed to remedy a deprivation of liberty. And the *Thunder Basin* Court recognized that channeling is not required when the plaintiff makes "a colorable showing that full post deprivation relief could not be obtained." *Id.* at 213 (quoting *Mathews v. Eldridge*, 424 U.S. 319, 331 (1976)). Absent jurisdiction in this Court, Ms. Comans has "no other means, within [her] control . . . to protect and enforce [her] rights." *Id.* (quoting *Leedom v. Kyne*, 358 U.S. 184, 190 (1958)).

It is no answer to say that Ms. Comans can raise her liberty claim on appeal to the

27

Federal Circuit. The Court can only address issues adjudicated by the agency under the CSRA and the agency will not and cannot address the liberty interest claim. This situation is thus different from that in *Elgin* where the employees challenged their discharge and the Supreme Court held that the challenge had to be brought before the MSPB even if the Board could not consider the employees' argument that the discharge for failure to register for the draft was unlawful because the Selective Service law was unconstitutional, reasoning that the Federal Circuit could address the argument on appeal. 567 U.S. at 7, 17. Here, the liberty interest claim is not simply another argument as to why the discharge was unlawful, it is a separate cause of action that is not cognizable under the CSRA and cannot result in overturning the discharge. Moreover, even if the Federal Circuit could address the claim, it would not have the necessary factual findings from the agency concerning the prejudicial statements, their falsity, and the damage they caused Ms. Comans, all of which are necessary to adjudicate the liberty interest claim.

Second, the liberty interest claim is "wholly 'collateral' to [the CSRA's] review provisions." *Thunder Basin*, 510 U.S. at 212 (quoting *Heckler v. Ringer*, 466 U.S. 602, 618 (1984)). Only when an employee "seeks relief from an action covered by the [CSRA]," is the employee "required to comply with the prescribed scheme of administrative and judicial review." *NAIJ,* 139 F.4th at 299. Here, the adverse statements made about Ms. Comans, not as formal grounds for her discharge, are not "action[s] covered by the [CSRA]." Rather, the Act created a procedure for "evaluating adverse personnel actions," such as terminations and suspensions. *Id.* at 302. The adverse statements made about Ms. Comans were not covered

28

"personnel actions."[12] Under the CSRA, an employee may contest before the MSPB "any action which is appealable to the 'board under any law, rule, or regulation." 5 U.S.C. § 7701(a). No law, rule or regulation makes stigmatizing statements made about an employee outside the formal notice of termination appealable to the MSPB.

Defendants argue that "[c]laims are not wholly collateral when they are a vehicle by which [a] petitioner[] seek[s] to reverse agency action." Memo. in Support of MTD at 11 (quoting *NAIJ*, 139 F.4th at 312). But the liberty interest claim does not seek to and cannot "reverse agency action." *See, e.g.*, *Ratliff v. City of Milwaukee*, 795 F.2d 612, 627 n.4 (7th Cir. 1986) ("If defendants had deprived [plaintiff] of her liberty interest in pursuing her occupation by publicizing *false* charges of either dishonesty, gross incompetence, or the like, . . . she could not regain her position."). The claim is wholly collateral to the CSRA's review provisions.

Finally, the liberty interest claim is "outside the agency's expertise." *Thunder Basin*, 510 U.S. at 212. This is not a case, like *Thunder Basin*, where the plaintiff's "claims at root require interpretation of the parties' rights and duties under" the agency's organic statute and agency regulations. *Id.* at 214. Defendants argue that "unlawful-removal claims fall squarely in the wheelhouse of the CSRA." Memo. in Support of MTD at 11. But a liberty interest claim is not an "unlawful-removal claim" as is made clear by the fact that such a claim cannot result in reinstatement or an award of backpay. *See supra*. The claim requires review of statements made about Ms. Comans outside the formal notice of termination, evaluation of those statements under *Roth* and its progeny, and assessment of the damage to reputation caused by such statements.

---

[12] The Fourth Circuit in *NAIJ* outlined the adverse personnel actions that can be appealed to the MSPB ranging from suspension of 14 days or more to removal. 139 F.4th at 302-03. *See also* 5 U.S.C. § 7501-04 and 7511-15. They do not include adverse statements about an employee not formally cited as grounds for covered discipline.

