# Exhibit 2

Mary Comans v. Department of Homeland Security

Docket # DC-0752-25-1783-I-1

Agency Motion to Dismiss

Summary Page

Case Title :    Mary Comans v. Department of Homeland Security

Docket Number :    DC-0752-25-1783-I-1

Pleading Title :    Agency Motion to Dismiss

Filer's Name :    Michelle Perry

Filer's Pleading Role :    Agency

## Details about the supporting documentation

| # | Title / Description | Mode of Delivery |
|---|---|---|
| 1 | Attachment 1 to Motion to Dismiss.pdf | Uploaded |
| 2 | Attachment 2 to Motion to Dismiss.pdf | Uploaded |
| 3 | Attachment 3 to Motion to Dismiss.pdf | Uploaded |
| 4 | Attachment 4 to Motion to Dismiss.pdf | Uploaded |
| 5 | Attachment 5 to Motion to Dismiss.pdf | Uploaded |
| 6 | Attachment 6 to Motion to Dismiss.pdf | Uploaded |

Mary Comans v. Department of Homeland Security

Docket # DC-0752-25-1783-I-1

Agency Motion to Dismiss

Table of Contents

Summary ............................................. 1
Table of Contents .................................... 2
Interview ............................................. 3
Body ................................................. 4
Attachment 1 to Motion to Dismiss .................... 21
Attachment 2 to Motion to Dismiss .................... 22
Attachment 3 to Motion to Dismiss .................... 26
    print plan.pdf ................................... 26
    print addendum.pdf .............................. 36
    print accomplishment.pdf ........................ 37
    print summary rating narrative.pdf .............. 42
    print LOB.pdf ................................... 44
Attachment 4 to Motion to Dismiss .................... 45
Attachment 5 to Motion to Dismiss .................... 47
Attachment 6 to Motion to Dismiss .................... 49
Certificate of Service ............................... 50

Mary Comans v. Department of Homeland Security

Docket # DC-0752-25-1783-I-1

Agency Motion to Dismiss

Online Interview

1. Enter a brief title for your pleading.

Agency Motion to Dismiss

2. Does your pleading assert facts that you know from your personal knowledge?

No

3. Do you declare, under penalty of perjury, that the facts stated in this pleading are true and correct?

Yes

UNITED STATES OF AMERICA
MERIT SYSTEMS PROTECTION BOARD
WASHINGTON REGIONAL OFFICE

| | | |
|---|---|---|
| MARY COMANS | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | Docket No. DC-0752-25-1783-I-1 |
| | ) | |
| U.S. DEPARTMENT OF HOMELAND SECURITY | ) ) | |
| | ) | |
| Agency. | ) | Date: September 26, 2025 |
| | ) | |

**AGENCY CLOSING BRIEF AND MOTION TO DISMISS**

This matter comes before the Merit Systems Protection Board ("Board" or "MSPB"), Washington Regional Office, upon the initial appeal of Mary Comans ("Appellant"). The appeal arises out of the actions of the U.S. Department of Homeland Security ("DHS"), and its component, the Federal Emergency Management Agency ("FEMA" or "the Agency"), to terminate Appellant's employment on February 11, 2025. Appellant's removal was undertaken pursuant to Article II of the United States Constitution at the direction of the President. As there are no material disputes of fact the Agency respectfully submits that a hearing is unnecessary and a decision on the merits should be issued. For this reason, the Agency respectfully withdraws the prior jurisdiction arguments and requests a decision as stated herein.

I.      STATEMENT OF FACTS

1.  FEMA appointed Appellant to the position of Chief Financial Officer (CFO) on September 13, 2020.  Attachment 1 (SF50 Appointment).

2.  As the FEMA CFO, Appellant occupied a Senior Executive Service (SES) appointment. Attachment 1.

3. The FEMA CFO "serves as the primary advisor to the Administrator and Deputy Administrator on agency financial management, financial systems, budget and accounting, program analysis and evaluation, internal controls, cash management, credit management, debt management policies, standards and compliance guidelines, and corrective actions relating to audit recommendations." Attachment 2 (CFO PD).

4. The CFO "[p]rovides executive leadership over the formulation, presentation, and execution of the FEMA budget" and "executive level direction to senior level officials on long- and short-range financial planning." Attachment 2.

5. The CFO also "[a]dvises the Administrator and senior leadership regarding Congressional testimony related to financial management issues, and represents the Administrator before Congressional hearings." Attachment 2; *see also* Attachment 3 at 13 (Appellant led the development of a Congressional Engagement Strategy utilized in meeting between FEMA leadership and Congressional members in both the House and Senate).

6. "As FEMA's CFO, it [was Appellant's] responsibility to lead, liaise and manage the across the Agency and with the OMB, DHS and Congressional Committees." Attachment 3 at 14.

7. The CFO further "[d]irects the assessment, development, implementation, and evaluation of financial management policy systems and operations, which are consistent with, and conform to existing laws, regulations, and approved principles and standards." Attachment 2; *see also* Attachment 3 at 16.

8. The FEMA CFO is expected to work in partnership with FEMA leadership to advance the strategic priorities of the administration. *See* Attachment 3 at 12 (Appellant discussed

in her self-assessment the work she performed in pursuit of Biden era administration goals in her 2024 performance appraisal).

9. The FEMA CFO reports directly to the Deputy Administrator of FEMA and receives direction from both the Deputy Administrator and the Administrator. Attachment 2.

10. The FEMA Administrator and Deputy Administrator are each nominated by the President and confirmed by the Senate pursuant to the Appointments Clause. *See* 6 U.S.C. §§ 113(a)(1)(D), 321c(a); *Presidential Appointee Positions Requiring Senate Confirmation and Committees Handling Nominations*, CRS Report RL30959 (Dec. 28, 2021).

11. On February 11, 2025, the Office of the President contacted DHS officials and informed DHS officials that four (4) FEMA employees were to be immediately terminated. Attachment 4 (FEMA Administrator Statement).

12. The DHS officials were specifically instructed to carry out the terminations pursuant to the authority of the President of the United States. Attachment 4.

13. On February 11, 2025, FEMA Senior Official Performing the Duties of the Deputy Administrator MaryAnn Tierney issued the Notice of Termination in order to remove Appellant from her position as the CFO from the Office of the Chief Financial Officer, FEMA.  Attachment 5 (Notice of Termination).

14. Appellant's termination was effective that same day. Attachment 6 (SF50 Termination).

## II.    DISCUSSION

The issues presented to the Board in the above captioned appeal are (1) whether Appellant's removal was in compliance with the U.S. Constitution and any applicable laws, and (2) whether Appellant was provided with any and all due process required. The Agency

respectfully argues that Appellant was properly removed under the auspices of Article II of the U.S. Constitution and was not owed additional due process beyond any accorded. The Agency submits, therefore, that the administrative judge should affirm the Agency's action to terminate Appellant pursuant to the President's constitutional authority.

> A.   The President Possessed the Authority to Order Appellant Be Terminated

Although Congress has granted *agencies* authority to remove employees pursuant to Chapter 75, that statutory authority is separate and distinct from the President's inherent removal authority under Article II. Long before the passage of the Civil Service Reform Act (CSRA), "the President's absolute power of removal of federal employees was established in principle." Gerald E. Frug, *Does the Constitution Prevent the Discharge of Civil Service Employees*, 124 U. PENN. L. REV. 942 (1976); *see also* 1 Annals of Cong. 463 (1789) (James Madison stated "if any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws"). Congress may pass civil service laws allowing for removal under specified circumstances, but the President's removal authority under the Constitution exists even in the absence of statutory authority. *See Myers v. United States*, 272 U.S. 52, 146 (1926) ("It is argued that these express provisions for removal at pleasure indicate that without them no such power would exist in the President. We cannot accede to this view."); *Parsons v. United States*, 167 U.S. 324 (1897) ("The provision for a removal from office at pleasure was not necessary for the exercise of that power by the president, because of the fact that he was then regarded as being clothed with such power in any event.").

The case at hand involves the President's exercise of his inherent Article II authority, rather than the exercise of statutory authority granted in Title 5. The notice of termination states this clearly. *See* Attachment 5 ("This action is being taken pursuant to Article II of the United

Document Number: 3683121          e-Appeal Submission: 09/26/2025 12:02 PM ET          MSPB Page 7 of 50

States Constitution, at the direction of the President."); *see also* Attachment 6 (removal SF-50). The Agency disclaims any reliance on Title 5 as a basis for Appellant's removal. Instead, the Agency removed Appellant from service at the direction of the President. Similarly, in *Myers* a postmaster was "removed from office by order of the Postmaster General, acting by direction of the President." 272 U.S. at 106. The U.S. Supreme Court upheld that removal and ruled that Congress could not require tenure protections that would prohibit the President from directing the removal of an officer who had been appointed by the President, by and with the advice and consent of the Senate. *Id.* at 106, 176-77.[1]

The inherent power of the President is reflected in the statutory history leading up to today. Creating what would become the competitive service, the Pendleton Act of 1883 provided a commission to assist the President in screening candidates for the performance of duties in the executive branch. Civil Service Act of 1883, ch. 522, 22 Stat. 403. The Pendleton Act did not move to restrict the President's removal power for non-political reasons. *Id*. A 1901 case before the Supreme Court found, in the absence of prescribed laws limiting removals, "the appointing power to remove at pleasure or for such cause as it deemed sufficient" under the Constitution. *Reagan v. United States*, 182 U.S. 419, 425 (1901). This foundational ruling was later refined for cases involving the President, explaining a presumption that the President holds the power to remove executive officers at will and that a statute must contain "plain language to take [that power] away." *Shurtleff v. United States*, 189 US 311, 316 (1903).

---

[1] *But see*, *United States v. Arthrex,* 594 U.S. 1, 25-27 (20221) (declining to hold unenforceable the Administrative Patent Judge's statutory tenure protections because "the source of the constitutional violation is the restraint on the review authority of the Director" of the Patent and Trademark Office); *United States v. Perkins*, 116 U.S. 483, 484-85 (1886) (ruling that "[w]e have no doubt that when congress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest").

In a few short years, the Lloyd-LaFollette Act of 1912 (37 Stat. 555; 5 U.S.C. 652) was passed mandating that "no examination of witnesses nor any trial or hearing shall be required except in the discretion of the officer making the removal." The Lloyd-LaFollette Act provided procedures for agencies to follow when dismissing employees. *See Croghan v. U.S.*, 89 F.Supp. 1002 (1950). Decades later, still working under this general framework, but with small functional edits through executive orders and the Veterans Preference Act (VPA) of 1944, the Supreme Court in *Arnett v. Kennedy* determined that some federal employees have a constitutional due process interest in continued federal employment. 416 U.S. 134 (1974).

With this background, Congress passed the Civil Service Reform Act of 1978 (CSRA) to replace prior legislation and executive orders with a new framework. Under the CSRA, 5 U.S.C. §1101 et seq., an employing agency who proposes a covered action against a covered employee must give the employee a notice of the proposed action, the opportunity to be represented by counsel, an opportunity to respond, and a written reasoned decision from the agency. §7513(b). The CSRA is silent, however, on the President's inherent power to remove executive employees.

The historical recognition of the President's authority has been upheld and reinforced in numerous recent cases, including after the CSRA was enacted. "The removal power helps the President maintain a degree of control over the subordinates he needs to carry out his duties as the head of the Executive Branch, and it works to ensure that these subordinates serve the people effectively and in accordance with the policies that the people presumably elected the President to promote." *Collins v. Yellen*, 594 U.S. 220, 252 (2021); *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197 (2020); *Free Enterprise Fund v. Public Co. Acct. Bd.*, 561 U.S. 477, 501-502 (2010). The Supreme Court further instructed that at-will removals, then as now, safeguard that "the lowest officers, the middle grade, and the highest, will depend, as they ought, on the

President, and the President on the community." *Free Enterprise Fund*, 561 U.S. at 498 (*quoting* 1 Annals of Cong. 499 (1789) (J. Madison)).

B.   The Agency Properly Removed Appellant Pursuant to Article II and No Additional Due Process was Required by the Constitution

Under the Constitution, "the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC*, 591 U.S. at 202 (quoting U.S. CONST. art. II, § 1; *id.* at §3). "The President's power to remove is essential to the performance of his Article II responsibilities and control over the Executive Branch." *Exela Enterprise Solutions, Inc. v. NLRB*, 32 F.4th 436, 445 (5th Cir. 2022). "Without such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Free Enterprise Fund*, 561 U.S. at 514.

The Supreme Court has "recognized only two exceptions to the President's unrestricted removal power." *Seila Law*, 591 U.S. at 203. The first exception, which is not relevant here, allows Congress to "give for-cause removal protections to a multimember body of experts." *Id.* at 216 (citing *Humphrey's Executor v. United States*, 295 U.S. 602 (1935)). The second exception enables Congress to "provide tenure protections to certain *inferior* officers with narrowly defined duties." *Seila Law*, 591 U.S. at 204 (emphasis in original) (citing *United States v. Perkins*, 116 U.S. 483 (1886) and *Morrison v. Olson*, 487 U.S. 654 (1988)). These two exceptions represent the "outermost constitutional limits of permissible restrictions on the President's removal power." *Seila Law*, 591 U.S. at 216.

The President's authority also may be exercised by the heads of departments, when the removal concerns an inferior officer, subject to only certain narrow exceptions. *See Seila Law,* 591 U.S. at 204 ("[T]he Framers expected the President would rely on subordinate officers for assistance."). Here no statute specifically constrains the President's authority under Article II.

7 | P a g e

Moreover, Congress by statute, could not constrain the President's authority to remove an inferior officer because the ability of the President, or the department head, to remove an inferior officer at will ensures the ability of the President, or department head, to supervise those inferior Constitutional officers. *See id.*; *Kennedy v. Braidwood Mgmt.*, 606 U.S. _, 145 S. Ct. 2427, 2442, 2444 (2025) ("The Secretary's ability to remove Task Force members at will enables him to supervise and direct them"). Thus, because no statute may constrain the President's authority, the due process clause does not require any additional procedural protections be provided prior to termination. *See Esparraguera v. Dep't of the Army*, 101 F.4th 28, 33 (D.C. Cir. 2024) (citations omitted). As such, the decision to terminate Appellant was neither legally nor procedurally flawed and must be upheld on appeal.

