**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

MARY COMANS,

        *Plaintiff*,

        *v.*

EXECUTIVE OFFICE OF THE PRESIDENT
*et al.*,

        *Defendants*.

No. 1:25-cv-01237-MSN-WEF

**DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S
MOTION FOR PARTIAL SUMMARY JUDGMENT AND IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

INTRODUCTION ......................................................................................................................... 1

RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS ......... 2

DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS ................................. 3

BACKGROUND ......................................................................................................................... 5

LEGAL STANDARD ................................................................................................................. 6

ARGUMENT .............................................................................................................................. 7

I.      THE COURT LACKS JURISDICTION OVER MS. COMANS'S CLAIMS ...................................... 7

II.     IN THE ALTERNATIVE, ARTICLE II OF THE FEDERAL CONSTITUTION REQUIRES THAT
        MS. COMANS BE SUBJECT TO AT-WILL REMOVAL ................................................................ 15

        A.      Ms. Comans Was an Officer of the United States .................................................. 18

        B.      The Limited Inferior-Officer Exception Does Not Apply ..................................... 21

III.    THE COURT CAN AFFORD NO REMEDY ON MS. COMANS'S LIBERTY-INTEREST
        CLAIM ...................................................................................................................................... 23

IV.     NEITHER THE DECLARATORY JUDGMENT "CLAIM" NOR THE MANDAMUS CLAIM
        ENTITLES MS. COMANS TO RELIEF ......................................................................................... 27

CONCLUSION ............................................................................................................................ 30

## TABLE OF AUTHORITIES

**Cases**

*Ballard v. Chief of FBI*,
  No. 7:03-cv-00345, 2004 WL 190425 (W.D. Va. Jan. 20, 2004)............................................. 25

*Carter v. Countrywide Home Loans, Inc.*,
  No. 3:07-cv-00651, 2009 WL 2742560 (E.D. Va. Aug. 25, 2009) ........................................... 7

*Codd v. Velger*,
  429 U.S. 624 (1977)...................................................................................................23-24, 24

*Collins v. Yellen*,
  594 U.S. 220 (2021).......................................................................................................... 16

*Conn. Dep't of Pub. Safety v. Doe*,
  538 U.S. 1 (2003)................................................................................................... 24, 25, 26

*Doe v. Va. Dep't of State Police*,
  713 F.3d 745 (4th Cir. 2013) ............................................................................................. 25

*Elgin v. Dep't of Treasury*,
  567 U.S. 1 (2012)......................................................................................................... 9, 14

*Elhady v. Kable*,
  993 F.3d 208 (4th Cir. 2021) ...................................................................................22, 23, 24

*Estate of Michael ex rel. Michael v. Lullo*,
  173 F.3d 503 (4th Cir. 1999) ............................................................................................. 28

*Fornaro v. James*,
  416 F.3d 63 (D.C. Cir. 2005)............................................................................................. 29

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
  561 U.S. 477 (2010).......................................................................................................... 16

*Goldstein v. Moatz*,
  364 F.3d 205 (4th Cir. 2004) ............................................................................................. 27

*Grosdidier v. Chairman, Broad. Bd. of Governors*,
  560 F.3d 495 (D.C. Cir. 2009)........................................................................................... 27

*Harrell v. City of Gastonia*,
  392 F. App'x 197 (4th Cir. 2010) .................................................................................. 23, 24

*Honeywell Int'l Inc. v. OPTO Elecs. Co.*,
  135 F.4th 170 (4th Cir. 2025) ........................................................................................... 27

*Humphrey's Executor v. United States*,
   295 U.S. 602 (1935)...................................................................................................... 17

*In re First Fed. Sav. & Loan Ass'n of Durham*,
   860 F.2d 135 (4th Cir. 1988) ........................................................................................ 28

*Jackler & Jaroch Consolidation v. Dep't of Justice*,
   No. CF-0752-26-0069-I-1, 2026 WL 789485 (MSPB Mar. 20, 2026)........................ 10, 11, 14

*Jaroch v. Dep't of Justice*,
   No. DA-0752-25-0328-I-1, 2025 WL 2476809 (M.S.P.B. Aug. 22, 2025) ............................ 10

*Kennedy v. Braidwood Mgmt., Inc.*,
   606 U.S. 748 (2025)............................................................................................... 17, 18

*Labgold v. Regenhardt*,
   700 F. Supp. 3d 440 (E.D. Va. 2023) ........................................................................... 6

*Lovern v. Edwards*,
   190 F.3d 648 (4th Cir. 1999) ........................................................................................ 7

*Lucia v. SEC*,
   585 U.S. 237 (2018)............................................................................................... 18, 20

*Mathews v. Eldridge*,
   424 U.S. 319 (1976)..................................................................................................... 24

*Morrison v. Olson*,
   487 U.S. 654 (1988)..................................................................................................... 21

*Renne v. Geary*,
   501 U.S. 312 (1991)....................................................................................................... 7

*Ridpath v. Bd. of Governors of Marshall Univ.*,
   447 F.3d 292 (4th Cir. 2006) ...................................................................................... 23

*Rossignol v. Voorhaar*,
   316 F.3d 516 (4th Cir. 2003) ........................................................................................ 6

*Sciolino v. City of Newport News*,
   480 F.3d 642 (4th Cir. 2007) ................................................................................. 23, 24

*Seila Law LLC v. CFPB*,
   591 U.S. 197 (2020)................................................................................................. *passim*

*Skelly Oil Co. v. Phillips Petroleum Co.*,
   339 U.S. 667 (1950)..................................................................................................... 27

iv

*Slaughter v. Trump*,
146 S. Ct. 18 (2025) .................................................................................................. 17

*Spriggs v. Diamond Auto Glass*,
242 F.3d 179 (4th Cir. 2001) ...................................................................................... 6

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) ............................................................................................ 8, 14

*United States ex rel. Rahman v. Oncology Assocs., P.C.*,
198 F.3d 502 (4th Cir. 1999) ................................................................................ 28, 29

*United States v. Arthrex*,
594 U.S. 1 (2021) .................................................................................................. 15

*United States v. Fausto*,
484 U.S. 439 (1988) ............................................................................................ 9, 27

*Va. Dep't of Corr. v. Jordan*,
921 F.3d 180 (4th Cir. 2019) ..................................................................................... 7

*Volvo GM Heavy Truck Corp. v. U.S. Dep't of Lab.*,
118 F.3d 205 (4th Cir. 1997) .................................................................................... 27

## Constitution

U.S. Const. Art. II, § 1, cl. 1 .................................................................................... 15

U.S. Const. Art. II, § 3 ............................................................................................ 15

## Statutes

5 U.S.C. § 3131 ..................................................................................................... 18

5 U.S.C. § 7541 ................................................................................................. 8, 11

5 U.S.C. § 7542 ................................................................................................. 8, 11

5 U.S.C. § 7543 ....................................................................................... 8, 11, 12, 13

5 U.S.C. § 7701(c)(1) .............................................................................................. 12

28 U.S.C. § 2201 ................................................................................................... 26

28 U.S.C. § 2202 ................................................................................................... 26

**Legislative Materials**

1 Annals of Cong. 463 (1789)................................................................................................. 16

1 Annals of Cong. 499 (1789)................................................................................................. 16


**Rules**

Fed. R. Civ. P. 12(h)(3)............................................................................................................ 7

Fed. R. Civ. P. 56(a) ............................................................................................................... 6

Loc. Civ. R. 56(B)................................................................................................................... 2


**Administrative & Executive Materials**

5 C.F.R. § 752.601(a)............................................................................................................ 11

5 C.F.R. § 1201.3(a)(10) ....................................................................................................... 11

44 C.F.R. § 207.5(d) ............................................................................................................. 20

44 C.F.R. § 207.7(e)............................................................................................................. 20

44 C.F.R. § 207.8(b)(3).......................................................................................................... 20

44 C.F.R. § 207.9(d)(3).......................................................................................................... 20

**INTRODUCTION**

The Chief Financial Officer (CFO) of the Federal Emergency Management Agency (FEMA) occupies a critical role. It requires leading the development of a budget amounting to over $45 billion in taxpayer dollars. It requires building relationships with members of Congress and advocating on behalf of the Executive Branch to counterparts in Congress to obtain the requested funds. It requires managing the expenditure of those tens of billions of dollars once they are appropriated. And it requires leading a team of over 450 employees.