The MSPB lacks expertise in each of those aspects of the evaluation of a liberty interest claim.

The liberty interest claim is not "of the type Congress intended to be reviewed within this statutory structure." *Thunder Basin*, 510 U.S. at 212.

### C. Defendants Wholly Fail to Address the Liberty Interest Claim

Defendants wholly fail to address Ms. Comans' liberty interest claim and, in fact, repeatedly misstate the scope of Ms. Comans' claims and prayer for relief. Defendants state that "Ms. Comans alleges injuries flowing exclusively from her loss of employment." Memo. in Support of Motion to Dismiss at 9. But she also alleges injuries flowing from the Defendants' false and stigmatizing statements and resulting deprivation of liberty. Defendants simply ignore the liberty interest claim.

Therefore, Ms. Comans' liberty interest claims should not be dismissed.

### CONCLUSION

For the above-stated reasons, this Court should deny the Defendants' Motion to Dismiss.[13]

---

[13] If the Court disagrees as to whether jurisdiction has been established, Ms. Comans requests, in the alternative, that she be permitted to conduct limited discovery to explore the factual circumstances that demonstrate jurisdiction exists in this Court. Indeed, Defendants acknowledge that "'a trial court may . . . go beyond the allegations of the complaint' and even conduct 'an evidentiary hearing' to 'determine if there are facts to support the jurisdictional allegations.'" Memo. in Support of MTD at 6 (quoting *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009)). Discovery would include, but not be limited to: (1) the scope of the government's claim that when the President or a Department head invokes the President's Article II authority, the CSRA cannot constitutionally be applied and (2) any directions given by the President, the Executive Office of the President, or the Attorney General to Members of the MSPB or MSPB Administrative Judges.

Date: January 20, 2026

Respectfully Submitted,

*/s/ Abbe David Lowell*
Abbe David Lowell (DDC No. 358651)
David A. Kolansky (DDC No. 7680722)
Isabella M. Oishi (DDC No. 7680428)
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, D.C. 20005
T: (202) 964-6110
F: (202) 964-6116
ALowellpublicoutreach@lowellandassocates.com
DKolansky@lowellandassociates.com
IOishi@lowellandassociates.com

*/s/ Heidi R. Burakiewicz*
Heidi R. Burakiewicz (DDC No. 473973)
BURAKIEWICZ & DEPRIEST, PLLC
1120 Connecticut Avenue, N.W., Suite 600
Washington, D.C. 20036
T: (202) 856-7500
HBurakiewicz@bdlawdc.com

*/s/ Mark S. Zaid*
Mark S. Zaid (DDC No. 440532)
Bradley P. Moss (DDC No. 975905)
LAW OFFICES OF MARK S. ZAID, P.C.
1250 Connecticut Avenue, N.W., Suite 700
Washington, D.C. 20036
T: (202) 498-0011
Mark@MarkZaid.com
Brad@MarkZaid.com

*/s/ Harold Craig Becker*
Harold Craig Becker (D.C. Bar #371239)
Taryn Wilgus Null (D.C. Bar #985724)
Norman L. Eisen (D.C. Bar #435051)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue, S.E., No. 15180
Washington, D.C. 20003
T: (202) 594-9958
craig@democracydefenders.org
taryn@democracydefenders.org
norman@democracydefenders.org

*/s/ Margaret M. Donovan*
Margaret M. Donovan (*pro hac vice*)
KOSKOFF, KOSKOFF & BIEDER, PC
350 Fairfield Ave., Suite 501
Bridgeport, CT 06604
Tel: (203) 336-4421
Fax: (203) 368-3244
mdonovan@koskoff.com

*/s/ Kevin Byrnes*
Kevin Byrnes, VSB 47623
Fluet
1751 Pinnacle Drive, Suite 1000
Tysons, Virginia 22102
T: (703) 590-1234
F: (703) 590-0366
kbyrnes@fluet.law
e-file@fluet.law

*Counsel for Plaintiff*

31

**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing Memorandum in Opposition to Defendant's Motion to

Dismiss for Lack of Jurisdiction on January 20, 2026, with the Clerk of Court using the CM/ECF

system, which will send a notification of filing to all counsel of record.


*/s/ Kevin Byrnes*
Kevin Byrnes
*Counsel for Plaintiff*