1. *The Board May Rule on the Agency's Constitutional Arguments*

The Agency agrees that with respect to the constitutional question at issue in this case—Appellant's termination under Article II of the Constitution—the Board may choose to exercise jurisdiction. Article II of the Constitution requires that an inferior officer such as Appellant be removable at-will by the President. As such, it is in this context that the Board may properly consider whether the CSRA can impede that requirement consistent with the Constitution. In resolving that question, the Board is not determining the facial constitutionality of the CSRA statute itself, but rather deciding a discrete constitutional question relevant to a decision to terminate an employee. *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 189-90 (2023).

Consequently, the Board is permitted to examine the Agency's constitutional justification for Appellant's removal as the MSPB "does have authority to adjudicate a constitutional challenge to an agency's application of a statute." *Special Counsel v.*

*Jackson*, 119 M.S.P.R. 175, 179 (2013); *see also May v. Off. of Pers. Mgmt.*, 38 M.S.P.R. 534, 538 (1988) (citing 3 Kenneth Culp Davis, *Administrative Law Treatise* § 20.04, at 74 (1958); Peter Broida, *A Guide to Merit Systems Protection Board Law and Practice* 345 (36th ed. 2019) ("Although there may be a constitutional violation, the Board does not have jurisdiction over the claim unless it also has jurisdiction over the action taken against the employee."). Indeed, the Supreme Court has acknowledged that the MSPB "routinely adjudicates some constitutional claims" when that claim is brought under the CSRA. *Bush v.* Lucas, 462 U.S. 367 (1983).

Accordingly, the Board has repeatedly exercised its jurisdiction to analyze, assess, and rule on constitutional questions that bear on the validity of an employee's removal. *See, e.g., May*, 38 M.S.P.R. at 536, 538 (due-process challenge to the retroactive termination of an annuity); *Special Counsel v. Murry*, No. CB-1216-15-0002-T-1, 2015 WL 6688194 (Nov. 3, 2015) (due-process and equal-protection challenge to the Special Counsel's allegedly selective enforcement of the Hatch Act); *Bain v. Off. of Pers. Mgmt.*, 49 M.S.P.R. 307 (1991) (equal-protection challenge to the calculation of retirement credits for seasonal employees); *In re Fishkin*, 2 P.A.R. 785, 790 n.6 (1968) (free-speech challenge to the Hatch Act's restraints on political activity); *Brooks v. Off. of Pers. Mgmt.*, 59 M.S.P.R. 207, 215 n.7 (1993), superseded by statute (equal-protection challenge to OPM's definition of "period of war").

The Agency recognizes that the Board has at times held that it lacks the authority to decide certain constitutional claims. For instance, the Board held that it lacked the authority to adjudicate the constitutionality of the statutory removal protection for MSPB's administrative judges. *See Davis- Clewis v. Dep't of Veterans Affairs*, 2024 M.S.P.B. 5, at *3 (2024). That is consistent with existing precedent and the Supreme Court's direction that the Board may

consider constitutional questions, like those the Agency raises here, that bear on the validity of a removal. The Board may choose to address whether the CSRA prevents the President or an agency head from exercising a constitutional prerogative to "fir[e] an employee" in a "specific substantive" case within the bounds of its existing jurisdiction. *Axon*, 598 U.S. at 189. And that is the question presented in this case.

Accordingly, under existing Supreme Court and MSPB precedent, administrative judges may consider constitutional arguments regarding the proper application of the civil service laws in individual cases, so long as the Board has jurisdiction over the appeal itself. Whether the MSPB has jurisdiction over an appeal depends "only on the nature of the employee and employment action at issue," not whether the claim implicates constitutional issues. *Elgin*, 567 U.S. 1, 18 (2012); *id.* at 12 ("The availability of administrative and judicial review under the CSRA generally turns on the type of civil service employee and adverse employment action at issue."); *see also* 5 U.S.C. 1204(a), 7701(a); 5 C.F.R. § 1201.3(a). As it is undisputed Appellant was an employee under 5 U.S.C. 7701 the Board has jurisdiction over an appeal regarding her termination and therefore may also adjudicate the Agency's constitutional justification for Appellant's removal.

2. *Appellant Was Removable At Will Under Article II of the Constitution*

As noted, under Article II the President must 'take Care that the Laws be faithfully executed.'" *Seila Law*, 591 U.S. at 203  (quoting U.S. Const. art. II, § 1, cl. 1; id. § 3). However, the President must rely on others to assist him in executing those laws. *See Id*. at 204 ("[T]he Framers expected that the President would rely on subordinate officers for assistance."); *Printz v. U.S.*, 521 U.S. 898, 922 (1997) (explaining that the President fulfills his duties under the Take Care Clause both "personally and through officers whom he appoints" (internal citations and

quotation marks omitted)); *In re Grand Jury Inv.*, 315 F. Supp. 3d 602, 666-67 & n.51 (D.D.C. 2018), aff'd, 916 F.3d 1047 (D.C. Cir. 2019) (collecting cases). To ensure that those officers faithfully execute the laws on his behalf, the President "as a general matter" has "authority to remove those who assist him in carrying out his duties." *Free Enter. Fund v. Pub. Acct. Oversight Bd.*, 561 U.S. 477, 513-14 (2010). "Without such power, the President could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Id.* at 514.

As such, while "all of" the "executive Power" is vested in the President, *Seila Law*, 591 U.S. at 203, the heads of departments—and inferior officers below them—may properly exercise that power on his behalf. *See* U.S. CONST., Art. II, § 2, cl. 2 (providing that the heads of departments may appoint inferior officers). And when heads of departments and inferior officers exercise executive power, their acts are attributable to the President. *See, e.g., U.S. v. Arthrex, Inc.,* 594 U.S. 1, 17 (2021) ("The activities of executive officers may take legislative and judicial forms, but they are exercises of – indeed, under our constitutional structure they *must be* exercises of – the executive Power, for which the President is ultimately responsible.") (internal quotations marks omitted).

By virtue of being an inferior officer, Appellant is removable at will under Article II. As an executive who exercises significant executive authority, Appellant was undoubtedly an inferior officer. To qualify as an officer, there are two "requirement[s]": an individual must (1) "occupy a 'continuing' position" established by law, and (2) "exercis[e] significant authority pursuant to the laws of the United States." *Lucia v. SEC*, 585 U.S. 237, 245 (2018) (first quoting *United States v. Germaine*, 99 U.S. 508, 511 (1879); and then quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam)).  When Congress has tasked a department head with the appointment

11 | P a g e

of an inferior officer like Appellant, the "default presumption is that the officer holds his position 'at the will and discretion of the head of the department.'" *Braidwood Mgmt., Inc.*, 145 S. Ct. at 2444 (quoting *Ex Parte Hennen*, 13 Pet. 230, 259-60 (1839)). In the absence of a mechanism for at-will removal, the degree of "unreviewable executive power" exercised by the FEMA CFO would present constitutional problems. *United States v. Arthrex, Inc.*, 594 U.S. 1, 18 (2021). Moreover, the department head may "enjoy[] the power of removal," *Free Enter. Fund*, 561 U.S. at 493, because "the power of removal of executive officers [is] incident to the power of appointment." *Myers v. United States*, 272 U.S. 52, 119 (1926).

There can be little doubt that Appellant, as the CFO of FEMA, "exercis[ed] significant authority pursuant to the laws of the United States." *See Lucia*, 585 U.S. at 245 (quotation marks omitted). As CFO Appellant "worked to initiate and design a zero-based budgeting (ZBB) construct to inform resource allocation;" "deployed the Department of Homeland Security's (DHS) first generative Automated Intelligence (AI) model to automate the generation of draft responses to Congressional questions on FEMA's budget and financial resources;" lead the team which processed and allocated FEMA appropriations of over $45 Billion dollars in 2024; "oversaw thousands of appropriations-related activities [and] [t]hrough formal and informal engagement with House and Senate Appropriators . . . influenced the decision process;" and served as a "trusted advisor to the FEMA Administrator, Deputy Administrator and Department of Homeland Security leaders." Attachment 3.

As noted *supra*, the Supreme Court has "recognized only two exceptions to the President's unrestricted removal power." *Seila Law*, 591 U.S. at 203. The FEMA CFO position does not qualify under either exception articulated by the Court. Appellant was neither a member of a multi-member panel of experts nor serving in a position with narrow duties protected by

statute from removal. Rather, as the FEMA CFO Appellant occupied a position of authority which influenced policy, interacted directly with Congress and wielded large amounts of resources. Such activities are plainly executive, rather than legislative or judicial—and "indeed, under our constitutional structure they *must be* exercises of [] the 'executive Power.'" *Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013). As such, the FEMA CFO's broad duties clearly exceed the bounds of the exception for certain inferior officers who perform only limited duties, exemplified by *Morrison v. Olson*, 487 U.S. 654 (1988). In *Morrison*, the Supreme Court concluded that removal protection for an independent counsel who had been appointed by a court of law was constitutional because the independent counsel had "limited jurisdiction" and "lack[ed] policymaking or significant administrative authority." *Id.* at 691. Far from "lacking policymaking or significant administrative authority," *Morrison*, 487 U.S. at 691, the FEMA CFO position performs policymaking work in all facets of the financial management of FEMA and exercises significant administrative authority overseeing over $45 Billion in appropriations.

Finally, "[w]hether one is an 'inferior' office depends on whether he has a superior other than the President. An inferior officer must be 'directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.'" *U.S. v. Arthrex, Inc.*, 594 U.S. 1, 13 (2021) (internal citations omitted). In Appellant's case this final requirement was also satisfied as she reported directly to the Deputy Administrator of FEMA, a Presidentially nominated and Congressionally approved position. *See supra*.

The significant responsibilities of the FEMA CFO demonstrate that she exercised significant executive power and must be removable at will. As such, any restriction on the removal of the FEMA CFO from office would violate the separation of powers and contravene the "central role" that "the President or his subordinate Heads of Departments play in selecting

the officers within the Executive Branch who will assist in exercising the 'executive Power.'" *Braidwood Mgmt.*, 145 S. Ct. at 2442 (quoting U.S. CONST., Art. II, § 2, cl. 2)); *see also Seila Law LLC*, 591 U.S. at 204 ("[I]ndividual executive officials will still wield significant authority, but that authority remains subject to the ongoing supervision and control of the elected President."). To hold otherwise would unduly restrict the "executive power" which is "vested in a President," who must "take care that the laws be faithfully executed." U.S. CONST., Art. II, § 1, cl. 1; § 3. The Agency's decision to terminate Appellant's appointment as FEMA CFO—a position in which Appellant exercised significant executive power—was a proper exercise of Article II authority.

### 3. Appellant was Provided with All Due Process Required By Virtue of Her Position

"If the employee serves at will – that is, if the government may remove her for 'any constitutionally permissible reason or for no reason at all' – the employee has no property interest." *Esparraguera*, 101 F.4th at 33 (citations omitted). Here, Appellant as an as an inferior officer, "subject to at-will dismissal," "lack[s] the statutorily-protected property interest necessary to ground a due process challenge." *Griffith v. Lanier*, 521 F.3d 398, 404 (D.C. Cir. 2008); *see also Chmielewski v. EPA*, 2022 WL 22902407, at *3 (D.D.C. July 28, 2022). Appellant's claim that she was not afforded due process therefore fails.

As explained above, the President and his immediate subordinates must be able to act quickly and make important, inherently discretionary judgment calls regarding the individuals who exercise executive power on his behalf. And, as all of the executive power belongs to the President, he should not be required to allow officials whom he no longer trusts to continue wielding executive power while he waits for a notice period to pass or a hearing to transpire. *Cf. Trump v. Wilcox*, 145 S. Ct. 1415, 1415 (2025) ("[T]he Government faces greater risk of harm

from an order allowing a removed officer to continue exercising the executive power than a wrongfully removed officer faces from being unable to perform her statutory duty."). Because these key personnel decisions regarding officers wielding executive power on the President's behalf involve "sensitive and inherently discretionary judgment call[s]," there is no meaningful standard for this Board to apply "to review the substance of such a judgment." *Dep't of Navy v. Egan*, 484 U.S. 518, 529 (1988) (holding that the Board did not have authority to review substance of underlying decision to deny or revoke security clearance in the course of reviewing an adverse action).

In sum, Appellant's due process rights were not violated when the Agency removed her from her inferior officer position that she served in subject to at will removal.

C.      Appellant Should Not Be Reinstated Even if She Prevails

DHS asserts that the decision to terminate Appellant as an inferior officer was appropriate under the authority of Article II. If the Board ultimately disagrees and finds that the removal was improper, the Agency respectfully requests that the Board decline to grant Appellant's requested remedy of reinstatement to duty, at least pending Board and/or judicial review.  *See* 5 U.S.C. § 7701(b)(2)(A) (stating that, if the employee is the prevailing party in an appeal, the employee "shall be granted the relief provided in the decision" unless "the deciding official determines that the granting of such relief is not appropriate"). "[T]he determination as to whether such relief is proper must be made by balancing the benefits and burdens to the parties anticipated by compliance with the order." *Merino v. Dep't of Just.*, 94 M.S.P.R. 632, 635 (2003).  Here, restoring Appellant to her former position would cause an immense burden on the Agency by compelling the DHS Secretary to retain the

15 | P a g e

services of an inferior officer whom she no longer believes should be entrusted with the exercise of executive power.

Accordingly, if the Board determines relief is appropriate, the Agency requests that any remedy afforded to Appellant be limited to financial compensation, consistent with the historical remedy for improper removal of executive officers. *Bessent v. Dellinger*, 145 S. Ct. 515, 517 (2025) (Gorsuch, J., dissenting) ("To be sure, throughout the Nation's history, various presidentially appointed officials… have contested their removal - and courts have heard and passed on their claims. But those officials have generally sought remedies like backpay, not injunctive relief like reinstatement." (citing *Myers*, 272 U.S. 52; *Humphrey's Executor*, 295 U.S. at 602)).

## III.   CONCLUSION

Pursuant to the President's authority under Article II of the U.S. Constitution Appellant was terminated from her position as an inferior officer with DHS. Appellant's removal was a proper exercise of the President's authority and no violation of law under the CSRA occurred. Accordingly, a decision in favor of the Agency must be rendered by the administrative judge in the above captioned appeal.