Those are just the headlines. As FEMA's CFO, Mary Comans also troubleshot major financial management problems hampering the agency's operations; she established new policy for the expenditure of federal dollars under FEMA's control; and she helped fundamentally transform the way FEMA delivered its services. Not to mention drafting proposed legislation for Congress's consideration or coordinating policy with the CFO for the Department of Homeland Security (DHS), FEMA's parent agency.

Such a figure is hardly a low-level functionary of the federal government. To the contrary, performing the role Ms. Comans filled at the time of her removal required exercising significant policymaking and administrative authority within the Executive Branch. That made her an officer of the United States. And as an officer of the United States, her significant executive authority came with at-will removability from that role at the direction of the President. Supreme Court precedent has made that point again and again. And it has identified only two exceptions to that rule: one for members of multimember bodies of experts exercising no executive power, and one for inferior officers with limited duties and no policymaking or administrative authority. As is apparent from the face of those exemptions, they have no role to play in this case.

1

That combination of facts and law entitles Defendants to summary judgment here.  As an initial matter, Defendants respectfully disagree with the Court's conclusion at the motion-to-dismiss stage that it may exercise jurisdiction over Ms. Comans's challenge to her removal.  For the reasons detailed below, the Court's contrary conclusion raises difficult practical and statutory implications, pointing to a better reading of the statute that would channel Ms. Comans's claim to the Merit Systems Protection Board (MSPB).  But even if the Court maintains its view on jurisdiction, it should afford Ms. Comans no relief on the merits.  For an official exercising as much executive authority as Ms. Comans did at the time of her removal, the Constitution requires her at-will removal at the direction of the President.  Accordingly, the Civil Service Reform Act (CSRA) cannot be constitutionally applied to constrain her removal, nor is Ms. Comans entitled to a hearing on the truth or falsity of allegations relating to her removal.

The Court should deny her motion for summary judgment and enter summary judgment in Defendants' favor on all claims.

## RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

For purposes of the Parties' cross-motions for summary judgment, Defendants do not dispute the truth of the facts alleged in Plaintiff's Statement of Undisputed Material Facts.  *See* ECF #46-2.  Should this case proceed to trial, however, Defendants reserve the right to dispute any fact material to the outcome of this case.[1]

---

[1] Defendants note that Plaintiff has not abided by the local rules of this Court, which require that a summary-judgment brief contain within it "a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue."  Local Civil Rule 56(B).

**DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.     For purposes of this motion, Defendants incorporate Plaintiff's statement of undisputed material facts herein.  *See* ECF #46-2.

2.     As FEMA's CFO, Ms. Comans occupied a supervisory position in the Senior Executive Service (SES).  Ex. A (FEMA CFO Position Description) at 1.

3.     In that capacity, Ms. Comans "[p]rovide[d] executive leadership over the formulation, presentation, and execution of the FEMA budget."  Ex. A at 2; *see also* Ex. B (Comans Performance Evaluation) at 15 (Ms. Comans "oversaw FEMA's budget development").

4.     She also "[c]oordinate[d] and develop[d] detailed justifications for major expenditures to be incorporated in the overall FEMA allocation of funds."  Ex. A at 2.

5.     She also "[s]upervise[d] a professional and technical workforce" and "[p]rovide[d] executive level direction to senior level officials on long- and short-range financial planning."  Ex. A at 2.

6.     She also "[c]onducted extensive evaluations of [Office of the Chief Financial Officer] program goals and objectives and direct[ed] necessary adjustments to assure compliance with and support to a rapidly changing and expanding agency mission."  Ex. A at 2.

7.     She also "[d]evelop[ed] and coordinate[d] initiatives and efforts to identify and resolve major financial management problems hampering the operations and programs of" FEMA.  Ex. A at 2.

8.     She also "[p]articipate[d] in the development of financial objectives, policies and plans with the DHS Chief Financial Officer."  Ex. A at 2.

9. She also "[e]stablishe[d] policy, organizational goals and processes for the office," and "[e]stablishe[d] standards of effectiveness, efficiency, and productivity for the office." Ex. A at 2.

10. She also "[d]irecte[d] the assessment, development, implementation, and evaluation of financial management policy systems and operations." Ex. A at 3.

11. In that capacity, she maintained contact "with all levels of FEMA employees, DHS headquarters staff, the White House and Congressional staffs, officials from other Federal agencies, State, and local governments." Ex. A at 3.

12. She was also "require[d] … to obtain and maintain a TOP SECRET security clearance with access to Sensitive Compartmented Information (TS/SCI)." Ex. A at 4.

13. As FEMA's CFO, she filled an "essential position" and was "instrumental in transforming the way FEMA conducts business," including by leading FEMA's "efforts … to garner funding from Congress for [its] key initiatives." Ex. B at 17.

14. She was "responsible for administering FEMA's $45+ billion budget across multiple appropriations based on a wide range of programmatic and operational demands." Ex. B at 18; *see also id.* at 15 (same).

15. She was charged with "defend[ing]" FEMA's annual budget request "through her engagements with [Capitol] Hill." Ex. B at 18.

16. She "worked to initiate and design a zero-based budgeting … construct to inform resource allocation for [FEMA's] future." Ex. B at 18.

17. She "led more than 450 personnel." Ex. B at 13.

4

18.     She "led an effort to fundamentally change the way FEMA delivers assistance to disaster survivors," including by coordinating operations with the Department of the Treasury.  Ex. B at 14.

19.     She managed a team of "subject matter experts" tasked with "draft[ing] a long-term legislation solution" to "address the challenges posed by … [FEMA's] existing appropriation structure."  Ex. B at 14.  "This legislative package [was] provided to Congress and [was] favorably received by Appropriation Committee staff."  Ex. B at 14.

20.     In her role, she also bore the "responsibility to lead, liaise and manage across [FEMA] and with the [Office of Management and Budget (OMB)], DHS and Congressional Committees."  Ex. B at 14.

21.     "Through formal and informal engagement with House and Senate Appropriators," she "influenced the decision process and garnered widespread support for FEMA's resource requirements and fostered continued trust between the Committees and FEMA."  Ex. B at 15.

## BACKGROUND

On February 11, 2025, Mary Comans was removed from her employment with the federal government.  *See* Statement of Undisputed Material Facts (SUMF) ¶ 1.  At that time, she was a member of the SES and served as the CFO of FEMA, a component of DHS.  *See id.* ¶¶ 1–2.