Respectfully submitted,

*Michelle L. Perry*

Michelle L. Perry
Senior Attorney-Advisor
Office of the General Counsel
U.S. Department of Homeland Security
Washington, DC 20528
T: (202) 282-9563
Michelle.perry@hq.dhs.gov

16 | P a g e

Ashley Darbo, Trial Attorney
Department of Homeland Security
Federal Emergency Management Agency
Office of Chief Counsel
500 C Street, S.W., 7SW
Washington, D.C.  20472-3179
T: (202) 286-5875
ashley.darbo@fema.dhs.gov

Document Number: 3683121          e-Appeal Submission: 09/26/2025 12:02 PM ET          MSPB Page 20 of 50

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296–33, Subch. 4

# NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|---|

## FIRST ACTION

| 5–A. Code | 5–B. Nature of Action |
|---|---|
| 5–C. Code | 5–D. Legal Authority |
| 5–E. Code | 5–F. Legal Authority |

## SECOND ACTION

| 6–A. Code | 6–B. Nature of Action |
|---|---|
| 6–C. Code | 6–D. Legal Authority |
| 6–E. Code | 6–F. Legal Authority |

| 7. FROM: Position Title and Number | 15. TO: Position Title and Number |
|---|---|

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|

| 14. Name and Location of Position's Organization | 22. Name and Location of Position's Organization |
|---|---|

## EMPLOYEE DATA

| 23. Veterans Preference | 24. Tenure | 25. Agency Use | 26. Veterans Preference for RIF |
|---|---|---|---|
| 1 – None  3 – 10–Point/Disability  5 – 10–Point/Other<br>2 – 5–Point  4 – 10–Point/Compensable  6 – 10–Point/Compensable/30% | 0 – None  2 – Conditional<br>1 – Permanent  3 – Indefinite | | YES  NO |

| 27. FEGLI | 28. Annuitant Indicator | 29. Pay Rate Determinant |
|---|---|---|

| 30. Retirement Plan | 31. Service Comp. Date (Leave) | 32. Work Schedule | 33. Part–Time Hours Per<br>Biweekly<br>Pay Period |
|---|---|---|---|

## POSITION DATA

| 34. Position Occupied | 35. FLSA Category | 36. Appropriation Code | 37. Bargaining Unit Status |
|---|---|---|---|
| 1 – Competitive Service  3 – SES General<br>2 – Excepted Service  4 – SES Career Reserved | E – Exempt<br>N – Nonexempt | | |

| 38. Duty Station Code | 39. Duty Station (City – County – State or Overseas Location) |
|---|---|

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|

45. Remarks

| 46. Employing Department or Agency | 50. Signature/Authentication and Title of Approving Official |
|---|---|

| 47. Agency Code | 48. Personnel Office ID | 49. Approval Date | |
|---|---|---|---|

5–Part 50–316

2 - OPF Copy - Long-Term Record - DO NOT DESTROY

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540–01–333–6238

# POSITION DESCRIPTION *(Please Read Instructions on the Back)*

**1. Agency Position No.**
ES0003

| 2. Reason for Submission | 3. Service | 4. Employing Office Location | 5. Duty Station | 6. OPM Certification No. |
|---|---|---|---|---|
| ☐ Redescription  ☐ New | ☒ Hdqtrs  ☐ Field | WASHINGTON, DC | WASHINGTON, DC | |

**2. Reason for Submission:** ☒ Reestablishment  ☐ Other

Explanation *(Show any positions replaced)*

**7. Fair Labor Standards Act:** ☒ Exempt  ☐ Nonexempt

**8. Financial Statements Required:** ☒ Executive Personnel Financial Disclosure  ☐ Employment and Financial Interest

**9. Subject to IA Action:** ☐ Yes  ☒ No

**10. Position Status:** ☐ Competitive  ☐ Excepted *(Specify in Remarks)*  ☐ SES (Gen.)  ☒ SES (CR)

**11. Position Is:** ☒ Supervisory  ☐ Managerial  ☐ Neither

**12. Sensitivity:** ☐ 1--Non-Sensitive  ☐ 2--Noncritical Sensitive  ☐ 3--Critical  ☒ 4--Special Sensitive

**13. Competitive Level Code**

**14. Agency Use**

| 15. Classified/Graded by | Official Title of Position | Pay Plan | Occupational Code | Grade | Initials | Date |
|---|---|---|---|---|---|---|
| a. Office of Personnel Management | | | | | | |
| b. Department, Agency or Establishment | CHIEF FINANCIAL OFFICER | ES | 0505 | 00 | GC | 3/28/17 |
| c. Second Level Review | | | | | | |
| d. First Level Review | | | | | | |
| e. Recommended by Supervisor or Initiating Office | | | | | | |

**16. Organizational Title of Position** *(if different from official title)*

**17. Name of Employee** *(if vacant, specify)*

**18. Department, Agency, or Establishment**
U.S. DEPARTMENT OF HOMELAND SECURITY

**c. Third Subdivision**
OFFICE OF THE CHIEF FINANCIAL OFFICER

**a. First Subdivision**
FEDERAL EMERGENCY MANAGEMENT AGENCY

**d. Fourth Subdivision**

**b. Second Subdivision**
OFFICE OF THE ADMINISTRATOR

**e. Fifth Subdivision**

**19. Employee Review**-This is an accurate description of the major duties and responsibilities of my position.

Signature of Employee *(optional)*

**20. Supervisory Certification.** *I certify that this is an accurate statement of the major duties and responsibilities of this position and its organizational relationships, and that the position is necessary to carry out Government functions for which I am responsible. This certification is made with the knowledge that* this information is to be used for statutory purposes relating to appointment and payment of public funds, and that false or misleading statements may constitute violations of such statutes or their implementing regulations.

**a. Typed Name and Title of Immediate Supervisor**

**b. Typed Name and Title of Higher-Level Supervisor or Manager** *(optional)*
DAVID GRANT
ACTING DEPUTY ADMINISTRATOR

Signature                    Date

Signature *(signed)* David A. Grant    Date 3-28-17

**21. Classification/Job Grading Certification.** *I certify that this position has been classified/graded as required by Title 5, U.S. Code, in conformance with standards published by the U.S. Office of Personnel Management or, if no published standards apply directly, consistently with the most applicable published standards.*

Typed Name and Title of Official Taking Action
COREY J. COLEMAN
CHIEF COMPONENT HUMAN CAPITAL OFFICER

Signature *(signed)*    Date 3/28/17

**22. Position Classification Standards Used in Classifying/Grading Position**

**Information for Employees.** The standards, and information on their application, are available in the personnel office. The classification of the position may be reviewed and corrected by the agency or the U.S. Office of Personnel Management. Information on classification/job grading appeals, and complaints on exemption from FLSA, is available from the personnel office or the U.S. Office of Personnel Management.

| 23. Position Review | Initials | Date | Initials | Date | Initials | Date | Initials | Date | Initials | Date |
|---|---|---|---|---|---|---|---|---|---|---|
| a. Employee *(optional)* | | | | | | | | | | |
| b. Supervisor | | | | | | | | | | |
| c. Classifier | | | | | | | | | | |

**24. Remarks**

**25. Description of Major Duties and Responsibilities** *(See Attached)*

NSN 7540-00-634-4265    Previous Edition Usable    5008-106

OF 8 (Rev. 1-85)
U.S. Office of Personnel Management
FPM Chapter 295

# Chief Financial Officer
# ES-0505-00

## INTRODUCTION

The incumbent serves as the Chief Financial Officer (CFO), Office of Chief Financial Officer (OCFO), within the Office of the Administrator, Federal Emergency Management Agency (FEMA), Department of Homeland Security (DHS).  The incumbent serves as the primary advisor to the Administrator and Deputy Administrator on agency financial management, financial systems, budget and accounting, program analysis and evaluation, internal controls, cash management, credit management, debt management policies, standards and compliance guidelines, and corrective actions relating to audit recommendations.

## MAJOR DUTIES

Provides executive leadership over the formulation, presentation, and execution of the FEMA budget.

Coordinates and develops detailed justifications for major expenditures to be incorporated in the overall FEMA allocation of funds.

Supervises a professional and technical workforce engaged in all facets of budget, accounting, financial systems and related programs.  Provides executive level direction to senior level officials on long- and short-range financial planning.

Conducts extensive evaluations of OCFO program goals and objectives and directs necessary adjustments to assure compliance with and support to a rapidly changing and expanding agency mission.

Develops and coordinates initiatives and efforts to identify and resolve major financial management problems hampering the operations and programs of the Agency.  Insures that the OCFO and staff serve as a technical, advisory, and consulting resource to management on system-wide financial management problems and issues.

Advises the Administrator and senior leadership regarding Congressional testimony related to financial management issues, and represents the Administrator before Congressional hearings.

Participates in the development of financial objectives, policies and plans with the DHS Chief Financial Officer.

Establishes policy, organizational goals and processes for the office.  Manages programs, operations and activities through first level supervisors.  Establishes standards of effectiveness, efficiency, and productivity for the office.  Monitors and

evaluates progress toward organizational goals and productivity, and makes adjustments to continually improve the guidance, support and advice provided to customer organizations.

Directs the assessment, development, implementation, and evaluation of financial management policy systems and operations, which are consistent with, and conform to existing laws, regulations, and approved principles and standards.

Coordinates the Agency's financial management program and activities to ensure internal and management controls are adequate and compliant with the Federal Managers Financial Integrity Act, the Chief Financial Officers Act, and related OMB and GAO requirements.

## SUPERVISORY CONTROLS

Serves under the direct formal supervision of the Deputy Administrator, FEMA. Receives strategic and tactical direction and objectives from the Administrator and Deputy Administrator.

## CONTACTS

Contacts are with all levels of FEMA employees, DHS headquarters staff, the White House and Congressional staffs, officials from other Federal agencies, State, and local governments.

## KNOWLEDGE AND ABILITIES REQUIRED

This position requires the incumbent to have extensive managerial or supervisory experience in Federal financial management or comparable fields. Incumbent also must have demonstrated ability to manage the activities of a large and diverse staff of professional, technical, and administrative personnel.

The incumbent must be able to communicate clearly and effectively, both orally and in writing, with strong interpersonal skills in order to meet and deal effectively with officials at all levels, both within and outside of DHS/FEMA.

Ability to independently plan and lead high level inter- and intra-agency activities for formulation, presentation, negotiation, and advice on the full range of financial management decision.

This position requires:

- Comprehensive knowledge of the operation of the Congress and the Executive Branch.
- Thorough knowledge of legislative program policy and budget development and implementation practices related to financial management.

- Expert knowledge of public laws, executive orders, Comptroller General decisions, regulations and procedures of the Office of Management and Budget, General Accounting Office, and other organizations that affect financial management activities.

## ADDITIONAL REQUIREMENTS:

The incumbent is required to submit a Financial Disclosure Statement, SF-278, within 30 days of entering the position; annually; and upon termination of employment.

The work of this position requires the incumbent to obtain and maintain a TOP SECRET security clearance with access to Sensitive Compartmented Information (TS/SCI).

TDP - This position has been identified as a Testing Designated Position (TDP) because of its security, public health, and/or public safety sensitivity, therefore you are subject to random drug testing under FEMA's Drug-Free Workplace Plan. Refusal to be tested will result in disciplinary action up to and including removal from federal service.

Emergency Assignment - Every FEMA employee has regular and recurring emergency management responsibilities, though not every position requires routine deployment to disaster sites. All positions are subject to recall around the clock for emergency management operations, which may require irregular work hours, work at locations other than the official duty station, and may include duties other than those specified in the employee's official position description. Travel requirements in support of emergency operations may be extensive in nature (weeks to months), with little advance notice, and may require employees to relocate to emergency sites with physically austere and operationally challenging conditions.

Key Requirement – In addition to the travel and relocation that may be required by emergency assignments, this position may require occasional non-emergency travel.

**DEPARTMENT OF HOMELAND SECURITY**
## SENIOR EXECUTIVE SERVICE PERFORMANCE MANAGEMENT SYSTEM
## EXECUTIVE PERFORMANCE PLAN

*With honor and integrity, we will safeguard the American people, our homeland, and our values.*

| Part 1. Consultation. *I have reviewed this plan and have been consulted on its development.* |
|---|

Executive's Name (Last, First, MI): Comans, Mary          Appraisal Period: 10/1/23–9/30/24

Executive's Signature: MARY FRANCIS F COMANS  Digitally signed by MARY FRANCIS F COMANS Date: 2023.11.01 08:40:47 -04'00'    Date: _____

Title: Chief Financial Officer          Organization: FEMA OCFO

Rating Official's Name (Last, First, MI): Hooks, Erik          ☒ CA  ☐ NC  ☐ LT/LE

Rating Official's Signature: ERIK A HOOKS  Digitally signed by ERIK A HOOKS Date: 2023.11.01 11:55:10 -04'00'    Date: 11/01/2023

| Part 2. Progress Review |
|---|

Executive's Signature: MARY FRANCIS COMANS  Digitally signed by MARY FRANCIS COMANS Date: 2024.05.20 08:21:11 -04'00'    Date: _____

Rating Official's Signature: ERIK A HOOKS  Digitally signed by ERIK A HOOKS Date: 2024.05.21 10:28:11 -04'00'    Date: 05/21/2024

Reviewing Official's Signature (Optional): _____    Date: _____

| Part 3. Summary Rating |
|---|

| Initial Summary Rating | ☒ Level 5 Achieved Excellence | ☐ Level 4 Exceeded Expectations | ☐ Level 3 Achieved Expectations | ☐ Level 2 Minimally Satisfactory | ☐ Level 1 Unacceptable |
|---|---|---|---|---|---|

Rating Official's Name (Last, First, MI): Hooks, Erik A.