In that capacity, Ms. Comans served in an "essential position."  SUMF ¶ 13.  She oversaw the "formulation" and "execution" of a budget amounting to over $45 billion in the fiscal year prior to her removal.  *Id.* ¶¶ 3, 14.  She was charged with justifying and advocating for FEMA's budgetary needs to appropriators in the House and Senate, coordinating not only with Capitol Hill but also with the White House and with other federal agencies.  *Id.* ¶¶ 11, 13, 15, 20–21.  And she oversaw a team of subject-matter experts drafting proposed legislation containing policy proposals

for Congress's consideration regarding FEMA's appropriations structure. *Id.* ¶ 19. Across those efforts, she exerted considerable influence over Congress's appropriations determinations and served as a critical point of contact with the legislative branch. *See id.* ¶¶ 19–21.

Ms. Comans was also "instrumental in transforming the way FEMA conducts business." *Id.* ¶ 13. She supervised a workforce of over 450 people and established policy and standards for her office. *Id.* ¶¶ 6, 9, 17. She provided "executive level direction" regarding FEMA's "long- and short-range financial planning," including by developing financial policies for the agency. *Id.* ¶¶ 5, 8, 10. That work included designing a "zero-based budgeting" policy to guide FEMA's future "resource allocation," and working closely with the DHS CFO on agency policies and objectives. *Id.* ¶¶ 8, 16. She was charged with troubleshooting "major financial management problems" at FEMA and "led an effort to fundamentally change the way FEMA delivers assistance to disaster survivors." *Id.* ¶¶ 7, 18. And she enjoyed top-secret security clearance. *Id.* ¶ 12.

On February 11, 2025, Ms. Comans was notified in writing by MaryAnn Tierney, then-Senior Official Performing the Duties of Deputy Administrator (SOPDDA) of FEMA, that she was being removed from the federal civil service, effective immediately. *See id.* ¶ 1. SOPDDA Tierney's removal memorandum stated:

> This is an official notice that, effective immediately, you are being removed from your position with the Federal Emergency Management Agency and from Federal service. This action is being taken pursuant to Article II of the United States Constitution, at the direction of the President. Article II, § 1 states that the executive Power "shall be vested in a President of the United States of America," and this termination is an exercise of that vested power.

*See ibid.*

## LEGAL STANDARD

"Summary judgment is proper where, viewing the facts in a light most favorable to the non-moving party, there remains no genuine issue of material fact and the moving party is entitled

to judgment as a matter of law." *Labgold v. Regenhardt*, 700 F. Supp. 3d 440, 444 (E.D. Va. 2023) (Nachmanoff, J.); *see* Fed. R. Civ. P. 56(a). "A material fact is one that might affect the outcome of the suit under the governing law." *Labgold*, 700 F. Supp. 3d at 444 (quoting *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001)) (quotation cleaned). And "[w]hen faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Ibid.* (citing *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)).

Separately, courts must "presume that [they] lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (quotation cleaned). And "the burden is on the party asserting jurisdiction to demonstrate that jurisdiction does, in fact, exist." *Lovern v. Edwards*, 190 F.3d 648, 654 (4th Cir. 1999). Challenges to subject-matter jurisdiction are "acceptable at the summary judgment stage of the case," *Carter v. Countrywide Home Loans, Inc.*, No. 3:07-cv-00651, 2009 WL 2742560, at *10 n.6 (E.D. Va. Aug. 25, 2009), and "[i]f the [C]ourt determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action," Fed. R. Civ. P. 12(h)(3); *see also Lovern*, 190 F.3d at 654 ("the absence of jurisdiction may be raised at any time during the case, and may be based on the Court's review of the evidence").

## ARGUMENT

### I.    THE COURT LACKS JURISDICTION OVER MS. COMANS'S CLAIMS

Defendants acknowledge that the Court has held, at the motion-to-dismiss stage, that it, and not the MSPB, is vested with jurisdiction to resolve this case. Defendants respectfully disagree with that conclusion for the reasons articulated in their motion-to-dismiss briefing, *see* ECF #27, 31, and in their supplemental brief on the relevant statutory provisions, *see* ECF #41. And given

the special significance of the jurisdictional question in this case, including the implications of that question for numerous like cases currently pending before the MSPB, Defendants believe that the question merits redoubled scrutiny. After all, "courts must always assure themselves of subject matter jurisdiction before reaching the merits" of a dispute. *Va. Dep't of Corr. v. Jordan*, 921 F.3d 180, 187 (4th Cir. 2019).

As the Court itself observed, its partial-dismissal order deviated somewhat from the arguments presented by the parties in their principal briefs. *See* ECF #42 at 5. Whereas the parties "devoted much of their attention to whether implied preclusion of jurisdiction is evident under" the framework announced in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), the Court instead turned its focus to what it called an antecedent "threshold question": "whether [Ms. Comans's removal] falls within the relevant statutory review scheme at all." ECF #42 at 5 (quotation cleaned). Here, of course, "the relevant statutory review scheme" is the CSRA. And to answer that "threshold question," the Court rightly looked to Subchapter V of Chapter 75 of the statute, *ibid.*, which expressly governs adverse actions, including removals, taken against members of the SES.

The Court began by observing that under the definitions of that subchapter, "there is no question that Plaintiff is an 'employee,'" and therefore covered by the statute. *See ibid.* (citing 5 U.S.C. § 7541). Next, the Court observed that the subchapter "'applies to a removal from the civil service' … with certain exceptions inapplicable here." *Id.* at 5–6 (quoting 5 U.S.C. § 7542). But despite the Court's observations that the statute covers both removals and Ms. Comans herself, it nonetheless doubted that the statute's exclusive review scheme covered Ms. Comans's removal. Turning to the third and final section of Subchapter V, the Court observed that the right to appeal to the MSPB applied to any covered "'employee against whom an action is taken under this

8

section.'"  *Id.* at 6 (quoting 5 U.S.C. § 7543(d)).  "[T]his section," the Court reasoned, must mean something other than "this subchapter," which would unmistakably reach all removals under the broad language describing "[a]ctions covered" in § 7542.  Accordingly, the Court held that the right of appeal to the MSPB existed only if the challenged removal satisfied the terms of the section containing that right—namely, § 7543—rather than, as in this case, merely invoking the President's discretionary removal authority under Article II of the Federal Constitution.

The Court's interpretation of those provisions raises difficult practical implications and stands in significant tension with numerous authorities on the subject.  For starters, it blows a gaping hole in Congress's deliberate effort, by passing the CSRA, to address a "leading purpose" of that legislation: "to replace the haphazard arrangements for administrative and judicial review of personnel action."  *United States v. Fausto*, 484 U.S. 439, 444 (1988).  "With respect to judicial review in particular," the Supreme Court has noted, "there was dissatisfaction with the wide variations in the kinds of decisions issued on the same or similar matters … under various bases of jurisdiction."  *Id.* at 445 (quotation cleaned).  And "beginning the judicial process at the district court level, with repetition of essentially the same review on appeal in the court of appeals," was understood to be "wasteful and irrational."  *Ibid.*  The CSRA was intended to address that "haphazard" system head-on, *id.* at 444, replacing it with a single, "integrated scheme of administrative and judicial review," *id.* at 445.  Despite that, the Court's rationale suggests that Congress left open a simple work-around to that integrated scheme: the assertion of Article II authority, *whether rightly or wrongly*, rather than invoking the CSRA itself.  Whatever the reason for an officer's termination—even an officer covered by the CSRA, who has experienced an action covered by the CSRA—Congress's intent to channel disputes arising from that action can now easily be trumped by the Executive's invocation of Article II.