Rating Official's Signature: ERIK A HOOKS  Digitally signed by ERIK A HOOKS Date: 2024.10.12 11:06:01 -04'00'    Date: 10/12/2024

Executive's Signature: MARY FRANCIS COMANS  Digitally signed by MARY FRANCIS COMANS Date: 2024.10.12 11:31:05 -04'00'    Date: 10/12/2024

Reviewing Official's Signature (Optional): _____    Date: _____

| Higher Level Review (If Applicable) |
|---|

☐ I request a higher level review.    Executive's Initials: _____    Date: _____

☐ Higher level review completed.          Date: _____

Higher Level Reviewer's Signature: _____    Date: _____

| Performance Review Board Recommendation | ☒ Level 5 | ☐ Level 4 | ☐ Level 3 | ☐ Level 2 | ☐ Level 1 |
|---|---|---|---|---|---|

PRB Chair's Signature: _____    Date: 12/16/2024

| Annual Summary Rating | ☒ Level 5 | ☐ Level 4 | ☐ Level 3 | ☐ Level 2 | ☐ Level 1 |
|---|---|---|---|---|---|

Appointing Authority's Signature: _____    Date: 12/16/2024

DHS Form 255-02 (08/23)          Page 1 of 10

## Part 4. Derivation Formula and Calculation of Annual Summary Rating

| Critical Element (CE) | Element Rating | | Weight (points) | Score | | Summary Level Ranges |
|---|---|---|---|---|---|---|
| | Initial | Final (if changed) | | Initial | Final (if changed) | 475-500 = Level 5 Achieved Excellence |
| 1. Leading Change | 5 | | 15 | 75 | 0 | |
| 2. Leading People | 5 | | 15 | 75 | 0 | 400-474 = Level 4 Exceeded Expectations |
| 3. Business Acumen | 5 | | 15 | 75 | 0 | 300-399 = Level 3 Achieved Expectations |
| 4. Building Coalitions | 5 | | 15 | 75 | 0 | 200-299 = Level 2 Minimally Satisfactory |
| 5. Results Driven | 5 | | 40 | 200 | 0 | |
| Total | | | 100 | 500 | | Any CE rated Level 1 = Level 1 Unacceptable |

## Part 5. Critical Elements

**Performance Standards for Critical Elements** (The performance standard for each critical element is specified below; examples for the top three performance levels can be found in the system description)

- **Level 5 (Achieved Excellence):** The executive demonstrates exceptional performance, fostering a climate that sustains excellence and optimizes results in the executive's organization, Department or government-wide. This represents the highest level of executive performance, as evidenced by the extraordinary impact on the achievement of the organization's mission. The executive is an inspirational leader and is considered a role model by Department leadership, peers, and employees. The executive continually contributes materially to or spearheads Department efforts that address or accomplish important Department goals, consistently achieves expectations at the highest level of quality possible, and consistently handles challenges, exceeds targets, and completes assignments ahead of schedule at every step along the way.

- **Level 4 (Exceeded Expectations):** The executive demonstrates a very high level of performance beyond that required for successful performance in the executive's position and scope of responsibilities. The executive is a proven, highly effective leader who builds trust and instills confidence in Department leadership, peers, and employees. The executive consistently exceeds established performance expectations, timelines, or targets, as applicable.

- **Level 3 (Achieved Expectations):** The executive demonstrates the high level of performance expected and the executive's actions and leadership contribute positively toward the achievement of strategic goals and meaningful results. The executive is an effective, solid, and dependable leader who delivers high-quality results based on measures of quality, quantity, efficiency, and/or effectiveness within agreed upon timelines. The executive meets and sometimes exceeds challenging performance expectations established for the position.

- **Level 2 (Minimally Satisfactory):** The executive's contributions to the organization are acceptable in the short term but do not appreciably advance the organization towards achievement of its goals and requirements. While the executive generally meets established performance expectations, timelines and targets, there are occasional lapses that impair operations and/or cause concern from management. While showing basic ability to accomplish work through others, the executive may demonstrate limited ability to inspire subordinates to give their best efforts or to marshal those efforts effectively to address problems characteristic of the organization and its work.

- **Level 1 (Unacceptable):** In repeated instances, the executive demonstrates performance deficiencies that detract from mission goals and requirements. The executive generally is viewed as ineffectual by Department leadership, peers, or employees. The executive routinely does not meet established performance expectations/timelines/targets and fails to produce - or produces unacceptable - work products, services, or outcomes.

| Element Rating Level Points | Level 5 = 5 points |
|---|---|
| | Level 4 = 4 points |
| | Level 3 = 3 points |
| | Level 2 = 2 points |
| | Level 1 = 1 points |

**Critical Element 1. Leading Change**    (Minimum weight 5 points)    Weight: 15

**Mandatory Performance Requirement:** Develops and implements an organizational vision that integrates key organizational and program goals, priorities, values, and other factors.  Assesses and adjusts to changing situations, implementing innovative solutions to make organizational improvements, ranging from incremental improvements to major shifts in direction or approach, as appropriate.  Balances change and continuity; continually strives to improve service and program performance; creates a work environment that encourages creative thinking, collaboration, and transparency; and maintains program focus, even under adversity.

**Department-Specific Performance Requirements:**

- **Customer Experience – applicable to all SES:** Supports DHS's commitment to transforming the customer experience across the Department in accordance with Executive Order 14058, the Biden-Harris Management Agenda, and OMB A-11 Section 280.  Improves and enhances the DHS customer experience using an iterative process of quantitative and qualitative research methods that focus on leveraging customer feedback, understanding and addressing customer areas of concern, as well as observing customer interactions and documenting those outcomes.  Analyzes the needs of the customer by collecting user experience information via direct interviews, usability testing, help desk/call center data, moderated research sessions or other data collection strategies.  Develops and adopts best practices and designs continuous improvement processes to add rigor to program initiatives and strengthen DHS customer interaction.  Leadership's responsibility to observe and enhance the DHS customer experience is a Department-wide priority.

Rating Official's Narrative: *(Optional)*

| *Critical Element Rating - Leading Change* | ☒ Level 5 | ☐ Level 4 | ☐ Level 3 | ☐ Level 2 | ☐ Level 1 |
|---|---|---|---|---|---|

**Critical Element 2. Leading People**    (Minimum weight 5 points)    Weight: 15

**Mandatory Performance Requirement:** Designs and implements strategies that maximize employee potential, connects the organization horizontally and vertically, and fosters high ethical standards in meeting the organization's vision, mission, and goals.  Provides an inclusive workplace that fosters the development of others to their full potential; allows for full participation by all employees; facilitates collaboration, cooperation, and teamwork, and supports constructive resolution of conflicts.  Ensures employee performance plans are aligned with the organization's mission and goals, that employees receive constructive feedback, and that employees are realistically appraised against clearly defined and communicated performance standards.  Holds employees accountable for appropriate levels of performance and conduct. Seeks and considers employee input.  Recruits, retains, and develops the talent needed to achieve a high quality, diverse workforce that reflects the nation, with the skills needed to accomplish organizational performance requirements while supporting workforce diversity, workplace inclusion, and equal employment policies and programs.

**Department-Specific Performance Requirements:**

- **Culture Improvement - applicable to all SES:** Supports the Agency-wide culture improvement efforts with executive leadership skills and deliberate organizational actions.  Provides clear communication of workforce culture objectives, programs, and improvements.  Assists supervisors and managers in leadership/management development, such as conflict management, emotional intelligence, and conducting difficult conversations, by providing training and development opportunities, as well as through daily interactions and coaching.

- **Employee Engagement – applicable to all SES:** Provides mission-driven strategic priorities for the organization, including articulating a clear vision and shared values. Fosters an employee centered, high performing organization in which individual and team excellence is recognized and rewarded.  This culture reinforces frequent and transparent two-way communication that engages employees and provides an environment that fosters high morale, makes employees feel heard and valued, and enhances the organization's ability to improve individual and unit performance.  This culture also recognizes the critical nature of family support in employee performance and undertakes activities to improve employee and workforce health and safety and family resilience to face the challenges of DHS service.

- **Inclusive Diversity – applicable to all SES:** Integrates inclusive diversity as a key strategic mission and operational priority at all levels of the organization.  Communicates why and how inclusive diversity issues are relevant to execute the

DHS mission. Facilitates forums/town halls/all-employee events to educate on inclusive behavior. Models behaviors that accept differences, build trust, and encourage staff to address issues and seek cooperative resolutions. Ensures mechanisms to stay abreast and act upon insights gleaned regarding the inclusive diversity culture within the organization. Leverages data insights to address inclusive diversity issues. Encourages and participates in inclusive diversity training (e.g., Unconscious Bias Awareness, Intentional Inclusion, etc.). Outcomes: Increased awareness of and commitment to inclusive diversity as a shared responsibility; promotion of a diverse workforce in which there are equitable opportunities to contribute, succeed and grow; and agency's inclusive diversity path is further defined based on shared perspectives and data insights.

- **Integrity and Accountability – applicable only to CBP SES:** Leads by example. Demonstrates integrity and accountability through his/her actions. Clearly communicates organizational and individual goals and expectations to employees so that everyone knows what they are trying to achieve. Takes timely and appropriate action when there is misconduct, unprofessional behavior, or performance deficiencies. Holds self and employees accountable for protecting civil rights and civil liberties, to include protecting the privacy of others.

- **Succession Planning and Leadership Development – applicable to all SES:** Actively engages in DHS and/or Component leadership development and succession planning initiatives. Designs and improves upon organizational strategies to recruit the next generation of leaders within the GS ranks. Participates in existing DHS and/or Component mentoring and/or coaching programs designed to promote the upward career growth of employees. Identifies or creates opportunities for employees to build functional and leadership skills required to succeed at the next level. Champions and encourages staff participation in developmental assignments, trainings, and initiatives designed to build leadership skills.

- **Training – applicable to all SES:** In alignment with guidance established by the Component Chief Learning Officer, the executive: (1) assesses, analyzes, and enhances onboarding and foundational training for new employees; (2) ensures that employees receive foundational training to successfully conduct their job duties within 60 days of onboarding; and (3) provides ongoing training and/or career growth and development opportunities for staff at least once per month.

- **Whistleblower Protection – applicable to all SES:** Responds constructively when employees make protected whistleblower disclosures. Takes responsible actions to resolve whistleblower disclosures. Fosters an environment in which employees of the agency feel comfortable making protected whistleblower disclosures. Ensures all employees and supervisors are informed of their rights and responsibilities with respect to the whistleblower disclosure, whistleblower protection and prohibited personnel practices.

| Rating Official's Narrative: *(Optional)* |
|---|
| |

| *Critical Element Rating - Leading People* | ☒ Level 5 | ☐ Level 4 | ☐ Level 3 | ☐ Level 2 | ☐ Level 1 |
|---|---|---|---|---|---|

| **Critical Element 3. Business Acumen** | **(Minimum weight 5 points)** | **Weight:** 15 |
|---|---|---|

**Mandatory Performance Requirement:** Assesses, analyzes, acquires, and administers human, financial, material, and information resources in a manner that instills public trust and accomplishes the organization's mission. Uses technology to enhance processes and decision making. Executes the operating budget; prepares budget requests with justifications; and manages resources.

**Department-Specific Performance Requirements:**

- **Advancing Equity in Federal Procurement – applicable to the Chief Acquisition Officer, the Senior Procurement Executive, the Office of Small and Disadvantaged Business Utilization Director, Heads of Contracting Activities, and SES program officials who participate in, or oversee personnel who participate in, planning acquisitions and/ or selecting contractors to support their programs and projects:** Promotes achievement of small business and socioeconomic prime contracting goals established for the Component. Socioeconomic categories include Service-Disabled Veteran-Owned, Small Disadvantaged, Women-Owned, and HUBZone small businesses. Communicates the importance of achieving the agency's small business contracting goals to component personnel; maximizes opportunities for small businesses as prime contractors; encourages small business outreach to improve understanding of mission and upcoming opportunities; and reduces barriers to doing business with DHS.

- **Contractor Performance Assessment Reporting – applicable to the Chief Acquisition Officer, Component Acquisition Executives, the Senior Procurement Executive, Heads of Contracting Activities, and SES program officials who participate in, or oversee personnel who participate in, contract administration and contract performance monitoring:** Ensures timely completion (at least 95%) of DHS contractor performance reports in the Contractor Performance Assessment Reporting System (CPARS), in coordination with the Contracting Officer, and in compliance with federal acquisition law, regulations, and policy.

- **Director's Priorities/Processing Times/Backlog Reduction – applicable only to USCIS SES:** Identifies, implements, and/or supports appropriate policy initiatives, workforce efforts, projects, and IT solutions to track and achieve the Director's Priorities, USCIS strategic plan initiatives, and USCIS backlog reduction goals by the end of FY 2024.

- **Federal IT Acquisition Reform Act (FITARA) – applicable only to CIOs, CFOs and CPOs:** Advances IT services and solutions and delivers IT capabilities in a manner most efficient to integrate people, processes, and technology across the Department. CIO, CFO and CPO closely collaborate in executing decisions for contracts, acquisition and financial management involving technology. Enhances IT capabilities of DHS and its partners by ensuring operational excellence and investment planning to meet the requirements of the mission.

Rating Official's Narrative: *(Optional)*

| *Critical Element Rating - Business Acumen* | ☒ Level 5 | ☐ Level 4 | ☐ Level 3 | ☐ Level 2 | ☐ Level 1 |
|---|---|---|---|---|---|

| **Critical Element 4. Building Coalitions** | **(Minimum weight 5 points)** | **Weight:** 15 |
|---|---|---|

**Mandatory Performance Requirement:** Solicits and considers feedback from internal and external stakeholders or customers. Coordinates with appropriate parties to maximize input from the widest range of appropriate stakeholders to facilitate an open exchange of opinion from diverse groups and strengthen internal and external support. Explains, advocates, and expresses facts and ideas in a convincing manner and negotiates with individuals and groups internally and externally, as appropriate. Develops a professional network with other organizations and identifies the internal and external politics that affect the work of the organization.

**Department-Specific Performance Requirements:**

- **Coordination on Privacy and Civil Liberties – applicable to all SES:** Executes DHS' critical mission while safeguarding privacy, civil rights, and civil liberties. Coordinates with the Privacy Office (PRIV), including Component Privacy Officers and privacy points of contact, and Office for Civil Rights and Civil Liberties (CRCL) when implementing policies, programs, and operations that impact the rights of the DHS workforce and the communities we serve, including meaningful coordination at the inception of those activities to ensure timely and actionable advice.

- **Information Sharing – applicable only to SES working within the Information Sharing Environment:** Shares terrorism-related information in a manner consistent with protection of sources and methods, and legal standards relating to privacy and civil liberties and national security in a manner consistent with The Intelligence Reform and Terrorism Prevention Act of 2004 (IRTPA). Identifies opportunities to provide complete, tailored, timely, actionable and validated terrorism-related information at the level or levels necessary to address the needs of ISE users. Collaborates with others and identifies impediments or improvements to information sharing among Federal state/local, private sector, and foreign partners. Develops highly effective recommendations for new or revised policies, business practices, and technology to address these areas. Collaborates with others and promotes a uniform federal message to partners and the private sector which reduces redundancies, eliminates conflicting information, and enhances meaningful coordination and collaboration.