Congress's wishes ought not be so easily circumvented.  After all, on the Court's rationale, even the *legally wrong* invocation of Article II removal authority would suffice to undermine Congress's creation of a single integrated scheme of review.  Further, as the Court's order rightly noted, district courts are powerless to award back pay and money damages under the CSRA, ECF #42 at 10; accordingly, the availability of monetary relief, which the MSPB *is* authorized to award, *see Elgin v. Dep't of Treasury*, 567 U.S. 1, 6 (2012), would likewise toggle on or off depending on the Executive's invocation of Article II.  That simply cannot be right.  And perhaps mindful of these reasons, the MSPB itself—that is, the very entity charged with adjudicating the mine-run of cases under the CSRA, and the foremost agency expert on that statute—has rejected this Court's view of federal-employee appellate rights.  In *Jaroch v. Department of Justice*, for instance, the Chief Administrative Judge (CAJ) considered the appeal of a former immigration judge from his removal on Article II grounds. No. DA-0752-25-0328-I-1, 2025 WL 2476809 (MSPB Aug. 22, 2025).  The CAJ concluded that the MSPB had jurisdiction over the appeal for the same reasons articulated in Defendants' motion-to-dismiss briefing: he was a covered employee challenging a removal, which is an adverse action expressly covered by Chapter 75.  *Id.*  After the CAJ resolved the appeal in favor of the former immigration judge *on the merits*, *see id.*, the Government petitioned for review from the full Board, where all parties agreed with the CAJ that the MSPB had jurisdiction to entertain the appeal, *see* No. CF-0752-26-0069-I-1, 2026 WL 789485, at ¶ 9 (MSPB Mar. 20, 2026).

While the full Board did reverse for lack of jurisdiction, it did *not* do so simply because Article II had been invoked in the removal.  Instead, the Board reasoned that jurisdiction failed only because Article II actually required at-will removal of those specific appellants, such that procedural rights afforded by the CSRA "cannot be applied to them."  *Id.* at ¶ 9.  In other words,

the Board deemed itself powerless to act only when Article II validly applied to require at-will removal.  To that end, it *specifically* addressed the prospect of more frequent invocations of Article II to circumvent the CSRA's integrated-review scheme.  "Our holding in this case," the Board explained, "does not mean that an agency can deprive the Board of jurisdiction over an adverse action merely by invoking Article II authority."  *Id.* at ¶ 31.  Rather, jurisdiction would only fail when "a particularly employee *is* subject to at-will Article II removal" because the statutory removal protections, including the employee's right of appeal, "cannot constitutionally apply to that employee."  *Ibid.* (emphasis added). Where Article II does *not* apply, the Board expressly retained jurisdiction: "[a]n individual who otherwise meets the definition of an employee … is entitled to come before the Board for a determination of whether the [statutory] protections apply."  *Ibid.*[2]

That understanding of MSPB jurisdiction supports the underlying purpose of the CSRA, as described above; comports with statutory text; and is reaffirmed by longstanding MSPB regulations.  Those regulations have, in no uncertain terms, long provided that the Board's appellate jurisdiction extends to removals, without relevant qualification, of SES members.  *See* 5 C.F.R. §§ 1201.3(a)(10), 752.601(a).  And the text of the CSRA expressly purports to govern both SES members like Ms. Comans, 5 U.S.C. § 7541, and removals of such employees without relevant qualification, 5 U.S.C. § 7542.  With all respect to the Court's order, it is highly implausible that the right of SES members to seek relief from the MSPB "under this section," *see*

---

[2] To be sure, the Government disagrees with the Board's conclusion that the as-applied unconstitutionality of procedural protections reflects a *jurisdictional* bar on MSPB review.  The correct approach would have been for the Board to exercise jurisdiction, but then deny relief *on the merits* for all the same reasons identified in its opinion.  Nonetheless, even the Board's opinion disclaiming jurisdiction in *Jaroch* would *retain* jurisdiction where Article II is improperly asserted (which Ms. Comans obviously believes is the case here).

5 U.S.C. § 7543(d)—including monetary relief such as back-pay and damages—rises and falls with the invocation of Article II during the challenged removal.   Aside from the practical complications discussed above, on the Court's rationale, a removal that does not satisfy *any* of the conditions of § 7543 would not be "under" that section, and therefore not appealable to the MSPB.

The Court notes, for instance, that § 7543(a) requires that removals be limited to instances including "misconduct," "neglect of duty," or "malfeasance," and concludes that removals taken for *other* reasons must therefore not be "under" § 7543.  ECF #42 at 6–7.  But § 7543 also imposes other requirements. It requires that removals be preceded by "at least 30 days' advance written notice."  § 7543(b)(1).  It requires that the employee be afforded "a reasonable time, but not less than 7 days, to answer orally and in writing and to furnish affidavits and other documentary evidence."  § 7543(b)(2).  It requires that the employee be permitted representation "by an attorney or other representative."   § 7543(b)(3).   And it requires that the employee receive "a written decision and specific reasons therefor at the earliest practicable date."   § 7543(b)(4).   On the Court's logic, if an aggrieved employee's right to appeal depends on satisfying § 7543(a), it must also depend on satisfying § 7543(b).  The pivotal language, after all, refers to action taken "under this section"—that is, § 7543—not "under § 7543(a)."  *See* § 7543(d).  Suddenly, circumventing MSPB jurisdiction—and, by extension, Congress's intent to create a single integrated review scheme—becomes even easier than asserting Article II: the same feat could be accomplished by providing an employee merely 29 days' notice; or six days to furnish evidence; or even a written decision lacking in "specific reasons," or issued after undue delay.

The result is to reduce the MSPB from a hub of integrated administrative review to but one body, alongside 94 district courts, reviewing adverse actions against federal employees, with the MSPB docket limited to challenges on the *merits* of a given removal—but only if that removal has

12

satisfied the requirements of § 7543(a)–(b).  In other words, the MSPB would be limited to reviewing the justifications for a "for cause" dismissal and the sufficiency of the evidence supporting those removals.  *See* 5 U.S.C. § 7701(c)(1) (describing evidence standards for upholding agency action).  It would have no role left to play in adjudicating actions—even if "covered" by the CSRA, *see* § 7542—that were *not* taken in keeping with the "for cause" requirements of § 7543(a) or, *inter alia*, the notice requirements of § 7543(b).  And it would have no role left to play in enforcing those procedural protections afforded to covered employees by the CSRA.  Needless to say, that conception of the MSPB's purview bears no resemblance to the agency that has, by Congressional design, served as the preeminent venue for adjudicating employment claims by covered federal employees for decades.

The better reading of the statute is that which avoids these anomalies.  Congress's use of different language—"covered by this subchapter" in § 7543(a), but "under this section" in § 7543(d)—is best understood to reflect the fact that § 7543 is the *only* section of the subchapter to authorize removals of SES members.  Whereas § 7542 simply lists various types of actions that would be addressed together in the following section, it is § 7543 that actually authorizes taking those actions, limiting their occurrence to certain specific circumstances.  Section 7543(a)–(b) authorizes the taking of various adverse actions by reference to § 7542; § 7543(d), by contrast, addresses an employee's *response* to the taking of such adverse action, which could only have been taken under § 7543(a)–(b).  Accordingly, there would have been no reason for Congress to describe the appeal right by reference to the entire subchapter when reference to the only section authorizing the adverse action would have the same effect.

Tellingly, Ms. Comans's invocation of MSPB jurisdiction reflects her agreement with the Government on this point.  At no point in her opposition to Defendants' motion to dismiss did Ms.