  Leverages system capabilities to enhance information sharing and collaboration to identify new, innovative approaches or solutions that may be more adaptable to a rapidly changing environment. Ensures information is made available in a timely manner and is accessible and relevant to customer or partner needs. Operates in a manner designed to maximize cooperation and collaboration and ensures appropriate information is shared with relevant parties. Ensures self and all employees complete all relevant training on time.

- **Public/Private Sector Partnership – applicable to all SES:** Strengthens and leverages existing, relevant partnerships and actively seeks to identify and develop new strategic partnerships with stakeholders in the public and private sectors, at all levels, in alignment with organizational goals and objectives. Evaluates the qualitative and quantitative impact of public and private sector partnerships and develops recommendations for strengthening existing partnerships and identifies opportunities for new ones. Increases awareness and impact of DHS programs and resources by developing and implementing a comprehensive partnership and engagement strategy that defines the partnership structure, roles, and responsibilities. Ensures employees develop, maintain, and leverage partnerships with stakeholders in the public and private sectors by identifying, curating, and growing partnering capacities.

- **Union Partnership – applicable only to SES with union involvement:** Fosters a culture of collaboration with union representatives and leadership by (1) engaging in pre-decisional involvement whenever feasible; (2) offering regular meetings at least quarterly to discuss issues of concern, organizational priorities, areas for collaboration; and (3) ensuring appropriate representation and active participation in agency labor management forums.

Rating Official's Narrative: *(Optional)*

| | | | | | |
|---|---|---|---|---|---|
| *Critical Element Rating - Building Coalitions* | ☒ Level 5 | ☐ Level 4 | ☐ Level 3 | ☐ Level 2 | ☐ Level 1 |

| **Critical Element 5. Results Driven** | **(Minimum weight 20 points)   Weight:** 40 |
|---|---|

This critical element must have at least 1 performance requirement (there is no maximum number of requirements, agency should specify if it sets a maximum number).

This critical element includes specific performance requirements expected of the executive during the appraisal period, focusing on measurable results from the strategic plan or other measurable outputs and outcomes clearly aligned to organizational goals and objectives.  At a minimum, the performance requirements must contain measurable results and their quality indicators describing the range of performance at Level 3 for each result specified.  In addition to the quality indicators, applicable measures of quantity, timelines, and/or cost-effectiveness may be included as appropriate.  It is recommended to also establish the threshold quality indicators and measures for Levels 5 and 2.  Indicators must reflect the same level of performance as the respective performance standard contained in Part 5.

Strategic Alignment - identify clear, transparent alignment to agency strategic planning initiatives (e.g., relevant agency or organizational goals/objectives with cited page numbers from the Strategic Plan, Congressional Budget Justification/Annual Performance Plan, or other organizational planning document) in the designated section for each performance requirement.

| Performance Requirement 1 | Strategic Alignment |
|---|---|
| Financial Operations:  Provide timely, accurate and efficient financial management services and operations in order to maximize resources in support of the Departmental Management and Operations Future Year Homeland Security Program (FYHSP) by providing comprehensive leadership, oversight, and support to all FEMA Components. (FYHSP Program).<br>1. Reduce interest penalties paid on all invoices to less than $50 per $1 million in total payments throughout FY 2024 in order to maximize the use of Agency financial resources. (GPRA, FYHSP)<br>2. Ensure the unit cost of processing a vendor payment invoice does not exceed $50 per invoice during FY2024 resulting in an efficient accounts payable office function. (FYHSP)<br>3. Ensure 98% of vendor invoices are paid electronically during FY 2024 resulting in administrative cost savings to the Federal Government. (FYHSP)<br>4. Enhance FEMA collections in FY 2024 by ensuring 90% of eligible/certified debts are submitted to the US Department of Treasury within 120 days for cross-servicing.<br>5. Process 95% of travel vouchers within 5 days after receiving an accurate, funded and approved voucher during FY 2024 resulting in timely reimbursement to FEMA's Emergency Managers. | 2020-2024 DHS Strategic Plan, Goal 5 Strengthen Preparedness and Resilience (pg. 44) & Goal 6 Champion the OHS Workforce and Strengthen the Department, Objective 6.3: Optimize Support to Mission Operations. (pg. 55)<br>2) FEMA 2022-2026 Strategic Plan Goal 3: Promote and Sustain a Ready FEMA and Prepared Nation (pg.19).<br>3) FEMA OCFO Strategic Priority number 3: Mature and optimize business processes (pg. 7). Reduce the complexity of FEMA by streamlining current business processes and modernizing our financial systems. |
| Performance Requirement 2 | Strategic Alignment |
| Controls/Audit: Enhance FEMA's audit readiness program and strengthen internal controls by addressing identified deficiencies over financial reporting and operations to obtain a "clean" external audit opinion on the OHS FY2023 Annual Financial Report.<br>1. Reduce by 5% the number of existing/repeated Audit findings as of September 30, 2024 resulting | 1) The 2020-2024 DHS Strategic Plan, Goal 5 Strengthen Preparedness and Resilience (pg. 44) & Goal 6 Champion the DHS Workforce and Strengthen the Department, Objective 6.3: Optimize Support to Mission Operations. (pg. 55)<br>2) FEMA 2022-2026 Strategic Plan Goal 3: Promote and Sustain a Ready FEMA and |

| Performance Requirement 2 | Strategic Alignment |
|---|---|
| in increased agency wide internal controls.<br>2. Contribute to the DHS unqualified "clean" audit opinion by improving the remediation of the Notice of Findings and Recommendations (NFR) by 5% over the FY21 results by September 30, 2024.<br>3. Ensure the FY 2024 annual improper payment (IPERIA) error rate on the Vendor Payment Program does not exceed the error rate of 1.4% resulting in timely and accurate payments to vendors for goods and services. | Prepared Nation (pg.19).<br>3) FEMA OCFO Strategic Priority number 3: Mature and optimize business processes (pg. 7). Reduce the complexity of FEMA by streamlining current business processes and modernizing our financial systems. |

| Performance Requirement 3 | Strategic Alignment |
|---|---|
| Budget: Enhance FEMA's resource program and strengthen capabilities and outcomes by working with FEMA leadership and key external stakeholders<br>1. Continue to provide and source resources in support of the FEMA Mission. Ensure that external deadlines are met 90% on time or early.<br>2. 5% increase in O&S execution rates as compared to FY 2023 execution rates by July 31, 2024, to ensure 99% spend rate by 9/30/2024.<br>3. Mature the PPBE process across the agency and providing four Quarterly Spend Plan Reviews chaired by the Deputy Administrator enabling leaders to make budgetary adjustments for fact-of-life changes throughout the FY.<br>4. For Disaster Relief Fund, continue to assess and enhance business processes to increase the accuracy of projections, so that spend plans will be within 80 - 120% of the actual costs overall for the fiscal year by 9/30/2024. | 1) DHS Strategic Mission 5: Strengthen National Preparedness and Resilience, DHS Goal 5 Ensure Readiness of Front-line Operators and First Responders & DHS Goal 6 Strengthen Service Delivery and Manage DHS Resources. (pg. 45)<br>2) FEMA 2022-2026 Strategic Plan Goal 3: Promote and Sustain a Ready FEMA and Prepared Nation (pg.19).<br>3) FEMA OCFO Strategic Priority number 3: Mature and optimize business processes (pg. 7). Reduce the complexity of FEMA by streamlining current business processes and modernizing our financial systems. |

| Performance Requirement 4 | Strategic Alignment |
|---|---|
| Financial Systems: Strengthen and modernize FEMA business systems by leveraging technology and data integration to improve the quality and reliability of financial information utilized in making management decisions.<br><br>1: Ensure the FSM program makes satisfactory progress on the program schedule and work breakdown structure. Satisfactory progress is defined as meeting programmatic performance goals so to not have to report a cost, schedule, or performance breach to DHS. Such changes will contribute to improving the percent of funds provided to State, Local, Tribal, Territorial, and other federal agencies for which data sets have been made publicly available and machine readable. Such success instills confidence on the part of DHS, OMB, and Congress that FEMA is managing this high-profile, high-risk program effectively.<br>2: With respect to Robotics Process Automation (RPA); develop an OCFO plan to mature the RPA effort and expand the use of automation. Partner with other FEMA organizations to expand the use of the automation technology and continue to be a thought leader across FEMA.<br>3: Complete the acquisition of FEMA's Program, Planning, Budget, and Execution (PPBE) software in | 1) The 2020-2024 DHS Strategic Plan, Goal 5 Strengthen Preparedness and Resilience (pg. 44) & Goal 6 Champion the DHS Workforce and Strengthen the Department, Objective 6.3: Optimize Support to Mission Operations. (pg. 55)<br>2) FEMA 2022-2026 Strategic Plan Goal 3: Promote and Sustain a Ready FEMA and Prepared Nation (pg.19). |

| Performance Requirement 4 | Strategic Alignment |
|---|---|
| Q1 FY24 and start the implementation of the software in Q2 FY24. Engage with OCFO, OPPA, and OCIO leadership to implement a robust governance process to guide the PPBE effort. A PPBE automated solution will transform the way FEMA formulates and executes its future budgets. | |

| Performance Requirement 5 | Strategic Alignment |
|---|---|
| Ready Financial Management Cadre by hiring training, and qualifying incident workforce personnel to support FEMA's mission.<br>• Achieve and maintain a force strength Incident Management positions equal targets confirmed by the Certifying A October 2022, by September 30, 2024.<br>• Achieve and maintain an average national qualification for their cadre equal or greater than the GPRA qualification metric of 70% by September 30, 2024.<br>• Fill to 80% or greater all their cadre's scheduled academic FQS deliveries one month prior to course start date to ensure staff adequately trained and qualified.<br>• Ensure all the cadre's scheduled academic FQS deliveries have less than 20% non-disaster related cancellations, to maximize training and resources.<br>• Support the development and revision of curriculum for their cadre by coordinating curriculum designers and stakeholders all project milestones are completed 30, 2024.<br>• Coordinate with the Workforce Development Division to target pairing rates within the first 60 days of a disaster to ensure a 50% Coach & Evaluator to Trainee/Candida rate, utilizing C&E specific deployment indirect/virtual observations.<br>• Support disaster response operation 90% of field disaster staffing requirements in accordance with agency force structure requirements and established policy build capability for response to catastrophic disasters.<br><br>• By September 1, 2024, develop a contingency staffing plan to build and maintain readiness during a high disaster activity this includes established readiness plans that account for contracts, Surge Capacity coverage or other staffing sources. | HS QHSR 5: Strengthen National preparedness and resilience. 2014 Quadrennial Homeland Sec Review<br><br>• FEMA 2022-2026 Strategic Pl 1: Instill Equity as a Foundation of Emergency Management (pg.9 |

Rating Official's Narrative: *(Optional)*




*Critical Element Rating - Results Driven*    ☒ Level 5    ☐ Level 4    ☐ Level 3    ☐ Level 2    ☐ Level 1

## Part 6. Summary Rating Narrative *(Mandatory)*

**Part 7. Executive's Accomplishment Narrative** *(Optional)*

**Part 8. Department Use**

**DHS Privacy Act Statement**

Pursuant to 5 U.S.C. § 552a(e)(3), this Privacy Act Statement serves to inform you of why DHS is requesting the information on this form.

**AUTHORITY:** DHS is authorized to collect the information requested on this form pursuant to 5 U.S.C. § 43 and DHS Directive 255-10.

**PURPOSE:** DHS is requesting this information for implementation of the DHS Senior Executive Service Performance Management System Executive Performance Plan (DHS Form 255-02), which is the annual performance agreement for SES employees.  The form allows supervisors to establish performance elements and requirements in consultation with the SES and consistent with the goals and performance expectations in the agency's strategic planning initiatives.  DHS will use the form to collect performance-related data to make decisions relevant to performance awards and performance-based pay adjustments.

**ROUTINE USES:** The information requested on this form may be shared externally as a "routine use" to other government agencies, to assist the Department of Homeland Security in monitoring and communicating performance.  Rating information in collected annually by the Office of Personnel Management and these records may be transferred to another agency upon transfer or reassignment.  A complete list of the routine uses can be found in the system of records notice associated with this form, "OPM/GOVT-2 Employee Performance File System Records SORN."  The Department's full list of system of records notices can be found on the Department's website at **http://www.dhs.gov/system-records-notices-sorns**.

**CONSEQUENCES OF FAILURE TO PROVIDE INFORMATION:** Providing this information to is voluntary.  However, failure to provide this information may result in non-consideration of performance-related incentives or may be related to a conduct issue resulting in removal.

**Addendum – New FY 2024 SES/TSES Department-Specific Performance Requirements**

This is an addendum to FY 2024 Senior Executive Service (SES)/Transportation Security Executive Service (TSES) performance plans for new requirements.  The three new requirements below have been added to **Critical Element 1: Leading Change**, under the Department-Specific Performance Requirements.  These new requirements apply to all executives and are effective immediately for the remainder of the FY 2024 performance appraisal period.  All existing FY 2024 Department-Specific Performance Requirements remain in effect.

Executives on a signed FY 2024 SES/TSES performance plan are not required to sign a new performance plan.  Executives and their rating official must **review, sign and date this addendum** acknowledging the new requirements, then **attach the signed addendum** to their existing FY 2024 performance plan.

New executives or ones not currently on an FY 2024 SES/TSES performance plan **will not** need to sign this addendum once the FY 2024 SES/TSES performance plan template is updated to include these new requirements.

---

**Critical Element 1: Leading Change**

**Driving Cohesion – applicable to all SES:** Advances strategic and operational cohesion across the Department to improve mission execution and drive greater efficiency.  Fosters an understanding of dependencies within and outside of the organization that impact success of programs; leads change management behaviors to strengthen this understanding and commitment to supporting cross-Component mission success; increases alignment to the Secretary's annual DHS priorities; and accomplishes mission requirements in a productive, efficient, and innovative manner.  These behaviors include, but are not limited to, defining vision and goals, developing strategies to accomplish goals and objectives, identifying and engaging stakeholders, communicating and implementing change, reviewing progress and analyzing results.