Comans suggest that the MSPB *lacked* jurisdiction to entertain her claims. *See* ECF #29. Instead, she only invoked the jurisdiction of this Court as an exigency-rooted exception to the general rule that "agency action to remove employees covered by the CSRA through termination, such as in this matter, is supposed to be challengeable before the MSPB." Compl. ¶ 27. And all the while, she maintained her action in the MSPB itself on precisely the same claims as those before this Court. In fact, up until she filed her supplemental brief on April 7, 2025—long after the Court's motion-to-dismiss hearing, not to mention the filing of her principal brief—she never doubted the MSPB's jurisdiction, seeking comprehensive relief in that forum, including for her liberty-interest claim. And although her supplemental brief does, for the first time, argue that "the MSPB lacks jurisdiction over all her claims," ECF #40 at 1, she bases that argument on exactly one point: that "[t]he MSPB itself has now held that it lacks jurisdiction over appeals by inferior officers who are terminated via an assertion of Article II authority," *id.* at 2 (citing *Jackler*, 2026 WL 789485). But again: the Board's analysis reflects what should have been a merits holding, not a jurisdictional one; and in any event, the Board *retained* jurisdiction over all cases except those in which Article II required at-will removal, 2026 WL 789485 at ¶¶ 9, 31.

In other words, the parties have long *agreed* that the MSPB has jurisdiction to grant Ms. Comans relief, and even accepting the Board's recent disclaimer of jurisdiction in *Jackler*, that disclaimer would only apply if Ms. Comans could concede that she must be removable at will under Article II. Needless to say, that is hardly Ms. Comans's position. And because the parties are in agreement that Ms. Comans's claims are within the scope of the CSRA—again, she herself has brought all the same claims before the MSPB—they are in agreement on the "threshold question" identified by the Court, ECF #42 at 5, thereby triggering the *Thunder Basin* analysis.

14

From there, the analysis is the same as that outlined in Defendants' principal motion-to-dismiss briefs.  At step one of the *Thunder Basin* analysis, *Elgin* teaches that the CSRA evinces Congress's intent to preclude district-court jurisdiction.  *See* ECF #27 at 9; *Elgin*, 567 U.S. at 10–13.  And at step two of that analysis, Ms. Comans's claims are channeled to the MSPB because they are "of the type Congress intended to be reviewed within this statutory structure."  *Thunder Basin*, 510 U.S. at 212; *see* ECF #27 at 9–11.  That's because meaningful judicial review remains available under the CSRA's scheme by way of the Federal Circuit; and claims like these, which aim to vindicate Ms. Comans against her removal, are neither "collateral" to the CSRA's review provisions nor "outside the agency's expertise," given the CSRA's detailed attention to the removal of federal employees.  *See* ECF #27 at 10–11.

Because the CSRA channels Ms. Comans's claims exclusively to the MSPB, this Court lacks jurisdiction to entertain them.  Accordingly, it should enter judgment against Ms. Comans and in Defendants' favor.

## II.    IN THE ALTERNATIVE, ARTICLE II OF THE FEDERAL CONSTITUTION REQUIRES THAT MS. COMANS BE SUBJECT TO AT-WILL REMOVAL

Even if the Court were to maintain the view that it possesses jurisdiction entertain this case, it should enter judgment in Defendants' favor for another fundamental reason:  Article II of the Federal Constitution requires that Ms. Comans be removable at will, rendering the limitations on removal listed at § 7543(a)–(b) unconstitutional as applied in this case.

Article II requires that "[t]he executive Power shall be vested in a President," and that the President "take Care that the Laws be faithfully executed."  U.S. Const. Art. II, § 1, cl. 1; *id.* § 3.  "The entire 'executive Power' belongs to the President alone."  *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020).  "But because it would be impossible for one man" alone to carry out that responsibility, "the Constitution assumes that lesser executive officers will assist" the President in

discharging those duties. *Ibid.* (quotation cleaned). "Today, thousands of officers wield executive power on behalf of the President in the name of the United States." *United States v. Arthrex*, 594 U.S. 1, 11 (2021).

Three principles necessarily follow from that arrangement. First, because it is the President's authority—not their own—that those "lesser executive officers" wield, they "must remain accountable to the President." *Seila Law*, 591 U.S. at 213. Second, such accountability only exists by virtue of the power to remove those "lesser executive officers" from their posts: "it is only the authority that can remove such officials that [those officials] must fear and, in the performance of their functions, obey." *Id.* at 213–14 (quotation cleaned). Which leads to the third principle: that "'[i]f any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws'"—a power that must "include[] the ability to remove executive officials." *Id.* at 213 (quoting 1 Annals of Cong. 463 (1789) (J. Madison)). After all, "[w]ithout such power, the President could not be held fully accountable" by the national electorate "for discharging his own responsibilities; the buck would stop somewhere else." *Id.* at 204 (quotation cleaned). Instead, "[t]hrough the President's oversight," including the removal power, "'the chain of dependence is preserved,' so that 'the lowest officers, the middle grade, and the highest' all 'depend, as they ought, on the President, and the President on the community'" of voters that elect him. *Id.* at 224 (quoting 1 Annals of Cong. 499 (1789) (J. Madison)); *see also Collins v. Yellen*, 594 U.S. 220, 252 (2021) (removal power "helps the President maintain a degree of control over the subordinates he needs to carry out his duties" and "ensure[s] that these subordinates serve the people … in accordance with the policies that the people presumably elected the President to promote").

16

That very removal power is the authority that was exercised by then-SOPDDA Tierney, "at the direction of the President," to remove Ms. Comans here. And that power is an "unrestricted" one, with very few recognized exceptions. *Seila Law*, 591 U.S. at 215. As an initial matter, the "general rule that the President possesses the authority to remove those who assist him in carrying out his duties," *id.* at 215 (quotation cleaned), might not apply with equal force if the relevant individual, despite being formally housed in the Executive Branch, does not wield executive power—that is, does not qualify as an "officer" of the United States. *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 506 (2010) (reserving judgment on "whether lesser functionaries subordinate to officers of the United States must be subject to the same sort of control" by the President (quotation cleaned)). But if the relevant individual is an officer of the United States—as Ms. Comans was—only two exceptions to the general rule remain. The first is for-cause removal protections granted "to a multimember body of experts, balanced along partisan lines, that perform[s] legislative and judicial functions and [does] not exercise any executive power." *Seila Law*, 591 U.S. at 216 (recounting *Humphrey's Executor v. United States*, 295 U.S. 602 (1935)). (That exception does not apply here.[3]) The second is for "inferior officers with limited duties and no policymaking or administrative authority." *Id.* at 218. "Those two exceptions … represent … the outermost constitutional limits of permissible congressional restrictions on the President's removal power." *Ibid.* (quotation cleaned).

---

[3] And in any event, this exception may not have long left to live. *See Slaughter v. Trump*, 146 S. Ct. 18 (2025) (granting stay of district-court opinion, which had turned on application of *Humphrey's*, and granting certiorari on, *inter alia*, whether *Humphrey's* should be overruled). *Slaughter* was subsequently argued on the merits during the Supreme Court's October 2025 term, and a decision is expected imminently.

Because Ms. Comans was an (inferior) officer, and because no exception applies to the general rule of unrestricted removal authority over executive officers, no congressional limitation on the Article II removal authority is constitutionally enforceable in this case.