**Employee Experience – applicable to all SES:** Supports DHS's commitment to improving the employee experience across the Department, focusing on addressing employees' basic needs.  Basic needs are defined as the tools, resources, support, technologies, and infrastructure employees need to do their work effectively.  Examples include facilities, equipment, IT, mental and physical health, and respite.  Uses feedback from a variety of sources as appropriate (e.g., the OPM Federal Employee Viewpoint Survey (FEVS), pulse surveys, all-hands and town hall meetings, focus groups, and stay and exit surveys and interviews), to analyze employees' needs, address concerns, and develop and adopt best practices that have direct impact on improving the employee experience.  Communicates progress on addressing issues identified by employees, both upward to leadership and outward to the workforce through various communication mechanisms.

**Workforce Resilience – applicable to all SES:** Supports DHS's commitment to improving employee well-being and resilience by implementing transformative efforts focused on the mental and physical health and safety of employees to ensure that our workforce is ready to meet the demands of our mission.  Engages the workforce directly to better understand challenges and areas of concern that may lead to diminished employee well-being, performance, and retention.  Leads the integration of innovative workforce health and safety concepts and solutions into operations to drive positive change.  Supports the ability of the workforce to prioritize their health and wellness by encouraging the efficient use of policies such as the DHS Workforce Health and Wellness Program.

---

I acknowledge receipt of these new FY 2024 Department-Specific Performance Requirements.

MARY FRANCIS COMANS
Digitally signed by MARY FRANCIS COMANS
Date: 2024.05.16 09:44:01 -04'00'
_____
**Executive Signature**

ERIK A HOOKS
Digitally signed by ERIK A HOOKS
Date: 2024.06.06 14:50:52 -04'00'
_____
**Rating Official Signature**




DEPARTMENT OF HOMELAND SECURITY
FEDERAL EMERGENCY MANAGEMENT AGENCY
**SENIOR EXECUTIVE PERFORMANCE MANAGEMENT SYSTEM**
**CLOSEOUT: FISCAL YEAR 2024 EXECUTIVE PERFORMANCE PLAN**

| Part 7: Executive's Accomplishment Narrative *(Mandatory)* | |
|---|---|
| Use this Accomplishment Narrative Template to document your individual accomplishments related to the Critical Elements and Performance Requirements in your FY24 Executive Performance Plan. Your response is limited to **no more than five pages**, using no smaller than a 10-point font size. | |
| Executive's Name *(Last, First, MI):* Comans, Mary F | Appraisal Period: **From: October 1, 2023** **To:    September 30, 2024** |
| Rating Official's Name *(Last, First, MI):* Hooks, Erik A | Date: |

Highlighted below are selected performance accomplishments across the major functional business areas I am responsible for as FEMA's Chief Financial Officer.  The narrative provided demonstrates my leadership for this performance cycle in the critical elements of: Leading Change, Leading People, Business Acumen, Building Coalitions and Results Driven.  During this rating period I provided high quality, responsive financial support to the Agency, have partnered with FEMA leadership to advance strategic priorities, consistently delivered results and have strong credibility with our external stakeholders at DHS Headquarters, OMB, and the Congress.  I am also proud of the work I've done to build and sustain a high quality OCFO team and have been a positive influence on the workforce.

**Critical Element 1.  Leading Change**
**Self-Performance Assessment:** At the direction of the Administrator to mature the Agency's planning, programming, budget and execution (PPBE) life cycle, I worked to initiate and design a zero-based budgeting (ZBB) construct to inform resource allocation for the ensuring future.  The ZBB promotes constructive coordination with FEMA stakeholders with the objective of sharpening the analytic foundation of the FY 2027-2031 Resource Allocation Plan.  Specifically, the ZBB establishes the processes and procedures for "targeted program reviews," frames additional FEMA-wide program analysis and evaluation efforts, and highlights the use of FEMA PBIS, a new resource and budget system of record that was implemented by my team this fiscal year.

In support of this effort, I recommended to the Administrator and Deputy Administrator that Agency focus its initial programmatic deep-dive on three critical elements of our Agency's operation: Disaster Relief Fund Base, Enterprise IT and Exercises.  Additionally, I proposed a zero-based approach to allow for a fresh evaluation of our budget and resource requirements.  The ZBB analysis will help FEMA mature from a tactical, "review-and-approve" programming/formulation process to one that invites FEMA senior leadership into a strategic, "debate and decide" approach earlier in the PPBE process.  Further the outcome of this analysis will expand FEMA's and ultimately the Administrator's decision space as we consider scenario-based resource allocation options, informed by the Agency's priorities and a dynamic fiscal environment.

Similarly, the Administrator has charged each Program to identify efficiencies to increase capacity to better achieve the Agency's priorities.  To this end, during this rating period, my organization successfully deployed the Department of Homeland Security's (DHS) first generative Automated Intelligence (AI) model to automate the generation of draft responses to Congressional questions on FEMA's budget and financial resources.  To achieve initial operating capability in January 2024, I lead the team through several critical steps to ensure desired outcomes were achieved and risks associated with implementing an emerging technology were mitigated.

The first step of this effort was to identify a low risk, high yield use-case to demonstrate the value of generative AI.  I quickly narrowed the scope down to building an AI model that could leverage publicly available information, such as FEMA's Congressional Budget Justification, to auto-generate responses to budget related questions.  Further, this use-case also benefits all of FEMA, as the Agency receives an average of 15 questions per day from the Senate and House Appropriation Committees.  Responding to these questions often takes the whole of FEMA, thousands of hours per year,

Attachment C

pulling resources away from other mission critical activities.  Next, I worked with the Chief Information Officer to ensure we adhered to DHS AI governance policy and were safely and securely operating the AI model.

While only in the initial phase, the OCFO's AI model is able to generate a 90% accurate response requiring little correction and/or editing.  Once fully deployed, it is anticipated that this innovative solution will reduce person-hours by more than 10% as well significantly increase the timeliness of the Agency's response to Congress.  Ultimately, the intent is to scale FEMA's OCFO AI model and add the ability to analyze DHS financial policy and appropriation law.

Use of AI represents a significant leap forward for OCFO and the broader FEMA enterprise. Providing my staff with this tool has fundamentally transformed how my organization conducts financial data analysis and respond to stakeholder inquiries. The efficiency and consistency brought about by this innovation have greatly enhanced FEMA's capabilities to produce timely and accurate responses to stakeholder's budget questions. Ultimately, continued investment in generative AI will allow FEMA to meet the Administrator strategic intent to reduce our administrative burdens, enhance customer experience and increase operational efficiency.

**Critical Element 2.  Leading People**
**Self-Performance Assessment:** FEMA implemented Immediate Needs Funding (INF) on August 29, 2023 as Hurricane Idalia approached the Florida coast to ensure sufficient funding to meet ongoing disaster operations and preserve funding for life saving/sustaining activities.  Though necessary, this posture paused obligations for nearly 2,500 projects across the country.  With the passage of the first of four FY 2024 Continuing Resolutions on September 30, 2023, Congress provided FEMA $16B in emergency supplemental funding allowing the Agency to lift INF restrictions during the first day of this performance cycle.

Recognizing the impact INF has on SLTT communities we serve, I stood up a strike team within the CFO organization to quickly and expeditiously process the 2,500 project worksheets and obligate more than $3 billion.  Additionally, to keep our stakeholders informed, I worked with External Affairs to establish a link on the FEMA homepage that provided daily status updates.  By October 13th, all projects paused under INF were obligated and fully funded.

Throughout this rating period, I successfully led and managed the health financial health of the DRF.  For the second consecutive year, the DRF's annual appropriation of $20B would be insufficient to fully resource all response and recovery needs this fiscal year.  As such, I asked my team to develop a reporting dashboard for internal and external stakeholders that provided monthly updates on the anticipated exhaust date.  Additionally, working with the Regions, Office of Response and Recovery and the Office of the Chief Procurement Officer, I assembled a team to scrub "open" DRF obligations to recoup funding to help sustain the Fund as we awaited a supplemental.

This focused effort extended our ability to fund critical DRF activities and sustained FEMA's ability to meet its mission.  Through these actions, FEMA deobligated and returned: $1 billion in unused Public Assistance and Hazard Mitigation Grants; $876 million in Mission Assignments and $474 million in other disaster assistance contracts.  At the close of the fiscal year, $3 billion in excess funds had been identified and returned to the DRF.

Further, I led the development of a Congressional Engagement Strategy.  This strategy included a tic-toc of key engagements by the Administrator and a library of written documents for Agency and Departmental leadership to leverage to amplify the DRF message.  Over the course of July and August, the Administrator met with every key Appropriator and other Congressional champions in the House and Senate to garner their support for the $9 billion supplemental proposal and long-term fixes that will provide enduring reform.

Despite the deliberate and proactive aforementioned actions, on August 7th the Agency had to implement INF restrictions due to a series of major disaster activities and a rapidly depleting DRF balance. This guidance allowed the Agency to prioritize ongoing disaster operations and preserve funding for initial response and recovery activities for any new incidents.

As FEMA's CFO I led more than 450 personnel and I am proud that OCFO continues to be one of the highest rated organization within FEMA in term of employee satisfaction as captured through the 2023 Federal Employee Viewpoint Survey. OCFO's Global Satisfaction rate is among the top three within FEMA and exceeds the rest of DHS and the government-wide average. My organization continues to have one of the highest Diversity & Inclusion IQ and Employee Engagement scores. I take great pride and satisfaction in these results, and they are a testament to the collective OCFO

Attachment C

leadership, and the results reflect the empathy and respect we have for one another, and OCFO's dedication to helping people before, during and after disasters.

**Critical Element 3.  Business Acumen**
**Self-Performance Assessment:** As FEMA's CFO I have significant expertise and experience optimizing financial, technological, and human resources with the purpose of enhancing FEMA's mission accomplishments. To that end, I am constantly looking for innovative, efficient ways to accomplish our goals and improve business processes.

During this rating period I led an effort to fundamentally change the way FEMA delivers assistance to disaster survivors. In working with the U.S. Department of Treasury and the Office of Recovery, Individual Assistance (IA) my team has developed and piloted a path to deliver financial assistance quicker to survivors who do not have a traditional bank account. With this piloted capability, instead of issuing a paper check, Treasury is able to provide digital payment t through services such as Venmo, PayPal and Apple Pay.  The result of which, FEMA is now able to provide disaster assistance to disaster survivors in underserved populations/communities within a few days instead of waiting 2 to 3 weeks for a Treasury check to arrive.

FEMA initiated this pilot in June and as September 30, 2024, FEMA has conducted a successful pilot of the digital pay process, whereby 67% of survivors received their funding within 2-3 days instead of 2-3 weeks for a Treasury check. FEMA is continuing to enhance the process and will conduct a second pilot in the coming months.

To address the challenges posed by the current DRF Base appropriation structure and the increasing demands of disaster response, I identified and brought together the applicable subject matter experts to draft a long-term legislation solution.

Currently, the DRF Base is appropriated at an estimated $1 billion and is scored as discretionary spending. In contrast, the DRF Majors, which is activated upon a presidential major disaster declaration, is scored as "disaster relief" spending under the Balanced Budget and Emergency Deficit Control Act (BBEDCA) and does not count against the federal government's discretionary spending limits imposed under BBEDCA. A critical limitation under the current structure is that until a disaster is officially declared a presidentially declared disaster, only the Base funding can be utilized. This restriction has led to the rapid depletion of the Base funds, as all initial disaster response efforts are charged to the Base until a major disaster declaration allows costs to be reassigned to DRF Majors funding.  Further, DRF Base funding is scored against the discretionary spending caps, however, budget requests for Base funding must compete against funding for the rest of the federal government, which limits the amount of funding available for the Base; whereas, "disaster relief" funding for the DRF Majors is subject to a separate, independent cap that does not impact any other funding.

Given the increasing volatility in disaster frequency and severity, and the financial strain it places on the DRF Base, I asked the subject matter expert to draft legislation that would reclassify all items currently under the DRF Base (FMAG, Emergencies, Surge, and DRS) be reclassified under the BBEDCA "disaster relief" adjustment through. This reclassification would provide FEMA the necessary flexibility to manage disaster-related expenses more effectively.

This legislative package has been provided to Congress and has been favorably received by Appropriation Committee staff as they work FEMA's larger supplemental requirements.  It is also included in the Agency's FY2026 Budget submission that is currently with OMB.  Once enacted, this legislative package will mitigate FEMA's funding risk, streamline funding mechanisms, increase our flexibility and ultimately allow us to better serve disaster survivors.

**Critical Element 3.  Building Coalitions**
**Self-Performance Assessment:** As FEMA's CFO, it is my responsibility to lead, liaise and manage the across the Agency and with the OMB, DHS and Congressional Committees. Over the course of this rating period, I have worked to further cultivate the collaborative relationships with internal and external partners to aid FEMA's mission as well as bolster the available resources to deliver on Agency priorities.  Programmatic issues that rise to the level of Congressional scrutiny can become sensitive and controversial, not to mention politically charged; budget issues are often at the forefront of these. Over
the last several fiscal years the budget climate has grown increasingly dynamic making it even more critical to build and maintain coalitions and relationships.

Actions taken by myself and my team resulted in the Agency being appropriated more than $45.4B in FY 2024, as of date. More specifically, during FY 2024 OCFO lead and oversaw thousands of appropriations-related activities, including:

Attachment C

programmatic and informational briefings, responding to Questions for the Record, and requests for legislative drafting assistance. Through formal and informal engagement with House and Senate Appropriators, I have influenced the decision process and garnered widespread support for FEMA's resource requirements and fostered continued trust between the Committees and FEMA. Other examples of relationship and coalition building activities include:

overseeing the development of materials for budget rollout, facilitating briefings with Appropriators, Intergovernmental and Association partners on critical FEMA programs as well as ensuring FEMA's Program Offices are well versed on the appropriations processes and how to best advocate for their programmatic needs.

FEMA's relationship with the Congressional Appropriation Committees is held up as the model that our DHS peers should emulate and regularly recognized for our collaboration and constructive dialog. As a result, we are often asked to consult with other DHS CFO Offices and help our component peers to mature their processes. The relationships with HAC/SAC have never been stronger, as demonstrated by the intelligence we received in advance of congressional action, the positive comments to leadership, and the repeated requests for FEMA support. During this rating period, CFO continued to be highly successful in articulating the mission requirements of the Agency and obtaining the necessary funding to meet it operational demands.