## A.    Ms. Comans Was an Officer of the United States

Constitutional text contemplates two kinds of "officers" of the United States: principal officers and inferior officers. *Kennedy v. Braidwood Mgmt., Inc.*, 606 U.S. 748, 759 (2025). The distinction lies in the official's level of seniority within the Executive Branch. "Generally speaking, whether one is an inferior officer depends on whether he has a superior other than the President, and how much power the officer exercises free from control by a superior." *Id.* at 761 (quotation cleaned). To "summarize[] the governing principle: [i]nferior officers are those whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Id.* at 761 (quotation cleaned).

Still, not every person within the Executive Branch is properly considered an officer of the United States. Some are instead "non-officer employees"—that is, "part of the broad swath of lesser functionaries in the Government's workforce." *Lucia v. SEC*, 585 U.S. 237, 245 (2018). To classify any given individual, the Supreme Court has set out a "basic framework for distinguishing between officers and employees." *Ibid.* First, to qualify as an officer, an individual "must occupy a 'continuing' position established by law"—that is, her duties must be "continuing and permanent" rather than "occasional or temporary." *Ibid.* And second, one is only an officer if she "exercise[s] significant authority pursuant to the laws of the United States." *Ibid.*

Ms. Comans satisfies that framework here, qualifying her as an "officer"—specifically, an inferior officer—of the United States. *First*, her position as a member of the SES and as CFO of

18

FEMA was "continuing and permanent," not "occasional or temporary." Neither of those roles reflects a temporary or fleeting employment status.

*Second*, Ms. Comans "exercised significant authority" on behalf of the Executive Branch. For starters, Ms. Comans was a member of the SES—a select group of federal officials charged with "ensur[ing] that the executive management of the Government of the United States is responsive to the needs, policies, and goals of the Nation and otherwise is of the highest quality." 5 U.S.C. § 3131. They are also "accountable and responsible for the effectiveness and productivity of employees under them." *Id.* § 3131(3). By definition, such officials wield "significant authority" in the operation of the Executive Branch: making the Government "responsive to the needs … of the nation" and ensuring that it is "of the highest quality" is no trivial exercise, nor is responsibility for the broad swath of non-officer employees beneath them in the chain of authority. It is, in fact, the very responsibility of the President himself, who stands at the helm of the entire Executive Branch. And to ensure that the President remains "fully accountable" by the national electorate "for discharging his own responsibilities," those exercising that responsibility on his behalf must be freely removable. *Seila Law*, 591 U.S. at 204.

In any event, even among members of the SES, Ms. Comans exercised a distinctive set of responsibilities qualifying her as an executive officer of the United States. She was the Chief Financial Officer of an agency within the Executive Branch controlling tens of billions of taxpayer dollars each year. SUMF ¶¶ 1–3, 14. From her leadership position, she helped formulate FEMA's proposed annual budget, then served as the agency's representative to Congress as the Administration justified and advocated for the passage of the budget she helped develop. *Id.* ¶¶ 3–4, 15. On behalf of her agency, she maintained critical relationships with White House staff, Congress, and State and local governments. *Id.* ¶¶ 11, 21. By her own admission, her role allowed

her to exercise meaningful influence on behalf of FEMA over Congress's deliberations. *Id.* ¶¶ 20–21. She even oversaw the drafting of proposed legislation, which she then delivered to her counterparts in the Legislative Branch. *Id.* ¶ 19. Put simply: in the critical and ever-present dialogue between the Executive and Legislative branches, hers was an essential role. It would intolerably injure the Presidency to enforce, as Ms. Comans urges, any limitation on the President's oversight of those critical functions she exercised by virtue of the power of the Executive Branch— power that is vested in, and therefore derives from, the President himself. *See Seila Law*, 591 U.S. at 203 (the executive power—"all of it"—is vested in the Presidency itself).

And then there is the significant authority Ms. Comans wielded within FEMA itself. She personally supervised a team of 450 employees, and was responsible for administering over $45 billion in taxpayer funds. SUMF ¶¶ 5, 14, 17. She purportedly "transform[ed] the way FEMA conducts business" and "fundamentally change[d] the way FEMA delivers assistance to disaster survivors." *Id.* ¶¶ 13, 18. She designed a budgeting plan to inform FEMA's future resource allocations, and generally directed, established, and implemented policy, including in coordination with the CFO of DHS. *Id.* ¶¶ 8–10, 16. Further, under codified FEMA regulations, it is the FEMA CFO alone who may make changes to otherwise fixed terms regarding funding for grantees to cover their management costs for a given disaster or emergency response. *See* 44 C.F.R. § 207.5(d)–(e); *see also id.* § 207.7(e) (giving FEMA CFO sole authority to approve additional interim funding for grantees); *id.* § 207.8(b)(3) (giving FEMA CFO sole authority to approve extensions of time for grantee's expenditure of allocated funds); *id.* § 207.9(d)(3) (giving FEMA CFO sole authority to extend time for grantee's reimbursement for eligible costs arising from disasters or emergencies declared before November 13, 2007).

Simply put, it defies belief that the Chief Financial Officer of an agency like FEMA is not an officer of the United States, or that a member of the SES exercising these significant functions does not exercise "significant authority" within the Executive Branch. The various functions and responsibilities discussed above are hardly the stuff of a "lesser functionar[y]" serving as a non-officer employee. *Lucia*, 585 U.S. at 245. And because Ms. Comans was an officer at the time of her removal, she is necessarily subject to the general rule of at-will removal.

## B.   The Limited Inferior-Officer Exception Does Not Apply

Finally, neither of the two narrow exceptions to the general unrestricted-removal rule applies to Ms. Comans. As an initial matter, she cannot satisfy the *Humphrey's* exception because she was not a member of "a multimember body of experts, balanced along partisan lines, that perform[s] legislative and judicial functions and [does] not exercise any executive power." *Seila Law*, 591 U.S. at 216. But more to the point, the "*Morrison* exception"—*i.e.*, that for "inferior officers with limited duties and no policymaking or administrative authority," *id.* at 218—simply cannot be squared with the significant duties, policymaking authority, and administrative authority Ms. Comans undisputedly exercised in her former role.

In *Morrison*—which, along with *Humphrey's*, "represent[s] … the outermost constitutional limit[] … on the President's removal power," *ibid.*—the Supreme Court evaluated the nature of an "independent counsel" tasked with "investigat[ing] and, if appropriate, prosecut[ing] certain high-ranking Government officials." 487 U.S. 654, 660 (1988). Though the Court deemed the independent counsel an inferior officer, it nevertheless upheld removal protections for that position because of the highly constrained scope of that office. *Id.* at 671–72. "An independent counsel's role is restricted primarily to investigation and, if appropriate, prosecution for certain federal crimes," the Court observed. *Id.* at 671. "[T]his grant of authority

21

does not include any authority to formulate policy for the Government or the Executive Branch, nor does it give [the independent counsel] any administrative duties outside of those necessary to operate her office." *Id.* at 671–72. The office was "temporary in the sense that an independent counsel is appointed essentially to accomplish a single task, and when that task is over the officer is terminated." *Id.* at 672 (quotation cleaned). And that task was "confined to a specific matter in which the Department of Justice had a potential conflict of interest." *Seila Law*, 591 U.S. at 219. Such "limited jurisdiction and tenure," combined with the "lack[] [of] policymaking or significant administrative authority," permitted an exception to the general rule of at-will removal. *Morrison*, 487 U.S. at 691–92.

No such constraint, by contrast, is reflected in the role Ms. Comans played at the time of her removal. The overwhelming number of administrative and policymaking functions qualifying Ms. Comans as an "officer," discussed above, *see supra* Part II.A, are the same functions that put her well outside the scope of the *Morrison* exception to the general removability rule. Accordingly, for largely the same reasons discussed in Part II.A above, no exception to the general rule applies, and Ms. Comans was necessarily subject to at-will removal at the time of her separation from federal civil service.