**Critical Element 5.  Results Driven**
**Performance Requirement 1: Budget**
**Self-Performance Assessment:** During this rating period, I have successfully faced and lead during difficult budget challenges. In FY 2024, FEMA responded to major hurricanes, wildfires and other non-Stafford Act mission requirements related to Homeland Defense. I oversaw FEMA's budget development and submittal of regular and one DRF supplemental appropriation requests. I was responsible for administering FEMA's $45+ billion budget across multiple appropriations based on a wide-range of programmatic and mission demands.

Through my and my team's engagements with the Hill, FEMA's FY 2024 Budget, which was enacted December 23, 2024, provided $30.1B in funding. An increase of more than $192M above the FY 2023 Enactment.  The late enactment of the appropriation put great importance on FEMA's Quarterly Executive Resources Panels and Spend Plan Reviews. Recognizing the criticality of these decision meetings I led, oversaw the development, and enhanced the quality of four quarterly resource and spend plan review sessions to FEMA senior leadership. Under my leadership, OCFO continued to mature its end of year close-out process and management of the FEMA's uncommitted/unobligated resources. In doing so, Agency-wide initiatives, such as buildout of regional SCIFs, tribal engagements across the 10 regions, continuity initiatives, capability and capacity to combat mis/disinformation were resourced and supported. Further I conducted pre-briefs for senior leadership to ensure full transparency and visibility into decision making options and priorities prior to sessions. In partnership with OPPA, OCFO reviewed and scored over 21 Execution Decision Options submitted during FY 2024 for quality and funding need. The value and result of this hard work can be seen in the accomplishment of year-end close. In partnership with OCPO, I ensured a smooth FY 2024 closeout by leading a multitude of collaboration sessions in preparation for year-end. OCPO and OCFO worked together to ensure any programmatic fallout was used and as a result, FEMA executed 99% of all available expiring funds and far exceeded the performance goal. Within the DRF account specifically, we obligated more than $38B of which $15B was for COVID-19 operational requirements this fiscal year.

**Performance Requirement 2:**
**Self-Performance Assessment:**  During this rating period I enhanced FEMA's audit readiness program and continued to strengthen FEMA's internal controls by addressing identified deficiencies over financial reporting and operations in order to obtain a "clean" external audit opinion on the DHS FY 2024 Annual Financial Report.

To accomplish this performance goal, I successfully established a control environment to address known audit findings by reducing the risk of FEMA contributing to a material weakness or negatively impacting the Department's "clean" audit opinion. To date, the 2024 existing audit finding have been reduced by 63%.  Together with Agency leadership, OCFO substantially reduced the number of existing/repeated audit findings and existing audit findings.

I enhanced and matured audit documentation by ensuring all necessary procedures for internal controls and audit were updated and validated. My team ensured policies and standard operating procedures were complete and in place to meet established FEMA Assurance Statement Requirements. Overall, Audit is an area that the entire Agency continues to strengthen. The accomplishments made in Audit this rating period were increased and enhanced by my leadership

Attachment C

engagement and championing FEMA's understanding of the value of the OMB A-123 process and audit remediation. While there will always be work to do, I believe the Agency is maturing, and more aware, stronger, engaged, and moving in the right direction in terms of institutionalizing a culture of compliance.

**Performance Requirement 3: Finance**
**Self-Performance Assessment:** During this rating period, I was highly effective in producing results within my Finance performance targets. I provided timely, accurate and efficient financial management services and operations through comprehensive leadership, oversight, and support to all FEMA Programs and Offices. Additionally, I strengthened OCFO operational efficiency and effectiveness by reengineering our business processes to maximize Agency resources and support our stakeholders.

The interest penalties paid on all invoices were less than $50 per $1 million in total payments and as of September 30, 2023, FEMA paid an average of $13.83 per $1 million in interest penalties (minuscule amount). Also, the unit cost of processing a vendor payment invoice does not exceed $50 per invoice; the average cost of processing an invoice during FY 2024 is $34.09. I have exceeded the goal of 98% of invoices paid electronically and ensured 99.77% were paid electronically. In addition, FEMA referred 100% of eligible/certified debts to the US Department of Treasury and paid 95% of travel vouchers within 1.68 days which exceeded the 5-day DHS goal.

**Performance Requirement 4: Financial Systems**
**Self-Performance Assessment:** During this rating period, I took steps to strengthen and modernize FEMA business systems by leveraging technology and data integration to improve the quality and reliability of financial information utilized in making management decisions. FEMA's financial success and accomplishments are even more impressive considering the Agency's financial system is more and 45 years old. The OCFO team maintained 99.9% operability and availability of our antiquated system. This was achieved by my Financial Systems team being squarely focused on maintaining and sustaining our legacy WebIFMIS financial system, despite daily reliability challenges and resource constraint.

I serve has the executive sponsor of the Financial Systems Modernization initiative and I ensure FEMA's FSM program continues to make meaningful progress. I worked with DHS and FEMA leadership to maintain visibility on our timeline and the path forward to a successful implementation and cutover. I oversaw the FEMA FSM team in the collection of requirements, development of a plan for engagement, and collection of documents to support software Discovery. Furthermore, I worked with the FEMA stakeholders and DHS Financial Systems Modernization Executive Council members to develop amendment language to codify the process for the Go/No-Go decision to cut-over the new financial systems when it's ready to be implemented to ensure the FEMA Administrator retained/maintained final decision authority on FEMA's cutover to the new financial system.

**Performance Requirement 5: Financial Management Cadre (5)**
**Self-Performance Assessment:** As the Cadre Authority for the Financial Management (FM) Cadre, my Cadre continues to achieve its hiring and qualification goal. In fact, through determination and the assistance of sharing of FM Cadre job announcements, the Financial Management Cadre achieved its Force Structure hiring target and is full strength. The majority of positions have been onboarded, with only a few final candidates awaiting EOD. Our recruitment efforts through USAJobs and hiring events have proven effective. Our current focus is on ensuring qualifications.

To that end, in FY 2024, 95 Financial Management Cadre Members have become fully qualified with many more members less than 10% away from completion. The FM Cadre's academic FQS deliveries continue to have less than the 20% non-disaster related cancellations and so far in FY2024. To enhance our readiness, my Cadre is hosting a Sustainment Exercise where 250 Financial Managers from across FEMA gathered for the purpose of team building, receiving updates on changes to directives, policies and procedures, and to receive an Appropriation Law refresher. Our Financial Management Exercise received widespread praise and is now being used as a benchmark for other cadres. Overall, FY24 has set a strong foundation for our continued success.

Attachment C

DEPARTMENT OF HOMELAND SECURITY
FEDERAL EMERGENCY MANAGEMENT AGENCY

**SENIOR EXECUTIVE PERFORMANCE MANAGEMENT SYSTEM**
**CLOSEOUT: FISCAL YEAR 2024 EXECUTIVE PERFORMANCE PLAN**



| Part 6: Summary Rating Narrative *(Mandatory)* | |
|---|---|
| Please limit your response to **no more than two pages**, using no smaller than a 10-point font size. **NOTE**: Both the Rating Official and the Executive are required to sign below and sign page 1 (Part 3: Summary Rating) of the Executive's Performance Plan after meeting to discuss the Executive's FY23 achievements. | |
| Executive's Name *(Last, First, MI): Comans, Mary* | Appraisal Period: **From: October 1, 2023** **To:    September 30, 2024** |
| Rating Official's Name *(Last, First, MI): Hooks, Erik* | |
| Rating Official's Signature:    ERIK A HOOKS        Digitally signed by ERIK A HOOKS Date: 2024.10.12 11:09:38 -04'00' | Date: |

Ms. Mary Comans has achieved excellence serving in the essential position of FEMA's Chief Financial Officer (CFO).  Ms. Comans has done an outstanding job and has demonstrated unwavering leadership.  Ms. Comans is an effective, well-respected leader and trusted advisor to the FEMA Administrator, Deputy Administrator and Department of Homeland Security leaders.  Her success and accomplishments are further enhanced when one overlays the complexity of FEMA's operational environment, the most nuanced and intricate across the Department of Homeland Security.  In FY 2024, Ms. Comans leveraged her financial and analytical skill, strong work ethic, caring leadership, and positive professional relationships to move the Agency forward under demanding and unprecedented circumstances.  Ms. Comans leadership was instrumental in transforming the way FEMA conducts business and she engaged with leaders across the government and Agency to identify ways to improve and enhance operations, while finding unique and creative ways to ensure Agency and Department success.

During this rating period, Ms. Comans led the Agency's efforts with external stakeholders on various DHS and FEMA priorities, to garner funding from Congress for our key initiatives, including significant investments in workforce readiness and Incident Management support, critical funding for our IT modernizations, and continued support for the Administrator's strategic plan and FEMA's modernization initiatives.  Early in this rating period, Ms. Comans identified that that the Disaster Relief Fund's (DRF) annual appropriation of $20 billion would be insufficient to fully resource all response and recovery needs this fiscal year.  As such, she leveraged a strategy to recoup over $3 billion to be returned to the DRF and extend FEMA's ability to fund critical mission activities.  Original projections forecasted that FEMA would have to implement Immediate Needs Funding restrictions in June 2024 but, because of her actions and the collations she built around sustaining the DRF, Ms. Comans has able to stave off INF implementation until August 2023.

Under his leadership, the OCFO remains one of the highest rated organizations within FEMA in term of employee satisfaction as captured through the 2023 Federal Employee Viewpoint Survey.  OCFO's Global Satisfaction rate exceeds the DHS and the government-wide average.  Her organization is leader in the Agency in Diversity & Inclusion IQ, Employee Engagement and other key focus areas of Leadership, Employee Development and Employee Performance and Advancement. This accomplishment is a testament to Ms. Comans and her leadership team, and the results reflects the entire OCFO's dedication to living FEMA Core Values of Respect, Integrity, Fairness and Compassion.

Ms. Comans supported and championed FEMA's Strategic Plan.   Major accomplishments in support of the FY 2022- 2026 Strategic Plan include:

- **Instill Equity as a Foundation of Emergency Management**
  - Directed an initiative to institute a digital payment option for disaster survivors without a bank account.  This effort will provide disaster assistance to disaster survivors in an accelerated manner.
  - Ensured equity in all CFO operations by ensuring competitive and fair processes are in place for all OCFO hiring and business practices.
  - Promoted the creation of Diversity, Equity, and Inclusion (DE&I) Working Group and held monthly DE&I meetings as well as sponsored multiple activities covering topics including Black History Month, Women's History Month, Juneteenth, and Indigenous Peoples' Day.

- **Lead Whole of Community in Climate Resilience**
  - Developed a funding strategy and identified $3M in resources to support Community Disaster Resilience Zones Act.

Attachment D

- o   Partnered with Resilience to develop an project plan to successfully implement the largest reorganization in FEMA's history.
- o   Led FEMA's external engagements with OMB and Congress associated with the announcement BRIC NOFO in Fall 2023.

- **Promote and Sustain a Ready REMA and Prepared Nation**
  - o   Worked with DHS Headquarters to continue progressing on our Financial Systems Modernization (FSM) efforts that will provide FEMA with a modern integrated financial, procurement, and asset management system to enable mission critical functions.
  - o   Developed multiple automations through Robotics Process Automation to address control deficiencies, resulting in greater efficiencies and accuracy during FEMA operations.
  - o   Coordinated an extensive effort with FOD, OCC and the Regions to analyze and update FEMA's 50-week policy resulting in greater flexibilities for FEMA deployed staff.

During this rating period, Ms. Comans successfully faced and lead during difficult budget challenges.  In FY 2024, FEMA responded to major hurricanes, historic wildfires, and other non-Stafford Act events.  She oversaw FEMA's budget development and submittal of the regular, one supplemental request, Continuing Resolution anomalies and technical assistance estimates.  She is responsible for administering FEMA's $45+ billion budget across multiple appropriations based on a wide range of programmatic and operational demands.   She successfully defended the Agency's FY 2024 President's Request and through her engagements with the Hill and as a result, FEMA's FY 2024 Budget, which was signed into law March 23, 2024, provided $30.2B in funding. An increase of $192M above the FY 2022 Enacted.

The late enactment of the appropriation put great importance on FEMA's Quarterly Executive Resources Panels.  Recognizing the criticality of these decision meetings she led, developed, and enhanced the quality of four quarterly resource review sessions to FEMA senior leadership.  Under her leadership, OCFO continued to mature its end of year close-out process which pulled back uncommitted/unobligated resources from the FEMA components in July.   This enabled the Agency to move O&S and DRF programmatic fallout to cover unfunded Agency priorities.  Execution of these dollars were made possible through her partnership with the Chief Procurement Officer (OCPO) to ensure a smooth FY 2024 closeout.  OCPO and OCFO worked together to ensure any programmatic fallout was effectively and prudently used, as a result, FEMA executed 99% of all available expiring funds.  An impressive achievement as it was done while concurrently supporting operational demands and preparing for a government lapse in appropriations.

At the direction of the Administrator to mature the Agency's planning, programming, budget and execution (PPBE) life cycle, Ms. Comans worked to initiate and design a zero-based budgeting (ZBB) construct to inform resource allocation for the ensuring future.   The ZBB promotes constructive coordination with FEMA stakeholders with the objective of sharpening the analytic foundation of the FY 2027-2031 Resource Allocation Plan.  Specifically, the ZBB establishes the processes and procedures for "targeted program reviews," frames additional FEMA-wide program analysis and evaluation efforts, and highlights the use of FEMA PBIS, a new resource and budget system of record that was implemented by my team this fiscal year.  The ZBB analysis will help FEMA mature from a tactical, "review-and-approve" programming/formulation process to one that invites FEMA senior leadership into a strategic, "debate and decide" approach earlier in the PPBE process.  Further the outcome of this analysis will expand FEMA's and ultimately the Administrator's decision space as we consider scenario-based resource allocation options, informed by the Agency's priorities and a dynamic fiscal environment.

Ms. Comans consistently leads and engages with the facts, a calm demeanor, and a mission enabling (or Customer Service) philosophy.  Ms. Comans is a dedicated public servant who fosters a collaborative and inclusive work environment.  Ms. Comans is results orientated and puts the needs of the Agency, the mission and her people first and foremost.  The attached self-assessment highlight Ms. Comans' major accomplishments and achievements (not all inclusive) and demonstrates her leadership during this performance cycle in the critical elements of: Leading Change, Leading People, Business Acumen, Building Coalitions and Results Driven.