*     *     *

At bottom, Ms. Comans's significant responsibilities at the time of her removal made her an officer of the United States, and no exception to the President's removal authority over executive officers applies here in a way that would render her removal by then-SOPDDA Tierney, "at the direction of the President," unlawful. Accordingly, the Court should deny Ms. Comans's motion for summary judgment on her property-interest claim, and enter summary judgment in Defendants' favor on the full suite of claims she asserts seeking to reverse her removal.

22

**III.    THE COURT CAN AFFORD NO REMEDY ON MS. COMANS'S LIBERTY-INTEREST CLAIM**

Aside from challenging the removal itself, Ms. Comans separately claims that events surrounding her removal caused her "reputational harm" for which she is entitled to relief.  Compl. ¶ 40; *see also* ECF #45 at 1 (claiming "protected liberty interest in her good name").  But even assuming Ms. Comans has made the minimum showing for a liberty-interest claim, she is nevertheless entitled to no relief on that claim: none of the allegedly reputation-bruising statements bear on the validity of the exercise of Article II removal authority, rendering the only permissible remedy—a name-clearing hearing—a meaningless exercise.

To be sure, "[t]he Supreme Court has acknowledged a constitutional liberty interest in one's reputation."  *Elhady v. Kable*, 993 F.3d 208, 225 (4th Cir. 2021).  "But recognizing the potentially boundless nature of this right, the Court has established doctrinal limits to narrow the category of cases claiming reputational injury."  *Ibid.*  Accordingly, "under what is sometimes referred to as [the] 'stigma plus' test, … no deprivation of a liberty interest occurs when, in the course of defaming a person, a public official solely impairs that person's future employment opportunities, without [also] subjecting him to a present injury such as termination of government employment."  *Ridpath v. Bd. of Governors of Marshall Univ.*, 447 F.3d 292, 309 n.16 (4th Cir. 2006) (quotation cleaned).

That's because "stigma or reputation alone, apart from some more tangible interests such as employment, is not 'liberty' within the meaning of the Due Process Clause."  *Elhady*, 993 F.3d at 226 (quotation cleaned).  Accordingly, "it is not enough that a disclosure of negative information might make people think badly of you," *ibid.*: "in order to deprive an employee of a liberty interest, a public employer's stigmatizing remarks must be made in the course of a discharge or significant demotion," *Ridpath*, 447 F.3d at 309 (quotation cleaned).  More specifically, a successful claimant

23

"must show [(1)] a statement 'stigmatizing his good name' and damaging his standing in the community; (2) some type of dissemination or publication of the statement; and (3) some other government action that alters or extinguishes one of his legal rights." *Elhady*, 993 F.3d at 225 (quotation cleaned); *see also Sciolino v. City of Newport News*, 480 F.3d 642, 646 (4th Cir. 2007) (similar, and noting that the relevant statement must be "false").

Critically, these factors, if shown, would reflect a procedural—not substantive—violation. That's because "the constitutional harm is not the defamation itself; rather it is the denial of a hearing at which the dismissed employee has an opportunity to refute the public charge." *Sciolino*, 480 F.3d at 649 (quotation cleaned). Accordingly, "[i]f the public employee can establish a protected liberty interest under th[e] framework" described above, the appropriate remedy would be no more than "due process, which in this context involves a 'name-clearing hearing.'" *Harrell v. City of Gastonia*, 392 F. App'x 197, 203 (4th Cir. 2010) (unpublished op.); *see also Codd v. Velger*, 429 U.S. 624, 627 (1977) ("the remedy mandated by the Due Process Clause … is an opportunity to refute the charge" (quotation cleaned)). "[T]he hearing required … is solely to provide the person an opportunity to clear his name." *Codd*, 429 U.S. at 627 (quotation cleaned). "In this regard, the Due Process Clause 'is not a guarantee against incorrect or ill-advised personnel decisions.'" *Harrell*, 392 F. App'x at 203 (quoting *Sciolino*, 480 F.3d at 649) (quotation cleaned). "Instead, due process requires simply the opportunity to be heard 'at a meaningful time and in a meaningful manner,'" "even if the former employee's efforts to refute and clear his name are ultimately unsuccessful." *Ibid.* (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)).

But that name-clearing effort, of course, is only meaningful if the content of the relevant defamatory statements relates to the justification for the adverse employment action taken alongside those statements. After all, "reputation alone," without the accompanying adverse

24

employment action, is no basis upon which relief can be granted. *Elhady*, 993 F.3d at 226. For that reason, where the content of the defamatory statements is of no bearing on the validity of the adverse action, no name-clearing hearing should be afforded—even when the three-part "stigma plus" test is satisfied.

That is precisely the teaching of the Supreme Court in *Connecticut Department of Public Safety v. Doe*, in which a convicted sex offender challenged a state statute requiring covered offenders to provide such personal information as their name, address, photograph, and a DNA sample to the state's Department of Public Safety, which in turn was required to publicize that information on a website and a publicly available registry. 538 U.S. 1, 4–5 (2003). The plaintiff there specifically alleged that he was not a "dangerous sexual offender" and that the state law deprived him of a liberty interest in his reputation. *Id.* at 6. After the lower courts granted summary judgment in the plaintiff's favor, the Supreme Court reversed—without deciding one way or another whether the plaintiff had really been deprived of a liberty interest. "[E]ven assuming, *arguendo*, that [the plaintiff] has been deprived of a liberty interest," the Court explained, "due process does not entitle him to a hearing to establish a fact that is not material under the [state] statute." *Id.* at 7. That's because "the fact that [he] seeks to prove—that he is not currently dangerous—is of no consequence under" the state law, the requirements of which "turn[ed] on an offender's conviction alone." *Ibid.* "[N]ondangerousness," the Court observed, "simply does not matter," no matter the reputational harm. *Ibid.* Accordingly, a name-clearing hearing on that issue would be "a bootless exercise." *Id.* at 8. "Plaintiffs who assert a right to a hearing under the Due Process Clause," the Court concluded, "must show that the facts they seek to establish in that hearing are relevant" to the underlying alteration of legal status at the heart of a liberty-interest claim. *Ibid.*; *see also Doe v. Va. Dep't of State Police*, 713 F.3d 745, 759 (4th

Cir. 2013) (applying *Connecticut Department of Public Safety* to deny a hearing that would amount to "a bootless exercise"); *Ballard v. Chief of FBI*, No. 7:03-cv-00345, 2004 WL 190425, at *3–4 (W.D. Va. Jan. 20, 2004) (claim for name-clearing hearing "meritless because there are no relevant facts in dispute," and "a hearing would have no purpose").

That logic applies neatly to this case. Ms. Comans's liberty-interest claim is premised on statements to the effect that she "circumvent[ed] leadership to unilaterally make egregious payments for luxury NYC hotels for migrants." Pl.'s SUMF ¶¶ 6–7. And her argument at summary-judgment is simply that she "was not accorded any form of name-clearing hearing before or after the stigmatizing statements were made." ECF #46 at 6. The point of any name-clearing hearing, then, would be for Ms. Comans to attempt to establish the fact that she did not, after all, circumvent leadership or approve problematic disbursements of funds. But such a hearing would be no less a "bootless exercise" than that contemplated in *Connecticut Department of Public Safety*: Ms. Comans was not fired for cause on the basis of the contents of the allegedly stigmatizing statements. As Ms. Comans herself admits, her "notice of removal … cited only Article II" of the Federal Constitution and the removal authority of the President therein; "[n]o cause for her removal was identified." Pl.'s SUMF ¶ 4. And the President's Article II removal authority is necessarily a discretionary and non-reviewable one. *See Seila Law*, 591 U.S. at 204 (Article II removal authority "unrestricted" other than two exceptions that, as discussed above, are inapplicable here). Accordingly, the truth or falsity of the allegedly stigmatizing statements are of "no consequence" to Ms. Comans's removal, which, at the President's direction, could lawfully have been directed for no reason at all. *Conn. Dep't of Pub. Safety*, 538 U.S. at 7.