In summary, FEMA is fortunate to have her leadership and to have such a dedicated financial and management professional.  Many of the Agency's, the Department's successes in FY 2024 are directly attributable to Ms. Comans' actions.

Erik Hooks
Deputy Administrator, FEMA

Attachment D

## DEPARTMENT OF HOMELAND SECURITY
# INTEGRATED PERFORMANCE PLAN INPUT FOR
# SENIOR COMPONENT LINE OF BUSINESS DIRECTORS

| Senior Component LOB Director's Name:<br><br>Mary Comans | Component:<br><br>FEMA | Rating Period:<br><br>From: 10/01/2023 To: 09/30/2024 |
|---|---|---|

| Component Rating Official's Name:<br><br>Erik Hooks | | |
|---|---|---|

| CXO's Name:<br><br>Stacy Marcott | CXO's LOB:<br><br>OCFO        Other (please specify): |
|---|---|

## EXECUTIVE PERFORMANCE PLAN DEVELOPMENT: LOB GUIDANCE

LOB Directors must include performance goals, specific meaningful outcomes and measures for the rating period in performance agreements established with respective CXOs. The DHS Strategic Plan, your LOB Strategic Plan, and/or other strategic guidance referenced below guides your LOB direction for the rating year. Incorporate this strategic direction into the executive performance plan. This plan must include, as appropriate to your organization, objectives, results and measures written to support DHS mission goals as described in the strategic guidance.

Strategic Document Reference: ENTER THE GUIDING DOCUMENT REFERENCE FOR THIS LOB RATING YEAR  (i.e., Human Capital Strategic Plan Goal 1.4 and 2.5)

CFO FY22-26 Strategic Plan
Goal 1: People - Be the workplace of choice for highly skilled and talented people delivering financial excellence. (Measure against CFO Human Capital Strategy)
Goal 2: Decision Support - Revolutionize CFO business practices and systems to enable proactive decision support. (Measure against FY24 targets of CFO Operational Plan)
Goal 3: Deliberate Resourcing - Resource the Department of Homeland Security based on mission requirements, priorities and affordability. (Measure against FY24 targets of CFO Operational Plan)
Goal 4: Stewardship - Provide evidence to our DHS partners, Congress, and the public that we are good stewards of taxpayer money. (Measure against FMHA and FY24 targets of CFO Operational Plan)

Additional Guidance: ENTER COMPONENT-SPECIFIC OR ADDITIONAL PRIORITIES FOR THE RATING YEAR, OR CHECK "N/A"

☐ N/A

Implement Investment Reporting for Level 1,2,3 programs and sustain annual LCCE updates. Improve consistently red/yellow FMHA measures. Report conference expenses <=60 days post-event. Process FY24 new orders with all trading partners outside of Mission Assignments and prepare to process in-flight orders for intra-DHS transactions in G-Invoicing by 10/1/24. Provide leadership support to identify a G-invoicing solution for DOD and non-DOD Mission Assignments. Link DEFC data to DATA Act File C. Issue timely Management Decision Letters. Develop MAPs & submit A-123 deliverables per final Component commitment letter. Complete annual payment integrity deliverables. Reduce Insurance MW & contributions to ITGC. Clear Grants SD. Prep for FSM Migration: 1) outline UAT approach; 2) identify processes & controls significantly impacted. Complete FSM discovery on SAP.

## LOB SIGNATURE: PERFORMANCE GUIDANCE

| CXO's Signature:<br><br>STACY A MARCOTT    Digitally signed by STACY A MARCOTT<br>Date: 2023.11.02 16:42:38 -04'00' | Date: |
|---|---|

## END OF YEAR APPRAISAL: PERFORMANCE COMMENTS

ENTER COMMENTS (These will be made available to Raters, Reviewing Officials and PRB members for consideration in final year rating.)

FEMA improved completion of Congressional Briefing and Reporting requirements; provided timely conference expenses, investment reporting data requests and Life Cycle Cost Estimate updates, increasing future cost estimate accuracy; and is processing new orders in G-Invoicing except mission assignments. Completed annual payment integrity deliverables, issued timely Management Decision Letters and met non-IT internal control targets. Made progress remediating Insurance material weakness and Grants significant deficiency and needs to continue strengthening internal control. A very highly regarded CFO, Mary's keen insights shared in meetings and on panels always benefit the DHS financial community and she is a strong partner in any endeavor.

## LOB SIGNATURE: APPRAISAL

| CXO's Signature:<br><br>STACY A MARCOTT    Digitally signed by STACY A MARCOTT<br>Date: 2024.10.16 09:39:24 -04'00' | Date: |
|---|---|

DHS Form 421 (10/19)                                                                 Page 1 of 1

**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**
**WASHINGTON REGIONAL OFFICE**

| | | |
|---|---|---|
| MARY COMANS | ) | |
| Appellant, | ) | |
| v. | ) | Docket No. DC-0752-25-1783-I-1 |
| U.S. DEPARTMENT OF HOMELAND SECURITY | ) | |
| Agency. | ) | Date: April 22, 2025 |

**DECLARATION OF CAMERON HAMILTON**

1. I serve as the Senior Official Performing the Duties of the Administrator of the Federal Emergency Management Agency (FEMA) headquartered in Washington, D.C. I began serving in that role on January 20, 2025. FEMA is a component of the Department of Homeland Security (DHS). I make this Declaration based on my own personal knowledge, on information contained in the records of the FEMA and/or DHS, or on information provided to me by FEMA and/or DHS employees.

2. On February 10, 2025, a $59M payment to the New York City (NYC) Office of Management and Budget (OMB) under FEMA's Sheltering and Services Program (SSP) was flagged as a violation of the Secretary's January 28, 2025, direction in her memorandum "*Direction on Grants to Non-Governmental Organizations.*

3. FEMA took action to address the erroneous payment to include stopping all payments to entities under SSP and other grant programs, initiating manual de-committing and de-obligation of lines of accounting and engaging with the U.S. Treasury Department to claw back three (3)

payments under SSP totaling $83M.

4.  On February 9, 2025, I was contacted and requested to provide information to the Office of the President regarding the completion of the flagged payment to include identifying the names of individuals involved.

5.  On February 11, 2025, I received instruction that four (4) FEMA employees involved in processing the flagged payment were to be immediately terminated per a direction from the President.

6.  As I was on official travel on February 11, 2025, and unavailable to sign the notices of termination, MaryAnn Tierney, the Senior Official Performing the Duties of the Deputy Administrator at the FEMA, issued notices of termination to the 4 employees, to include Ms. Mary Comans. As the President had directed DHS to terminate the individuals, each termination was completed pursuant to the President's authority under Article II of the U.S. Constitution.

Pursuant to 18 U.S.C. § 1001 I hereby declare the foregoing to be true and correct.

Signed this date:

_____          April 22, 2025
Cameron Hamilton                                        Date
Senior Official Performing the Duties of the Administrator
Federal Emergency Management Agency
U.S. Department of Homeland Security

2

**U.S. Department of Homeland Security**
Washington, DC 20528



## MEMORANDUM

TO:        Mary Comans
           Chief Financial Officer
           Federal Emergency Management Association

FROM:      MaryAnn Tierney
           Senior Official Performing the Duties of the Deputy Administrator
           Federal Emergency Management Association

SUBJECT:   Notice of Termination

DATE:      February 11, 2025

This is an official notice that, effective immediately, you are being removed from your position with the Federal Emergency Management Agency and from Federal service.  This action is being taken pursuant to Article II of the United States Constitution, at the direction of the President. Article II, § 1 states that the executive Power "shall be vested in a President of the United States of America," and this termination is an exercise of that vested power.

**INSTRUCTIONS:** As of February 11, 2025, your access to all DHS systems will be terminated. You must turn in all Government-issued equipment including but not limited to cellular phones, laptop computers, iPhone-type devices, keys, and any DHS office files or back-up (key drives/discs) computer files you have in your possession. You must also ensure your DHS-issued credentials and access cards, to include a parking permit and/or government issued transit subsidy, are returned at this time.  You are instructed to provide a personal e-mail address where you can be contacted to make further arrangements.

--------------------------------------------------------------------------------------------------------------

## ACKNOWLEDGEMENT OF RECEIPT:

Please sign the acknowledgement of receipt below.  Your signature does not indicate agreement or disagreement with the contents of this document; it only serves as verification of your receipt of it.  Conversely, your refusal to sign[1] will not invalidate this document.

---

[1] If the employee refuses to sign acknowledging receipt, the supervisor should so annotate this on the file copy of this document.

2

Document Number: 3683121          e-Appeal Submission: 09/26/2025 12:02 PM ET          MSPB Page 48 of 50

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296–33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) COMANS, MARY FRANCIS F | 2. Social Security Number 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 | 3. Date of Birth 08/27/1978 | 4. Effective Date 02/11/2025 |
|---|---|---|---|

**FIRST ACTION** — **SECOND ACTION**

| 5–A. Code 330 | 5–B. Nature of Action REMOVAL | 6–A. Code | 6–B. Nature of Action |
|---|---|---|---|
| 5–C. Code ZLM | 5–D. Legal Authority ARTICLE II 1 OF UNIT | 6–C. Code | 6–D. Legal Authority |
| 5–E. Code | 5–F. Legal Authority | 6–E. Code | 6–F. Legal Authority |

| 7. FROM: Position Title and Number CHIEF FINANCIAL OFFICER 90977722 0EN033 | 15. TO: Position Title and Number |
|---|---|

| 8. Pay Plan ES | 9. Occ. Code 0505 | 10. Grade or Level 00 | 11. Step or Rate 00 | 12. Total Salary 225,700.00 | 13. Pay Basis PA | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19.Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|

| 12A. Basic Pay 225,700.00 | 12B. Locality Adj. .00 | 12C. Adj. Basic Pay 225,700.00 | 12D. Other Pay .00 | 20A. Basic Pay | 20B. Locality Adj. .00 | 20C. Adj. Basic Pay | 20D. Other Pay .00 |
|---|---|---|---|---|---|---|---|

| 14. Name and Location of Position's Organization FEDERAL EMERGENCY MGMT AGENCY Off of Chief Financial Officer | 22. Name and Location of Position's Organization |
|---|---|
| | EM HS CB0300000000000000   PP 04 2025 |

**EMPLOYEE DATA**

| 23. Veterans Preference 1 | 1 – None  2 – 5–Point  3 – 10–Point/Disability  4 – 10–Point/Compensable  5 – 10–Point/Other  6 – 10–Point/Compensable/30% | 24. Tenure 0 | 0 – None  1 – Permanent  2 – Conditional  3 – Indefinite | 25. Agency Use | 26. Veterans Preference for RIF  YES   X NO |
|---|---|---|---|---|---|

| 27. FEGLI C0 BASIC | 28. Annuitant Indicator 9 NOT APPLICABLE | 29. Pay Rate Determinant 0 NOT APPLICABLE |
|---|---|---|

| 30. Retirement Plan K FERS AND FICA | 31. Service Comp. Date (Leave) 07/25/2004 | 32. Work Schedule F FULL TIME | 33. Part–Time Hours Per Biweekly Pay Period |
|---|---|---|---|

**POSITION DATA**

| 34. Position Occupied 3 | 1 – Competitive Service  2 – Excepted Service  3 – SES General  4 – SES Career Reserved | 35. FLSA Category E | E – Exempt  N – Nonexempt | 36. Appropriation Code | 37. Bargaining Unit Status 8888 |
|---|---|---|---|---|---|

| 38. Duty Station Code 11-0010-001 | 39. Duty Station (City – County – State or Overseas Location) WASHINGTON  DIST OF COLUMBIA  DC |
|---|---|

| 40. Agency Data | 41. | 42. | 43. | 44. |
|---|---|---|---|---|

**45. Remarks**

```
SF-2819 WAS PROVIDED. LIFE INSURANCE COVERAGE IS EXTENDED FOR 31 DAYS
DURING WHICH YOU ARE ELIGIBLE TO CONVERT TO AN INDIVIDUAL POLICY (NON-
GROUP CONTRACT).
HEALTH BENEFITS COVERAGE IS EXTENDED FOR 31 DAYS DURING WHICH YOU ARE
ELIGIBLE TO CONVERT TO INDIVIDUAL POLICY (NONGROUP CONTRACT). YOU ARE
ALSO ELIGIBLE FOR TEMP CONTINUATION OF YOUR FEHB COVERAGE FOR UP TO
18 MTHS
FORWARDING ADDRESS= 1317 SOUTH GLEBE ARLINGTON, VA 22204
"         "   :
LUMP-SUM PAYMENT TO BE MADE FOR ANY UNUSED ANNUAL LEAVE.
REASON(S) FOR REMOVAL:ARTICLE II OF THE UNITED STATES CONSTITUTION,
AT THE DIRECTION OF THE PRESIDENT. ARTICLE II STATES THAT THE EXECUTIVE
POWER SHALL BE VESTED IN A PRESIDENT OF THE UNITED STATES OF AMERICA
```

| 46. Employing Department or Agency HOMELAND SECURITY | 50. Signature/Authentication and Title of Approving Official ELECTRONICALLY SIGNED BY: |
|---|---|
| 47. Agency Code HSCB | 48. Personnel Office ID 4293 | 49. Approval Date 02/09/2025 | PURNITA FIELDS  DIRECTOR, EXECUTIVE RESOURCES |

5–Part 50–316

2 - OPF Copy - Long-Term Record - DO NOT DESTROY

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540–01–333–6238

# Certificate of Service

e-Appeal has handled service of the assembled pleading to MSPB and the following Parties.

| Name & Address | Documents | Method of Service |
|---|---|---|
| MSPB: Washington Regional Office | Agency Motion to Dismiss | e-Appeal |
| Burakiewicz, Heidi | Agency Motion to Dismiss | e-Appeal |
| Darbo, Ashley | Agency Motion to Dismiss | e-Appeal |
| Koerner, John | Agency Motion to Dismiss | e-Appeal |
| Moss, Bradley | Agency Motion to Dismiss | e-Appeal |
| Null, Taryn | Agency Motion to Dismiss | e-Appeal |
| Zaid, Mark | Agency Motion to Dismiss | e-Appeal |

I agree to send a printed copy of the electronic pleading with attachments to all parties by the end of next business day, as follows:

| Name & Address | Documents | Method of Service |
|---|---|---|
| Comans, Mary<br><br>1317 S Glebe Road Arlington, Virginia 22203 United States of America | Agency Motion to Dismiss | US Mail |