The fact that Ms. Comans seeks to prove at a name-clearing hearing—*i.e.*, that the allegedly stigmatizing statements are false—is simply "not material" under the Article II-removal

framework. *Ibid.* Because a name-clearing hearing to that effect would be a "bootless exercise," the Court should deny Ms. Comans relief and enter summary judgment in Defendants' favor on the liberty-interest claim. *Id.* at 8.

## IV. NEITHER THE DECLARATORY JUDGMENT "CLAIM" NOR THE MANDAMUS CLAIM ENTITLES MS. COMANS TO RELIEF

Other than Ms. Comans's constitutional claims, the Court's partial-dismissal order, ECF # 42, allowed two other claims to proceed: the "Declaratory Judgment" claim, Compl. ¶¶ 55–57 (Claim VI), and the mandamus claim, Compl. ¶¶ 58–60 (Claim VII). Because those claims fail as a matter of law, the Court should grant summary judgment in Defendants' favor on both.[4]

*First*, the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, which Claim VI invokes as its basis, *see* Compl. ¶ 56, cannot support an independent claim to relief. The statute does not provide a cause of action, *see Honeywell Int'l Inc. v. OPTO Elecs. Co.*, 135 F.4th 170, 178 (4th Cir. 2025), nor a waiver of sovereign immunity, *see Goldstein v. Moatz*, 364 F.3d 205, 219 (4th Cir. 2004).[5] Instead, "[t]he operation of the … Act is procedural only": by it, Congress merely "enlarged the range of remedies available in the federal courts." *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950). Accordingly, while it may be available as a form of relief should Ms. Comans prevail on any of her *other* claims, it cannot survive as a standalone claim. And in any event, Ms. Comans is not entitled to any relief, including declaratory relief, for the reasons described in Parts I–III above.

---

[4] Ms. Comans does not affirmatively seek summary judgment on the basis of these claims. *See* ECF #45. Defendants, by contrast, do seek summary judgment in their favor on those claims.

[5] Nor is it an independent grant of jurisdiction. *Volvo GM Heavy Truck Corp. v. U.S. Dep't of Lab.,* 118 F.3d 205, 210 (4th Cir. 1997).

*Second*, Ms. Comans is entitled to no relief on her mandamus claim, which asks for a writ "commanding Defendants to return her to office." Compl. ¶ 59. As an initial matter, that claim fails for precisely the same rationale the Court applied to dismiss Ms. Comans's APA claims. In its partial-dismissal order, the Court explained that her "APA claims challenging her termination cannot proceed, given the ordinarily 'comprehensive and exclusive' nature of the CSRA." ECF #42 at 10 (quoting *Grosdidier v. Chairman, Broad. Bd. of Governors*, 560 F.3d 495, 497 (D.C. Cir. 2009). That holding with respect to the APA claims is exactly right—and applies with equal force to the mandamus claim. After all, the CSRA was enacted to provide remedies that would replace not only those available under the previously applicable "patchwork of statutes," but also those sought in "suits for mandamus." *Fausto*, 484 U.S. at 444. On that logic, if the CSRA displaces APA claims, it equally displaces mandamus claims. And as this Court noted: "what you get under the CSRA is what you get." ECF #42 at 10 (quoting *Grosdidier*, 560 F.3d at 497).

In any event, even under the standard mandamus analysis, Ms. Comans would not be entitled to relief. That's because "[m]andamus is not favored except in extraordinary situations." *In re First Fed. Sav. & Loan Ass'n of Durham*, 860 F.2d 135, 138 (4th Cir. 1988). "[T]o establish the conditions necessary for issuance of a writ of mandamus, the party seeking the writ must demonstrate that (1) he has a clear and indisputable right to the relief sought; (2) the responding party has a clear duty to do the specific act requested; (3) the act requested is an official act or duty; (4) there are no other adequate means to attain the relief he desires; and (5) the issuance of the writ will effect right and justice in the circumstances." *United States ex rel. Rahman v. Oncology Assocs., P.C.*, 198 F.3d 502, 511 (4th Cir. 1999). "Where mandamus relief is sought against a public official, the alleged duty to act must involve a mandatory or ministerial obligation

28

which is so plainly prescribed as to be free from doubt." *Estate of Michael ex rel. Michael v. Lullo*, 173 F.3d 503, 513 (4th Cir. 1999) (quotation cleaned).

Ms. Comans cannot satisfy that highly demanding standard. First, as explained above, the President's unrestricted Article II removal authority renders her removal lawful. Even if her removal were *arguably* unlawful, that would not amount to the "clear and indisputable right" necessary to obtain mandamus relief. *Rahman*, 198 F.3d at 511. For the same reason, Defendants had no "clear duty" to abide by the CSRA's removal restrictions in an instance in which the head of the Executive Branch has exercised his unrestricted, discretionary authority to remove a senior executive official from her position. *Ibid.* The relationship between the President and those senior executive officials who aid him in the performance of his duties also explains why issuance of the writ would not "effect right and justice in the circumstances": allowing a removed officer to return to a position exercising the executive power would infringe on the ability of the public to hold the President accountable for the conduct of the Executive Branch. *Cf. Seila Law*, 591 U.S. at 204 ("the buck would stop somewhere else"). But perhaps most importantly, Ms. Comans simply cannot show that there is "no other adequate means to attain the relief [s]he desires": if she really *is* entitled to relief, and Article II were not lawfully applicable here, the CSRA would provide Ms. Comans with all the relief obtainable under the law. *Rahman*, 198 F.3d at 511. Nothing in the Complaint suggests the *inadequacy* of CSRA remedies, assuming they apply in the first place. *See also Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005) (Roberts, J.) (CSRA remedies not "inadequate for purposes of mandamus").

At bottom, "[t]he mandamus remedy is a drastic one reserved for extraordinary situations involving the performance of official acts or duties." *Rahman*, 198 F.3d at 511 (quotation cleaned). This case simply does not rise to that occasion, particularly given the existence of the CSRA as

29

the exclusive source of applicable remedies for the removal challenged in this case.  Accordingly, the Court should grant summary judgment in Defendants' favor on the mandamus claim.

**CONCLUSION**

For the foregoing reasons, the Court should enter summary judgment against Plaintiff and in favor of Defendants on all claims.

JUNE 8, 2026

TODD W. BLANCHE
Acting Attorney General

_____/s/_____
MATTHEW J. MEZGER
Assistant United States Attorney
Office of the United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:    (703) 299-3741
Fax:    (703) 299-3983
Email: Matthew.Mezger@usdoj.gov

*Respectfully submitted,*

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

CHRISTOPHER HALL
Assistant Branch Director
Federal Programs Branch

*/s/ Cesar Azrak*
CESAR AZRAK
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20005
Telephone: (202) 305-0693
Email: cesar.e.azrak@usdoj.gov

*Counsel for Defendants*