# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## ALEXANDRIA DIVISION

MARY COMANS,

        *Plaintiff*,

    v.

EXECUTIVE OFFICE OF THE PRESIDENT
*et al.*,

        *Defendants*.

No. 1:25-cv-01237-MSN-WEF

**PLAINTIFF MARY COMANS' COMBINED OPPOSITION TO DEFENDANTS'
CROSS-MOTION FOR SUMMARY JUDGMENT AND REPLY IN SUPPORT OF
MOTION FOR PARTIAL SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... iii

STATEMENT OF UNDISPUTED MATERIAL FACTS ....................................................... 1

STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS................................ 1

ARGUMENT .......................................................................................................................... 3

I.   The Court Should Reaffirm its Holding on Jurisdiction and Hold, in the Alternative, that Congress Did Not Intend Constitutional Claims of the Type Advanced by Defendants to be Channeled to the Agency ................................................................................................. 3

   A.   This Court and Other Courts Have Already Correctly Held that Cases Like This One Are Not Channeled to the MSPB ..................................................................................... 3

   B.   Defendants' Arguments that This Court's Prior Ruling Was Wrong Do Not Have Merit ...................................................................................................................................... 5

II.   Article II Did Not Give the President Authority to Fire Ms. Comans in Violation of the CSRA ................................................................................................................................... 7

   A.   140 Years of Supreme Court Precedent Contradicts the Defendants' Position .............. 7

   B.   *Morrison* Is Contrary to Defendants' Position Because Ms. Comans Was Subject to the Direction of Superior Officers ......................................................................................... 10

   C.   The President Had Sufficient Statutory Authority to Remove Ms. Comans From Her Position to Satisfy Even Defendants' Assertion of What Article II Requires ...................... 12

   D.   Ms. Comans Was Not an Inferior Officer and Certainly Had Less Authority Than the Independent Counsel at Issue in *Morrison* ........................................................................ 14

      1.   Ms. Comans Was Not an Inferior Officer .............................................................. 14

         a.   Ms. Comans Had a Staff Rather than a Line Position, and Was an Advisor Rather than a Decision-Maker ..................................................................................... 15

         b.   Ms. Comans' Decisions Were All Subject to Review and Reversal by Higher-Level Officers ........................................................................................................ 16

         c.   Ms. Comans Did Not Have Authority Comparable to Those Who Have Been Held to be Inferior Officers ........................................................................................ 17

         d.   DHS Did Not Appoint Ms. Comans as an Inferior Officer ................................. 18

      2.   Ms. Comans Had Less Independent Authority Than the Independent Prosecutor in *Morrison* ....................................................................................................................... 18

III.   Ms. Comans Has Stated a Liberty Interest Claim as to Which She Is Entitled to Judgment as a Matter of Law ............................................................................................. 20

   A.   A Name-Clearing Hearing Is Not a "Meaningless Exercise" ....................................... 20

i

B.    The Stigmatizing Statements Need Only Be Linked to the Adverse Employment Action and Need Not Be the Formal, Stated Cause of the Action ..................................................... 24

IV.    Ms. Comans Has Stated a Property Interest Claim as to Which She Is Entitled to Judgment as a Matter of Law ...................................................................................................... 26

V.    Defendants Admit, Ms. Comans Is Entitled to Relief Under the Declaratory Judgment Act if She Prevails on Her Other Claims ........................................................................................ 28

VI.    If No Other Remedy Is Available, Ms. Comans Is Entitled to a Writ of Mandamus .... 29

CONCLUSION.................................................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**

*Abramowitz v. Lake*, 803 F. Supp. 3d 1 (D.D.C. 2025) ................................................................. 4

*Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505 (4th Cir. 2003) ........................................ 3

*Ballard v. Chief of FBI*, No. 7:03-cv-00354, 2004 WL 190425 (W.D. Va. Ja. 20, 2004) ............ 24

*Barnhart v. Devine*, 771 F.2d 1515 (D.C. Cir. 1985) ................................................................... 29

*Board of Regents v. Roth*, 408 U.S. 564 (1972) ..................................................... 21, 22, 23, 27

*Buckley v. Valeo*, 424 U.S. 1 (1976) .......................................................................................... 14

*Cannon v. Village of Bald Head Island*, 891 F.3d 489 (4th Cir. 2018) ........................................ 26

*Carr v. Saul*, 593 U.S. 83 (2021) .............................................................................................. 15

*Comey v. Dep't of Justice*, No. 25-CV-7625, 2026 WL 1142679 (S.D.N.Y. Apr. 28, 2026) ........ 4

*Connecticut Department of Public Safety v. Doe*, 538 U.S. 1 (2003) ........................................... 23

*Cox v. N. Va. Transp. Comm'n*, 551 F.2d 555 (4th Cir. 1976) ..................................................... 25

*Doe v. Va. Dep't of State Police*, 713 F.3d 745 (4th Cir. 2013) .................................................. 24

*Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012) ........................................................................... 13

*Est. of Michael ex rel. Michael v. Lullo*, 173 F.3d 503 (4th Cir. 1999) ....................................... 29

*Free Enterprise Fund v. Public Company Accounting Oversight Board*,
   561 U.S. 477 (2010) .................................................................................................... 9, 13, 14

*Freytag v. Commissioner*, 501 U.S. 868 (1991) .......................................................................... 17

*Harrell v. City of Gastonia*, 392 F. App'x 197 (4th Cir. 2010) .................................................... 21

*In re Banks*, 37 F.3d 1492 (4th Cir. 1994) ................................................................................. 29

*In re First Fed. Sav. & Loan Ass'n*, 860 F.2d 135 (4th Cir.1988) ................................................ 29

*Jackson v. Clark*, 564 F. Supp. 2d 483 (D. Md.  2008) .............................................................. 26

*Johnson v. Morris*, 903 F.2d 996 (4th Cir. 1990) ....................................................................... 22

*Karamanos v. Egger*, 882 F.2d 447 (9th Cir. 1989) ................................................................... 29

*King v. Jerome*, 42 F.3d 1371 (Fed. Cir. 1994) ........................................................................... 5

*Lawrence v. United States*, 631 F. Supp. 631 (E.D. Pa. 1982) .................................................... 29

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ....................................................... 7

*Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237 (2018) ............................................................ 15, 17

*Meads v. VA*, 36 MSPR 574 (1988) ........................................................................................... 12

*Mitchell v. USPS*, 7 MSPR 141 (1981) ...................................................................................... 12

*Morrison v. Olson*, 487 U.S. 654 (1988) ............................................................................. passim

*Morrissey v. Brewer*, 408 U.S. 471 (1972) ................................................................................. 27

*Myers v. United States*, 272 U.S. 52 (1926) ....................................................................... 8, 9, 10

*Richardson v. Orangeburg Sch. Dist. No. 1*, 53 F.3d 329 (4th Cir. 1995) .................................... 21

*Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292 (4th Cir. 2006) ........................... 24, 25

*Rosenblatt v. Baer*, 383 U.S. 75 (1966) ..................................................................................... 20

*Sciolino v. City of Newport News, Va.*, 480 F.3d 642 (4th Cir. 2007) .......................................... 22

*Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197 (2020) .................... 10, 18

*Shirvinski v. U.S. Coast Guard*, 673 F.3d 308 (4th Cir. 2012) .................................................... 25

*Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667 (1950) .................................................... 28

*Socol v. Albemarle Cnty. Sch. Bd.*, 399 F. Supp. 3d 523 (W.D. Va. 2019) ................................. 26

*Steinagel v. Jacobson*, 507 F. Supp. 288 (S.D. Ohio 1980) .............................................. 29

*Stone v. Univ. of Md. Med. Sys. Corp.*, 855 F.2d 167 (4th Cir. 1988) ................................... 22, 24

*Thunder Basin Coal Co. v, Reich*, 510 U.S. 200 (1994) ................................................. 4

*Tucker v. Comm'r of Internal Revenue*, 676 F.3d 1129 (D.C. Cir. 2012) ............................. 15, 17

*United States v. Arthrex, Inc.*, 594 U.S. 1 (2021) ...................................................... 11, 17

*United States v. Nixon*, 418 U.S. 683 (1974) .......................................................... 17

*United States v. Perkins*, 116 U.S. 483 (1886) ................................................... 7, 8, 9, 10

## Statutes

5 U.S.C. § 3395(a) .................................................................................... 14

5 U.S.C. § 3395(a)(1) ................................................................................. 1, 13

5 U.S.C. § 3592(a)(2) ................................................................................. 13

5 U.S.C. § 7513(a)-(d) ................................................................................ 13

5 U.S.C. § 7543 ....................................................................................... 5

5 U.S.C. § 7543(a) ................................................................................. 5, 6, 27

5 U.S.C. § 7543(b) ................................................................................. 5, 6, 27

5 U.S.C. § 7543(d) ................................................................................. 5, 6, 27

28 U.S.C. § 1361 ...................................................................................... 30

## Constitutional Provisions

U. S. Const. art. II, § 2, cl. 2 ...................................................................... 8, 18

## Other Authorities

Connor J. Morgan, *The Due-Process Limits on the President's Power to Fire Civil Servants*, 135 YALE L. J. FORUM 830 (2026) ........................................................................ 28

Office of Legal Counsel, *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 2007 WL 1405459 (2007) .................................................. 14, 15

Office of Legal Counsel, *The Test for Determining 'Officer' Status Under the Appointments Clause*, 2025 WL 293746 (2025) ........................................................................ 14, 15

*Second Deputy Comptroller of the Currency— Appointment*, 26 Op. Att'y Gen. 627 (1908) ..... 17

Defendants make four arguments in their combined opposition and memo in support of their cross-motion for summary judgment: (1) this Court should reconsider its holding that it has jurisdiction, (2) Article II requires that Plaintiff Mary Comans be subject to removal without any cause or process, (3) the Court cannot afford any meaningful relief for the deprivation of Ms. Comans' liberty, and (4) neither the declaratory judgment nor the mandamus claim is a basis for relief. We demonstrate below that each of those arguments is wrong and also that Ms. Comans is entitled to summary judgment on her property interest claim.

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

Plaintiff does not dispute that the quotations in Defendants' Statement of Undisputed Material Facts are accurate quotations from either Ms. Comans' position description or performance evaluation.

**STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS**

Plaintiff states that there is no genuine dispute as to the following additional[1] material facts:

1. Consistent with the Civil Service Reform Act("CSRA"), Defendants could have removed Ms. Comans from her position as Federal Emergency Management Agency ("FEMA") Chief Financial Officer ("CFO") without any cause or process if they had transferred her to another position in the Senior Executive Service ("SES"). 5 U.S.C. § 3395(a)(1).

2. Ms. Comans occupied a line rather than a staff position. Second Comans Decl. ¶ 1.

3. Ms. Comans was an advisor to the Administrator, Deputy Administrator, and other officials of FEMA not a decision maker.  Her Position Description stated that she was the

---

[1] Plaintiff filed a separate Statement of Material Fact with its Motion rather than including it in her Memo as required by the Local Rules. Plaintiff will file an amended Memo if required by the Court as the original Memo was well under the page limit. The Additional Statement above is in response to arguments made in Defendants' Opposition and Cross-Motion.

1

"primary advisor to the Administrator and Deputy Administrator" on financial matters. Defs.' Opp'n., Dkt No. 55-1, Ex. A at 3. Her performance plan stated that she provided "financial management services." Defs.' Opp'n., Dkt. No. 55-2, Ex. B at 6 of 10. *See also* Second Comans Decl. ¶¶ 1, 5, 7, 8, 14, 15.

4. Ms. Comans had no authority over how FEMA spent funds or over FEMA's budget requests. Rather, she advised the decision-makers about how to spend funds and make budget requests in accordance with federal government financial policies and available resources. Second Comans Decl. ¶¶ 9-11.

5. Higher-level officials at the Department of Homeland Security ("DHS") and FEMA could reject any advice given by Ms. Comans and could reverse or revise any decision made by Ms. Comans. Second Comans Decl. ¶¶ ¶ 4, 1-3.

6. Ms. Comans "[s]erve[d] under the direct formal supervision of the Deputy Administrator" of FEMA. Defs.' Opp'n., Dkt. No. 55-1, Ex A at 4.

7. Even if Ms. Comans identified a violation of appropriations law, she had no authority to initiate any form of civil or criminal actions before any tribunal or to unilaterally stop the transaction. Second Comans Decl. ¶ 6.

8. Ms. Comans had no prosecutorial authority, no authority to initiate any form of civil or criminal action, no authority to conduct hearings or pre-hearing proceedings, no authority to adjudicate disputes, and no authority to make rules binding the public. Comans Decl. ¶ 17.

9. Ms. Comans was not appointed to the position of CFO by the President or the Secretary of DHS. Second Comans Decl. ¶ 18.

2

**ARGUMENT**

I.    **The Court Should Reaffirm its Holding on Jurisdiction and Hold, in the Alternative, that Congress Did Not Intend Constitutional Claims of the Type Advanced by Defendants to be Channeled to the Agency**

This Court should reaffirm its prior conclusion that the Merit Systems Protection Board ("MSPB") lacks jurisdiction over Ms. Comans' claims. Even if the Court reverses that conclusion, it should nevertheless retain jurisdiction on the grounds that Congress did not intend constitutional arguments of the type advanced by Defendants to be channeled to the agency as explained in Plaintiff's Opposition to Defendants' Motion to Dismiss at 16-20, Dkt. No. 29. The Court should adopt the second conclusion, in the alternative, *even if* it reaffirms its prior conclusion.

A.    **This Court and Other Courts Have Already Correctly Held that Cases Like This One Are Not Channeled to the MSPB**

On April 15, 2026, this Court correctly denied Defendants' Motion to Dismiss, specifically holding that "the MSPB has no jurisdiction" and "this Court necessarily has federal question jurisdiction over Plaintiff's due process claims." Order at 9, Dkt. No. 42. The Court had previously afforded all parties an opportunity to file supplemental briefs addressing the question of whether the MSPB has jurisdiction over Plaintiff's claims. Order, Dkt. No. 39; Pl's Mem. Dkt. No. 40; Defs' Mem., Dkt. No. 41. Defendants did not move for reconsideration but rather NOW seek to contest the Court's prior conclusion in their Opposition. *See* Defs.' Opp'n at 7-15, Dkt. No. 55. While the law of the case doctrine does not strictly apply to questions of subject matter jurisdiction, *see Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 515–16 (4th Cir. 2003), the Court should decline to disturb its prior, well-reasoned and correct conclusion.

In fact, three separate district courts have now held that federal employees protected by the CSRA can sue in federal court when the government asserts that Article II permits the

3

executive to fire them without regard to their statutory rights. *See Comey v. Dep't of Justice*, No. 25-CV-7625, 2026 WL 1142679 (S.D.N.Y. Apr. 28, 2026); *Abramowitz v. Lake*, 803 F. Supp. 3d 1, 10-13 (D.D.C. 2025). This Court and the *Comey* court (citing this Court's order with approval) held they haVE jurisdiction on the grounds that the MSPB lacks jurisdiction in this situation. *See Comey,* 2026 WL 1142679 at *9 ("'[T]he Board has no jurisdiction over this case. The Board's appellate jurisdiction is limited to those matters over which it has been given jurisdiction by law, rule, or regulation. There is no law, rule, or regulation that confers jurisdiction on the Board to review removal actions taken pursuant to Article II.'" (Quoting government's prior position with approval). The *Comey* court, in the alternative, and the *Abramowitz* court held they had jurisdiction on the grounds that Congress did not intend the CSRA to channel to the MSPB constitutional arguments of the type advanced by Defendants here. *See Comey*, 2026 WL 1142679 at *11. ("In sum, '[a]ll three *Thunder Basin* factors thus point in the same direction — toward allowing district court review of Comey's claims.... Her claims 'cannot receive meaningful judicial review' through the CSRA; '[t]hey are collateral to any decisions' the MSPB (or Office of Special Counsel) could make; and 'they fall outside the [agency's] sphere of expertise.' . . . It 'follows' that her claims 'are not 'of the type' the statutory review scheme[ ] reach[es],' and this Court may review them pursuant to its ordinary federal question jurisdiction) (citations omitted); *Abramowitz,* 803 F. Supp. 3d at 13 ("On balance, these considerations indicate that Congress did not intend to channel Abramowitz's removal claim through the CSRA scheme. . . . [T]he MSPB has no comparative advantage when it comes to the separation of powers issue at the heart of this dispute. . . . The Court has jurisdiction."). All three courts and both grounds were correct.

**B. Defendants' Arguments that This Court's Prior Ruling Was Wrong Do Not Have Merit**

The Court here carefully analyzed the terms of the operative subsection, 5 U.S.C. § 7543(d), and how Congress intentionally used different words in that subsection, "an action . . . taken under this *section*," than it used two subsections earlier in 7543(b), "an action covered by this *subchapter*." Giving import to that difference, as it was required to do, the Court concluded that an action "taken under this section," means an action taken pursuant to 5 U.S.C. § 7543(a), *i.e., "*for misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function," and not an action taken solely under Article II. That conclusion was further compelled by the direction that agency jurisdiction be construed "narrowly" to cover review of only those actions "specifically" provided by law. Order at 7, Dkt. No. 42 (quoting *King v. Jerome*, 42 F.3d 1371, 1374 (Fed. Cir. 1994)).

Defendants argue this Court was wrong for four reasons, none of which has merit.

First, Defendants argue that the difference in statutory wording has no significance because Section 7543 is the only section in the subchapter that authorizes removal of SES employees, thus, "there would have been no reason for Congress to describe the appeal right by reference to the entire subchapter." Defs.' Opp'n at 13, Dkt. No. 55. But that observation undercuts Defendants' own argument as it suggests that the Court would have been correct even if Congress had used the words "under this subchapter" because Section 7543 is the only section of the subchapter authorizing removal. Thus, "under this subchapter" means the same thing as "under this section" for the relevant purpose. And Congress simply made doubly sure to grant a right to appeal to the MSPB only to employees removed for the reasons specified in Subsection (a) of Section 7543 by using the words "under this section" instead of "under this subchapter."

5

If Defendants were correct, Congress would have used different language entirely. Congress could, for example, have provided that "[a]n employees against whom an action described in this subchapter is taken is entitled to appeal to the [MSPB]." But Congress did not so provide, and this Court properly gave meaning to the precise words used in the statute.

Second, Defendants argue that, under the Court's reasoning, any procedural violation of Subsection 7543(b), such as a failure to provide 30-days' notice, would also deprive the MSPB of jurisdiction. But the language cited by this Court in Subsection 7543(d) is "against whom an action is taken under this section." The phrase "taken under" clearly refers to actions *authorized* by Subsection 7543(a), *e.g.*, actions taken for cause. If Defendants were correct, Subsection 7543(b) would read "against whom an action is taken under *and in compliance with* this section." That is not what the text states.

Third, Defendants cite the MSPB's regulations, but this Court has already rightly concluded that the Board cannot adopt rules that expand its jurisdiction beyond what Congress provided. Order at 8, Dkt. No. 42.

Finally, Defendants argue that this Court's holding "blows a gaping hole in Congress's deliberate effort . . . 'to replace the haphazard arrangements for administrative and judicial review of personnel actions.'" Defs.' Opp'n at 9, Dk't No. 55 (citation omitted). But it is not this Court's holding that blows a hole in the CSRA, rather it is Defendants' radical argument that the protections of the Act cannot constitutionally be applied to personnel actions taken via an assertion of Article II authority. Congress certainly did not anticipate this sweeping assertion of executive authority and thus the Court's holding is in no way inconsistent with Congress' intent.[2]

---

[2] Defendants briefly make two other points: (1) Defendants assert that "this Court's order rightly noted [that] district courts are powerless to award back pay and money damages." Defs.' Opp'n at 10, Dkt. No. 55. That is simply incorrect. In fact, this Court expressly reserved that question.

This Court should reaffirm its prior conclusion that the MSPB lacks jurisdiction *and*, in the alternative, hold that Congress did not intend constitutional arguments of the type advanced by Defendants to be channeled to the agency.

## II. Article II Did Not Give the President Authority to Fire Ms. Comans in Violation of the CSRA

Defendants' central argument is that Article II of the Constitution renders the protections of the CSRA unconstitutional as applied to the President's firing of Ms. Comans without any cause or process. That argument is wrong for four independent reasons.

### A. 140 Years of Supreme Court Precedent Contradicts the Defendants' Position

An unbroken line of Supreme Court precedent stretching back to 1886 makes clear that Congress can limit the President's power to summarily fire inferior officers when Congress does not vest the power to appoint them in the President, as was the case here. Second Comans Decl. ¶ 18.

The Supreme Court held nearly 140 years ago, that Congress can limit the grounds for removal of inferior officers whose appointment Congress did not vest in the President. In *United States v. Perkins*, 116 U.S. 483 (1886), the Court held:

> when congress, by law, vests the appointment of inferior officers in the heads of departments, it may limit and restrict the power of removal as it deems best for the public interest. The constitutional authority in congress to thus vest the appointment implies authority to limit, restrict, and regulate the removal by such laws as congress may enact in relation to the officers so appointed.

*Id.* at 485.

*Perkins'* holding rests on the express terms of the Appointments Clause, which do not create the

---

*See* Order at 10 n.4, Dkt. No. 42. (2) Defendants argue that the MSPB "has rejected this Court's view," Defs.' Opp'n at 10, Dkt. No. 55, but Defendants concede both that the parties in the cited case did not contest the Board's jurisdiction and that the Board, in fact, held it lacked jurisdiction. *Id*. In addition, the Board in no way addressed the precise language relied on by this Court. Finally, this Court owes no deference to the Board's legal conclusion or the regulations cited by Defendants after *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024).

form of "unitary executive" that is assumed by Defendants' arguments. The Appointments Clause

provides: "the Congress may by Law vest the Appointment of such inferior Officers, as they think

proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U. S. Const. art.

II, § 2, cl. 2 (emphasis added). The clause thus expressly limits the President's power over federal

employment, specifically, the employment of inferior officers,[3] as it provides that Congress can remove

the power of appointment of such officers from the President and vest it in the courts or the heads of

departments. The Constitution does not create a "unitary executive" in the area of employment and

certainly does not give the President unilateral authority to hire and fire all employees under the guise

of faithfully executing the laws. As the Supreme Court recognize in *Myers v. United States*, 272 U.S.

52, 127 (1926), "Here then is an express provision introduced in words of exception for the exercise by

Congress of legislative power in the matter of appointments *and removals* in the case of inferior

executive officers." (emphasis added).

    *Perkins* has not been overruled and it thus controls here.[4]

    In fact, *Perkins* has been repeatedly reaffirmed by the Supreme Court. A century ago, in *Myers*,

272 U.S. at 126-27, the Court recognized,

> [T]he power of appointment and removal is clearly provided for by the
> Constitution, and the legislative power of Congress in respect to both is excluded
> save by the specific exception as to inferior offices in the clause that follows. This
> is 'but the Congress may by law vest the appointment of such inferior officers, as
> they think proper, in the President alone, in the Courts of Law, or in the Heads of
> Departments.' These words, it has been held by this court, give to Congress the
> power to limit and regulate removal of such inferior officers by heads of
> departments when it exercises its constitutional power to lodge the power of
> appointment with them. *United States v. Perkins*, 116 U.S. 483, 485 [(1886)].

The Court explained further, "Congress . . . . may leave with the President the right to appoint [officers]

---

[3] Defendants' argument rests entirely on the contention that Ms. Comans was an inferior officer.
[4] Tellingly, the Defendants do not even cite *Perkins*.

with consent of the Senate or direct another to appoint. In the latter event *United States v. Perkins*, 116 U.S. 483, makes it clear that the right to remove may be restricted." *Id*. at 192.

A century after *Perkins*, in *Morrison v. Olson*, 487 U.S. 654 (1988), the Court rejected the suggestion "that the language of Article II vesting the executive power of the United States in the President requires that every officer of the United States exercising any part of that power must serve at the pleasure of the President and be removable by him at will," explaining that that suggestion is "contrary to our holding in *United States v. Perkins*." *Morrison*, 487 U.S. at 689 n.29. The Court elaborated,

> this Court has never held that the Constitution prevents Congress from imposing limitations on the President's power to remove *all* executive officials simply because they wield 'executive' power. *Myers* itself expressly distinguished cases in which Congress had chosen to vest the appointment of 'inferior' executive officials in the head of a department. . . . In such a situation, we saw no specific constitutional impediment to congressionally imposed restrictions on the President's removal powers. See also *United States v. Perkins,* 116 U.S. 483, 485.

*Id.* at 689 n.27.[5]

Two decades later, in *Free Enterprise Fund v. Public Company Accounting Oversight Board,* 561 U.S. 477, 483 (2010), the Court again explained:

> Since 1789, the Constitution has been understood to empower the President to keep these officers accountable—by removing them from office, if necessary. . . . This Court has determined, however, that this authority is not without limit. . . . [I]n *United States v. Perkins,* 116 U.S. 483 . . . , the Court sustained . . . restrictions on the power of principal executive officers—themselves responsible to the President—to remove their own inferiors.

The Court made clear that when Congress vests the appointment power in the heads of departments, "it is ordinarily the department head, rather than the President, who enjoys the power of removal" and "[t]he Court has upheld for-cause limitations on that power." *Id*. at 493.

---

[5] Even in dissent, Justice Scalia made clear that "*Perkins* is in no way inconsistent with my views." 487 U.S. at 724 n.4 (Scalia, J., dissenting).

Most recently in *Seila Law LLC v. Consumer Financial Protection Bureau*, 591 U.S. 197, 217 (2020), the Court stated once more, "We have recognized a second exception [to the President's removal power] for *inferior* officers in two cases, [including] *United States* v. *Perkins*."

An unbroken line of Supreme Court precedent extending from 1886 to date establishes that when Congress vests the appointment of inferior officers in department heads,[6] rather than in the President, it can also limit the grounds for removal of those officers by the department head and the President.

### B. *Morrison* Is Contrary to Defendants' Position Because Ms. Comans Was Subject to the Direction of Superior Officers

The Supreme Court held in *Morrison* that Congress had the constitutional authority to impose a just-cause limitation on the Attorney General's power to fire an independent counsel appointed under the Ethics in Government Act of 1978. In so doing, the Court firmly rejected the radical assertion of presidential power advanced by Defendants: "The assumption was short-lived that the *Myers* case recognized the President's inherent constitutional power to remove officials no matter what the relation of the executive to the discharge of their duties and no matter what restrictions Congress may have imposed regarding the nature of their tenure." *Morrison*, 487 U.S. at 690 (cleaned up).[7] Rather, the Court explained, "the real question is whether the removal restrictions are of such a nature that they impede the President's ability to perform his constitutional duty." *Id*. at 691.

The *Morrison* Court proceeded to hold that so long as the decisions of inferior officers are subject to review by a superior officer, Congress can afford the former protection against discharge

---

[6] As explained in Subsection II(D)(1)(d) *infra*, Congress did not vest the appointment of the CFO in either the President or a department head, making this an even stronger case for the application of *Perkins*' holding.

[7] Even Justice Scalia, an ardent advocate of executive authority over federal employment, acknowledged that the suggestion that "every officer of the United States exercising any part of [the executive] power must serve at the pleasure of the President . . . . has never been the law." *Morrison*, 487 U.S. at 724 n.4 (Scalia, J., dissenting).

10

except for just cause without infringing upon Article II. The Court concluded, "[W]e cannot say that the imposition of a 'good cause' standard for removal by itself unduly trammels on executive authority." *Id*. The Court explained:

> Nor do we think that the 'good cause' removal provision at issue here impermissibly burdens the President's power to control or supervise the independent counsel, as an executive official, in the execution of his or her duties under the Act. This is not a case in which the power to remove an executive official has been completely stripped from the President, thus providing no means for the President to ensure the 'faithful execution' of the laws. Rather, because the independent counsel may be terminated for 'good cause,' the Executive, through the Attorney General, retains ample authority to assure that the counsel is competently performing his or her statutory responsibilities in a manner that comports with the provisions of the Act.. . . [T]he Attorney General may remove an independent counsel for "misconduct." . . .We do not think that this limitation as it presently stands sufficiently deprives the President of control over the independent counsel to interfere impermissibly with his constitutional obligation to ensure the faithful execution of the laws.

*Id*. at 692-93 (footnote omitted).[8]

In other words, regardless of the rank or duties of the inferior officer or employee at issue, Congress' imposition of a "good cause" requirement for termination does not unconstitutionally impair the executive's authority so long as the officer's or employee's decisions are subject to review by a superior officer. The President, directly or through an agency head removable by him at will, can order the inferior officer or employee to take lawful actions and the subsequent refusal to carry them out or failure to competently carry them out would provide good cause for disciplinary action.[9] The CSRA

---

[8] Justice Scalia agreed: the President must have "plenary power to remove principal officers . . . , but it does not require that he have plenary power to remove inferior officers. Since the latter are . . . subordinate to, *i.e.,* subject to the supervision of, principal officers who (being removable at will) have the President's complete confidence, it is enough—at least if they have been appointed by the President or by a principal officer—that they be removable *for cause,* which would include, of course, the failure to accept supervision." *Id*. at 724 n.4 (Scalia, J., dissenting).

[9] The holding in *United States v. Arthrex, Inc.*, 594 U.S. 1 (2021), is based on the same principle. In that case, the members of the Patent Trial and Appeal Board were protected from removal by the CSRA, *id.* at 25-26, and their decisions were not fully reviewable by the Director of the Patent Office, who is appointed by the President with the advice and consent of the Senate, *id.* at

11

provides no more protection than that. *See, e.g.*, *Meads v. VA*, 36 MSPR 574, 584 (1988) (upholding discharge for failure to follow orders); *Mitchell v. USPS*, 7 MSPR 141, 142 (1981) (same).

Higher officers within both DHS and FEMA had the authority to instruct Ms. Comans and to discipline her if she refused to follow those instructions or did not do so competently. *See* Subsection IID(1)(b) *infra*. Accordingly, Defendants' argument is inconsistent with *Morrison*.

### C. The President Had Sufficient Statutory Authority to Remove Ms. Comans From Her Position to Satisfy Even Defendants' Assertion of What Article II Requires

Central to Defendants' argument is the contention that the President's authority to take care that the laws be faithfully executed requires that "lesser executive offers" be accountable to him and that requires that he have "the power to remove those 'lesser executive officers' from their posts." Defs.' Opp'n at 16, Dkt. No. 55. But the President had statutory authority to remove Ms. Comans from "her post" without any cause or process and, thus, the CSRA is not unconstitutional as it applies to protect Ms. Comans from removal from the federal service entirely.

Defendants concede that Ms. Comans was a member of the SES. Defs.' Opp'n at 3, Dkt. No. 55. In recognition of the greater need for the President and agency heads to control the actions of members of the SES, Congress did not grant SES employees the full range of substantive and procedural protections accorded to lower-level employees. The CSRA gives agency heads discretion to reassign members of the SES without any cause or process and to remove them from the SES (but not the federal service) for reasons falling short of just cause.

---

8-9, 17. The Court held that that insulation from both removal and review was unconstitutional, but rather than invalidate the former, it invalidated the latter. *Id.* at 26. Thus, the Court held that providing for review by an officer of the United States, rendered the statutory protection of the inferior officers constitutional. Thus, even conceding that the Defendants' argument is correct, which it is not, the remedy would be to hold that any restrictions on review of FEMA's CFO's decisions are unenforceable, not to invalidate the CSRA's protection of Ms. Comans.

Congress specifically permitted the transfer of a career SES employee to another position within the SES without any cause or process. *See* 5 U.S.C. § 3395(a)(1). Congress also authorized the reassignment of a member of the SES to another civil service position *outside* the SES, *i.e.*, to demote the SES employee, for "less than fully successful executive performance," provided that the employee receives notice and is provided an "informal hearing before an official designated by the [MSPB]." 5 U.S.C. § 3592(a)(2). The latter provision contrasts with the protection the CSRA accords lower-level employees against demotion, which requires "such cause as will promote the efficiency of the service," an opportunity to respond to the alleged cause, and the right to appeal to the MSPB and obtain a full, formal hearing. 5 U.S.C. § 7513(a)-(d).

The Supreme Court has repeatedly emphasized the "painstaking detail" with which Congress defined the rights of federal employees in the CSRA. *See, e.g., Elgin v. Dep't of Treasury*, 567 U.S. 1, 11 (2012). In doing so, Congress limited the rights of SES employees and thereby expanded the President's authority to control their actions precisely to accommodate the President's greater need to control those higher-ranking employees in order to fulfill his duty to "take care that the laws be faithfully executed."

Despite this considerable authority possessed by the President and agency heads to take action if they are not satisfied with the performance of a member of the SES, such as Ms. Comans, the Defendants take the position that Article II permits the President to remove Ms. Comans from the federal service entirely without any cause or process despite the contrary command in the CSRA.

But the Supreme Court has directly addressed the CSRA's limited protection of SES employees and explained that the protections do not impermissibly constrain the President's control over executive branch employees. In *Free Enterprise Fund*, the Supreme Court distinguished the CSRA's protections of members of the SES from that of the Members of the Public Company Accounting Oversight Board

13

at issue in that case on the grounds that "members of the Senior Executive Service may be reassigned . . . ." 561 U.S. at 506 (citing 5 U.S.C. § 3395(a)). As the Court observed, the limited protection accorded members of the SES do not create the kind of "significant and unusual protections from Presidential oversight" that would render the protections unconstitutional. *Id*. Answering the question posed in *Morrison,* whether the limited "removal restrictions [granted to SES employees] are of such a nature that they impede the President's ability to perform his constitutional duty," 487 U.S. at 691, the Court strongly suggested the answer is no.

Defendants fail to explain why the President's and agency head's authority to remove Ms. Comans from the CFO position without any cause or process did not give the President precisely the authority Defendants argue he needs under Article II -- "the power to remove those 'lesser executive officers' from their posts," Defs.' Opp'n at 16, Dkt. No. 55, and they cannot do so because, as the Supreme Court explained in *Free Enterprise Fund*, the CSRA is consistent with Article II.

### D. Ms. Comans Was Not an Inferior Officer and Certainly Had Less Authority Than the Independent Counsel at Issue in *Morrison*

#### 1. Ms. Comans Was Not an Inferior Officer

Defendants' argument is entirely premised on the assertion that Ms. Comans was an inferior officer, but that is wrong.

An "Officer of the United States," as opposed to an employee, "exercis[es] significant authority pursuant to the laws of the United States." *Buckley v. Valeo*, 424 U.S. 1, 125–26 (1976). Officers have "been 'delegat[ed] . . . a portion of the sovereign powers of the federal government.'" Office of Legal Counsel ("OLC"), *The Test for Determining 'Officer' Status Under the Appointments Clause*, 2025 WL 293746 at *15 (2025) (quoting *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 2007 WL 1405459 (2007)). And "one could define delegated sovereign authority as power lawfully conferred by the

14

government to bind third parties or the government itself." *Id*. In considering whether individuals wield "significant authority" sufficient to render them Officers of the United States, courts consider "(1) the significance of the matters resolved by the officials, (2) the discretion they exercise in reaching their decisions, and (3) the finality of those decisions." *Tucker v. C.I.R.*, 676 F.3d 1129, 1133 (D.C. Cir. 2012). *See also Carr v. Saul*, 593 U.S. 83, 86 (2021) (whether the individual "exercised significant discretion when carrying out important functions" and whether they "often had the last word" probative of whether inferior officer) (cleaned up). As the Supreme Court has long recognized, the "broad swath" of the federal government is composed of "mere employees," not officers. *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 241, 245 (2018). Ms. Comans fell into that "broad swath."

### a. Ms. Comans Had a Staff Rather than a Line Position, and Was an Advisor Rather than a Decision-Maker

Defendants err because they do not recognize the difference between line and staff positions and thus confuse the importance of Ms. Comans' job, her skills, and her supervisory authority with the exercise of "a portion of the sovereign powers of the federal government." OLC, *Officers of the United States*, 31 Op. O.L.C. at 73. In staff positions, like that of CFO, highly skilled employees perform critical functions often with the aid of multiple subordinates, but those functions are in aid of line employees who exercise decision-making authority. The OLC further explains, "the authority exercised by [employees] is not sufficiently significant for Appointments Clause purposes because . . . it is the superior officials, not the line employees assisting them, in whom the powers are vested." OLC, *The Test for Determining "Officer" Status*, 2025 WL 293746 at *13. The OLC explained:

> consistent with Supreme Court precedent, the Executive Branch has long recognized that employees occupying subordinate positions within the federal government *who have not been directly vested with statutory or regulatory*

15

*responsibilities, but who merely assist or act as the agents of superior officers vested with such responsibilities*, [are not officers of the United States].

*Id.* at *16 (emphasis added). Staff employees, like Ms. Comans, do not exercise "a portion of the sovereign powers of the federal government'" and are thus not inferior officers. *Id.* at *15.

The FEMA CFO is not a policy-making position. The second sentence of the Position Description states, "The incumbent serves as the *primary advisor* to the Administrator and Deputy Administrator on agency financial management, financial systems, [etc.]" Defs.' Opp'n, Dkt. No. 55-1, Ex. A at 4 (emphasis added). Ms. Comans' Performance Plan confirms that her role was to "[p]rovide timely, accurate and efficient *financial management services* ... to all FEMA Components." Defs.' Opp'n, Dkt. No. 55-2, Ex. B at 6 of 10 (emphasis added). Ms. Comans was a financial advisor to FEMA leadership; she provided information to leadership about the agency's financial resources in order to inform leadership's decisions and advised leadership on how to properly use those resources in order to execute leadership's policy decisions. Any advice that she gave or decision that she made could be reviewed, rejected, or reversed by the Administrator or Deputy Administrator. Second Comans Decl. ¶ 4. Even if Ms. Comans identified what she believed to be a violation of federal law or policy regarding the use of federal funds, she had a reporting obligation but no authority to unilaterally stop the transaction or initiate any form of civil or criminal enforcement action. Second Comans Decl. ¶ 6. Ms. Comans was an advisor, not a decision-maker.

### b.  Ms. Comans' Decisions Were All Subject to Review and Reversal by Higher-Level Officers

In addition, Ms. Comans possessed no authority to make final decisions even within her areas of responsibility as all of her significant decisions had to be reviewed and approved by the Administrator or Deputy Administrator. The Position Description makes clear that the CFO

16

"[s]erves under the direct formal supervision of the Deputy Administrator." Defs.' Opp'n, Dkt. No. 55-1, Ex. 1. *See also* Second Comans Decl. ¶¶ 1-16. Such plenary "supervision" indicates that Ms. Comans' authority was "highly constrained," suggesting she was not an inferior officer, but an employee. *Tucker*, 676 F.3d 1129, 1134 (D.C. Cir. 2012). As the Office of Legal Counsel has recently stated, "well over a century ago the Attorney General issued an opinion recognizing that an 'officer is distinguished from [an] employee in the greater importance, dignity, and *independence* of his position.'" OLC, *Test for Determining "Officer Status*," 2025 WL 293746, at *11 (citing *Second Deputy Comptroller of the Currency— Appointment*, 26 Op. Att'y Gen. 627, 628 (1908) (emphasis added)). The OLC further explained, "the authority exercised by [employees] is not sufficiently significant for Appointments Clause purposes because of the ways in which their discretion is constrained." *Id*. at *13.

Ms. Comans lacked authority to make final decisions.

### c. Ms. Comans Did Not Have Authority Comparable to Those Who Have Been Held to be Inferior Officers

When compared to the responsibilities of individuals courts have found to be officers, Ms. Comans' authority was both more limited and more fully subject to review. The CFO exercises no investigative or prosecutorial authority, unlike the independent counsel in *Morrison* and the special prosecutors in *United States v. Nixon*, 418 U.S. 683 (1974). Nor does the CFO have adjudicatory authority, such as the power to direct and oversee discovery, unlike the special trial judges of the U.S. Tax Court in *Freytag v. Commissioner*, 501 U.S. 868 (1991), the Securities and Exchange Commission administrative law judges in *Lucia*, 585 U.S. at 237, and Administrative Patent Judges in *Arthrex,* 594 U.S. 1. Ms. Comans had no authority to initiate civil or criminal actions, adjudicate disputes, or make rules binding on members of the public or

the government. Second Comans Decl. ¶¶ 1-16. Defendants cite no case holding that a person with comparably limited authority was an inferior officer.

### d. DHS Did Not Appoint Ms. Comans as an Inferior Officer

Indeed, until now, neither Congress, the President, nor DHS has regarded Ms. Comans as an inferior officer. If she had been an inferior officer, her appointment would have had to be vested in and made by the President, the Courts, or the Department head, *i.e.*, the Secretary of DHS. *See* U.S. Const., art. II, Sec. 2, Cl. 2. But the SF50 identifies Elizabeth A. Hough, HR Officer, as the "approving official" for Ms. Comans' appointment. Second Comans Decl., Ex. 1. FEMA's Administrator selected Comans to fill the position. Comans Decl. ¶ 3. That Ms. Comans was not appointed by the President or the Secretary, Second Comans Decl. ¶ 18, confirms that she was not an inferior officer.

Since Ms. Comans was an employee and not an officer of the United States, she was constitutionally protected against arbitrary dismissal, even accepting Defendants' novel theory.

### 2. Ms. Comans Had Less Independent Authority Than the Independent Prosecutor in *Morrison*

Defendants acknowledge that the Supreme Court has recognized "exceptions" to the President's removal power, including for "certain inferior officers with narrowly defined duties" like the Independent Counsel at issue in *Morrison*. *Seila Law*, 591 U.S. at 204 (citing *Morrison*). See Defs.' Opp'n at 21, Dkt. No. 55. Ms. Comans, without question, had less, not more, independent authority than the Independent Counsel at issue in *Morrison*.

As explained in Subsection II(D)(1) *supra*, Ms. Comans' duties were purely advisory and completely internal to FEMA. She did not have independent authority to take actions binding on the public generally or on specific parties.

18

Ms. Comans' duties fall far short of those of the Independent Counsel. As described in *Morrison*, the Independent Counsel had the power to: (1) exercise all investigative and prosecutorial functions and powers of the Department of Justice, the Attorney General, and any other officer or employee of the Department of Justice;(2) conduct grand jury proceedings and other investigations; (3) participate in civil and criminal court proceedings and litigation, and appeal any decision in any case in which the counsel participates in an official capacity; (4) initiate and conduct prosecutions in any court of competent jurisdiction, frame and sign indictments, file information, and handle all aspects of any case, in the name of the United States; (5) appoint employees; (6) suspend all investigations and proceedings; and (7)dismiss matters within his prosecutorial jurisdiction without conducting an investigation or at any subsequent time before prosecution. *Id.*, 487 U.S. at 662.  Ms. Comans had no powers even close to those in scope or importance. *See* Second Comans Decl. ¶¶ 1-15. Moreover, the position and powers of the Independent Counsel were established by statute, while that is not the case for the FEMA CFO.

And, unlike the Independent Counsel, whose authority was by its very nature independent from others, Ms. Comans' decisions were fully reviewable by higher-level officials, including the FEMA Administrator and the Deputy Administrator. Second Comans Decl. ¶ 4. The Position Description makes clear that the incumbent "[s]erves under the direct formal supervision of the Deputy Administrator, FEMA." Defs.' Opp'n, Ex. 1, Dkt. No. 46-1.

*Morrison* held that "the real question is whether the removal restrictions are of such nature that they impede the President's ability to perform his constitutional duty." 487 U.S. at 691. Here, even more clearly than in *Morrison*, the answer is no.

19

**III.    Ms. Comans Has Stated a Liberty Interest Claim as to Which She Is Entitled to Judgment as a Matter of Law**

Defendants do not contest that Ms. Comans has both stated a claim for deprivation of liberty without due process and established that there are no genuine disputes about facts material to that claim. Rather, Defendants would have this Court "assume[] Ms. Comans has made the minimal showing for a liberty-interest claim." Defs.' Opp'n at 23, Dkt. No. 55. Defendants argue only that Ms. Comans is "entitled to no relief on that claim." *Id*. Not only is that wrong because Ms. Comans is entitled, at a minimum, to a declaratory judgment in her favor on the claim, but also because the typical, indeed the sole, remedy for a deprivation of liberty in the employment context, a name-clearing hearing, is not a "meaningless exercise" as Defendants suggest. *Id.*

**A.  A Name-Clearing Hearing Is Not a "Meaningless Exercise"**

A name-clearing hearing is not a "meaningless exercise." To the contrary, it is the standard, indeed the only, remedy courts grant for a deprivation of liberty without due process in the employment context. Moreover, an injury to reputation of the type caused by the stigmatizing statements at issue here and remedied by a name-clearing hearing has long been recognized as a cognizable injury under U.S. law. *See, e.g., Rosenblatt v. Baer*, 383 U.S. 75, 92 (1966) ("The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being — a concept at the root of any decent system of ordered liberty.")

Defendants argue that because Ms. Comans' removal notice cited only Article II as the cause for her removal, she "was not fired for cause on the basis of the contents of the allegedly stigmatizing statements" and that "the truth or falsity of the allegedly stigmatizing statements are of 'no consequence' to Ms. Comans' removal." Defs.' Opp'n at 32, Dkt. No. 55. Defendants

20

argue that "even assuming Ms. Comans has made the minimum showing for a liberty-interest claim, she is nevertheless entitled to no relief on that claim: none of the allegedly reputation-bruising statements bear on the validity of the exercise of Article II removal authority, rendering the only permissible remedy – a name-clearing hearing – a meaningless exercise." *Id.* at 29.[10] This argument wholly misses the point of a name-clearing hearing, which is the sole and appropriate remedy for Defendants' deprivation of Ms. Comans' liberty without due process, and will be of great value to Ms. Comans in that it will allow her to clear her name and restore her reputation.

Both the Supreme Court and the Fourth Circuit have made clear that name-clearing – not reinstatement – is the sole and appropriate remedy for a deprivation of liberty in the employment context and that an employee is entitled to that remedy even if the employee is not entitled to reinstatement *via* a property interest claim. *See, e.g., Harrell v. City of Gastonia*, 392 F. App'x 197, 203 (4th Cir. 2010) ("If the public employee can establish a protected liberty interest under this framework, the employee is entitled to due process, which in this context involves a 'name-clearing hearing.'"). "The purpose of the name-clearing hearing is to provide the person an opportunity to clear his name. Once a person has cleared his name at a hearing, his employer, of course, may remain free to deny him future employment." *Richardson v. Orangeburg Sch. Dist. No. 1*, 53 F.3d 329 (4th Cir. 1995) (cleaned up).

Indeed, a public employer's stigmatizing statements may infringe on an employee's liberty interest even if the employee has no property interest in continued employment and thus no claim to reinstatement. In *Board of Regents v. Roth*, 408 U.S. 564 (1972), the fountainhead of

---

[10] Defendants reiterate, "[W]here the content of the defamatory statements is of no bearing on the validity of the adverse action, no name-clearing hearing should be afforded." Defs.' Opp'n at 25, Dkt. No 55.

the liberty interest jurisprudence, the Supreme Court made clear that if a public employer makes stigmatizing statements about an employee in connection with the employee's termination, "due process would accord an opportunity to refute the charge before [employer] officials." *Id*. at 573. And that is true even in a case like *Roth* where the employee was dismissed at the termination of his contract's term and "the terms of the respondent's appointment secured absolutely no interest in re-employment for the next year. They supported absolutely no possible claim of entitlement to re-employment." *Id*. at 578.

The Fourth Circuit has also so held. In *Sciolino v. City of Newport News, Va.*, 480 F.3d 642 (4th Cir. 2007), a probationary employee who had been terminated for cause brought a liberty interest claim against his employer, alleging that "by placing false charges in his personnel file, which 'may be available' to prospective employers, the City deprived him of Fourteenth Amendment liberty interests—in his reputation and his ability to obtain future employment—without granting him a name-clearing hearing." *Id.* at 645. The Court held that "[a]lthough Sciolino, as a probationary employee, has no protected 'property' interest in his employment with the City, a public employer cannot deprive a probationary employee of his 'freedom to take advantage of other employment opportunities'" by making stigmatizing statements without according the employee a hearing. *Id.* at 645 (citing *Roth*, 408 U.S. at 573). Therefore, the court held that "a Fourteenth Amendment 'liberty interest is implicated by public announcement of reasons for an employee's discharge.'" *Id.* at 645-46 (citing *Johnson v. Morris*, 903 F.2d 996, 999 (4th Cir. 1990)). "To state this type of liberty interest claim under the Due Process Clause, a plaintiff must allege that the charges against him: (1) placed a stigma on his reputation; (2) were made public by the employer; (3) were made in conjunction with his termination or demotion; and (4) were false." *Id.* at 646 (citing *Stone v. Univ. of Md. Med. Sys.*

22

*Corp.*, 855 F.2d 167, 172 n.5 (4th Cir. 1988)). There is no requirement that the termination or demotion was itself unlawful or should be remedied.

If Defendants' argument were correct, an employee could never bring a liberty interest claims unless the employee could also bring a property interest claim, *i.e.*, Defendants argue the name-clearing hearing is "meaningless" unless it can result in reinstatement which requires a legal right to continued employment if the stigmatizing charges are refuted — in other words that the employee have a property interest. That, however, is clearly not the law. As discussed above, a liberty interest claim can be brought even in the absence of a property interest in continued employment. *See, e.g., Roth*, 408 U.S. at 573, 578.

*Connecticut Department of Public Safety v. Doe*, 538 U.S. 1 (2003) ("*CDPS*"), on which Defendants rely heavily, *see* Defs.' Opp'n at 31-33, Dkt. No. 55, did not involve an employment matter and the factual contention plaintiffs sought to dispute at a hearing was not actually asserted by Defendants. In *CDPS*, a registered sex offender sued the State arguing that the state deprived the offender of liberty without due process because the state did not provide the offender a hearing to prove the offender was not currently dangerous. 538 U.S. at 4. By state statute, the Connecticut sex offender registry includes "all persons convicted of criminal offenses against a minor, violent and nonviolent sexual offenses, and felonies committed for a sexual purpose," but includes the following disclaimer:

> [DPS] has not considered or assessed the specific risk of reoffense with regard to any individual prior to his or her inclusion within this registry, and has made no determination that any individual included in the registry is currently dangerous. Individuals included within the registry are included solely by virtue of their conviction record and state law.

*Id.* at 4-6. The Court rejected the due process claim on the ground that current dangerousness was immaterial under the state statute and expressly not asserted on the registry. "Indeed, the

23

disclaimer on the Website explicitly states that respondent's alleged nondangerousness simply does not matter." *Id.* at 7. The case is not on point[11] and the language from the decision cited by Defendants certainly does not overrule *sub silentio Roth* and all of the Fourth Circuit precedent that is directly on point and cited herein.

A name-clearing hearing is both the appropriate remedy (in addition to a declaratory judgment) and a meaningful one.

### B.  The Stigmatizing Statements Need Only Be Linked to the Adverse Employment Action and Need Not Be the Formal, Stated Cause of the Action

Defendants misrepresent the controlling case law by suggesting that in order to establish a liberty interest claim, Ms. Comans must show that Defendants' stigmatizing statements were made in the formal notice of termination. Defs.' Opp'n at 23-25, Dkt. No. 55. That contention has been repeatedly rejected by the Fourth Circuit. The stigmatizing statements must be related to the discharge but need not be stated as the formal cause of the discharge.

Defendants cite *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 309 (4th Cir. 2006), for the proposition that "in order to deprive an employee of a liberty interest, a public employer's stigmatizing remarks must be made *in the course of* a discharge or significant demotion," Defs.' Opp'n at 23, Dkt. No. 55 (emphasis added), but  Defendants wrongly narrow the meaning of "the course of" a discharge. In *Ridpath*, the Court found that that standard was met even though Ridpath did not allege that the stigmatizing statements were cited as grounds for what he alleged was an involuntary reassignment.[12] Indeed, the Fourth Circuit has cited

---

[11] Similarly, the two cases cited by Defendants at the end of their discussion of *CDPS*, *Doe v. Va. Dep't of State Police*, 713 F.3d 745 (4th Cir. 2013), and *Ballard v. Chief of FBI*, No. 7:03-cv-00354, 2004 WL 190425 (W.D. Va. Ja. 20, 2004), are not employment cases and rely on *CDPS* without further elaboration.

[12] Defendants also neglect to note that the quoted language was from *Stone*, 855 F.2d at 172 n.5, a case that involved a liberty claim brought by an employee who voluntarily resigned. *Id.* at 171. The full context of the quoted language is:

*Ridpath* in noting that it has "recognized that a loss of government employment *accompanied* by a public employer's stigmatizing remarks constitutes a deprivation of a liberty interest." *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 315 (4th Cir. 2012) (emphasis added). In this case, the stigmatizing statements about Ms. Comans were made "in the course of" her firing and the firing was "accompanied by" the stigmatizing statements, so the "stigma plus" test Defendants suggest applies has been satisfied.

Indeed, as explained in Plaintiff's opening Memorandum, the Fourth Circuit, in *Cox v. N. Va. Transp. Comm'n*, 551 F.2d 555 (4th Cir. 1976),  has made clear that to establish a liberty claim, the stigmatizing statements need not be formally cited as the cause of discharge. *See* Pl.'s Mot. for Summ. J. at 8 n.2, Dkt. No. 46. In *Cox v. N. Va. Transp. Comm'n*, 551 F.2d 555, 558 (4th Cir. 1976), the plaintiff, the deputy director of administration at a public agency, was terminated and, as here, "her letter of notification assigned no reason for her discharge." *Id.* at 557. Some commissioners of the agency made public statements asserting that the plaintiff was fired as a result of an internal investigation of financial wrongdoing. *Id.* The commission denied the plaintiff's request for an opportunity to be heard concerning the statements. *Id.* The Fourth Circuit held that the commission had deprived the plaintiff of liberty without due process of law, noting that "the absence of formal charges of wrongdoing [did not] lessen the injury to her reputation that was caused by the interviews the commissioners granted the press. The

---

> [A] public employer's stigmatizing remarks do not deprive an employee of a liberty interest unless they are made in the course of a discharge or significant demotion. Our finding that Stone was not discharged from his public employment but resigned voluntarily thus effectively disposes of any liberty interest claim he might assert.

*Id.* at 172 n.5 (citations omitted). The issue in *Stone* was thus that the employer had *not* discharged or demoted the plaintiff; instead, he had voluntarily resigned.

25

opportunity of a discharged public employee to get a new job may be hampered as badly by official leaks to the press insinuating dishonesty as by a published official reprimand. In either event, therefore, the employee is entitled to a hearing." *Id.* at 558.

Other cases from this circuit also hold that the stigmatizing statements need only be made in connection with the employee's discharge and need not be in the formal termination notice itself. *See, e.g.*, *Cannon v. Village of Bald Head Island*, 891 F.3d 489, 504-05 (4th Cir. 2018) (holding that plaintiffs stated due process claim based on email that defendant-employer sent to all employees several hours after plaintiffs' termination, stating that plaintiffs had been terminated based on violations of employer policies); *Socol v. Albemarle Cnty. Sch. Bd.*, 399 F. Supp. 3d 523, 538–39 (W.D. Va. 2019) (holding that disparaging remark made separately from, but on the same day as, plaintiff's termination formed basis for a liberty interest claim); *Jackson v. Clark*, 564 F. Supp. 2d 483, 490 (D. Md. 2008) (holding that plaintiff stated due process claim based on employer announcements to local media that plaintiff had been demoted for misconduct). Given that the false and stigmatizing statements Defendants made about Ms. Comans specifically stated that her alleged misconduct was the reason for her termination and that the statements were made on the day of her termination, Complaint ¶ 18, Dkt. No. 1, this case easily meets the standard established by the Fourth Circuit that the false statements be made in connection with the employee's discharge.

Ms. Comans is entitled to summary judgment on her liberty interest claim.

IV.    **Ms. Comans Has Stated a Property Interest Claim as to Which She Is Entitled to Judgment as a Matter of Law**

Ms. Comans also pleads a violation of the due process clause on the grounds that she was deprived of property without due process. Complaint ¶¶ 35-38, Dkt. No. 1. Defendants do not address that claim, presumably because they believe that if applying the protections of the CSRA

26

to the President's exercise of Article II authority to fire an employee is unconstitutional, the employee has no property interest in continued employment and thus the due process claim fails. But Defendants are wrong for two reasons.

First, Defendants do not dispute the fact that had Ms. Comans been an employee and not an inferior officer, Ms. Comans would have been entitled to notice and an opportunity to be heard prior to her removal and to a full evidentiary hearing post-removal under both the due process clause and the CSRA. *See* 5 U.S.C. § 7543(b), (d). But the Defendants contend those rights disappear if Ms. Comans is an inferior officer *even if* she disputes that classification. The Defendants misunderstand the definition of a property interest under governing Supreme Court precedent, even accepting their constitutional argument.

The Supreme Court has held that property interests "are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Roth*, 408 U.S. at 577. The independent source here is the CSRA. And the CSRA gave Ms. Comans a "claim[] of entitlement" to continued employment, even accepting the Defendants' Article II argument. In fact, this Court has already concluded that "section 7543(a) vests Plaintiff with a due process property interest in her continued employment." Order at 9, Dkt. No. 32.

The Supreme Court has long held that if property can only be taken if certain "conditions" are satisfied, the taking requires due process. *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972). Even accepting the Defendants' constitutional theory, Ms. Comans had an enforceable right to continued employment. Although the Agency's theory expands the grounds for termination such that Ms. Comans could be terminated without cause by the President *if* she

27

was an inferior officer, it does not render Ms. Comans an employee at will. Even accepting the

Defendants' theory, if Ms. Comans is not an inferior officer, Ms. Comans still had an

enforceable right to continued employment. Ms. Comans had a right to contest the assertion that

she was an inferior officer. She thus had a property interest in continued employment and her

termination without notice or any opportunity to be heard violated the due process clause.

Second, the property interest vested in Ms. Comans at the time of her appointment. Even

if Defendants were correct that the CSRA's procedural rights and protections cannot

constitutionally apply when the President exercised his Article II authority to fire Ms. Comans,

Article II cannot override the due process clause. Ms. Comans had a property interest in

continued employment at all times after her appointment that could not be taken without due

process. As a recent article in the YALE LAW JOURNAL FORUM concluded:

> even if the Court concludes that the CSRA's removal protections are unconstitutional insofar as they impose statutory limitations on the President's removal power, the removal protections' constitutional function will continue to operate, vesting civil servants with property rights in their continued employment. And those property rights, in turn, provide civil servants with constitutionally backed removal protections under the Due Process Clause. Consequently, although the Court may invalidate the statutory removal procedures required by the CSRA, civil servants will continue to be protected by the Due Process Clause.

Connor J. Morgan, *The Due-Process Limits on the President's Power to Fire Civil*

*Servants*, 135 YALE L. J. FORUM 830 (2026).

Defendants deprived Ms. Comans of her property interest in continued

employment without due process and they have made no argument to the contrary.

## V.      Defendants Admit, Ms. Comans Is Entitled to Relief Under the Declaratory Judgment Act if She Prevails on Her Other Claims

Although Defendants move for summary judgment on Ms. Comans' claim under the

Declaratory Judgment Act, they admit that "it may be available as a form of relief should Ms.

Comans prevail on any of her *other* claims." Defs.' Opp'n at 33, Dkt. No. 55. Ms. Comans

agrees that the Declaratory Judgment Act claim "cannot survive as a standalone claim." *Id.* As

discussed above, Ms. Comans is entitled to summary judgment on her due process claims and

thus is also entitled to a declaration that Defendants violated her constitutional rights. *See Skelly

Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–72 (1950).

## VI.    If No Other Remedy Is Available, Ms. Comans Is Entitled to a Writ of Mandamus

Ms. Comans concedes that "[i]n order to obtain mandamus relief, the petitioner must

show that no other adequate remedy is available." *In re Banks*, 37 F.3d 1492 (4th Cir. 1994)

(citing *In re First Fed. Sav. & Loan Ass'n*, 860 F.2d 135, 138 (4th Cir.1988)). As such, Ms.

Comans seeks a writ of mandamus only as an alternative remedy in the event that no other

remedy is available. Ms. Comans seeks a writ of mandamus only "[t]o the extent relief is

unavailable under either the APA, common law equity, or any other law." Complaint at 16, Dkt.

No. 1.

Numerous federal courts have considered a writ of mandamus to be a remedy potentially

available to an improperly terminated federal employee. Indeed, "[m]andamus jurisdiction 'has

not been rendered entirely unavailable by the CSRA; by providing a new avenue of review, the

CSRA altered the point at which mandamus potentially becomes available—the point at which

no alternative remedy is available.'" *Karamanos v. Egger*, 882 F.2d 447, 450 (9th Cir. 1989)

(citing *Barnhart v. Devine*, 771 F.2d 1515, 1527 (D.C. Cir. 1985)). *See also Lawrence v. United

States*, 631 F. Supp. 631, 639 (E.D. Pa. 1982) (cleaned up). As noted in *Steinagel v. Jacobson*,

507 F. Supp. 288, 291 (S.D. Ohio 1980), "where the employee seeks reinstatement upon review

of his discharge, and where such reinstatement may be properly characterized as relief in the

29

nature of mandamus (i.e., reinstatement is a 'clear duty' owed to plaintiff), federal district court jurisdiction may be properly founded upon 28 U.S.C. § 1361."

"A plaintiff may invoke the federal courts' extraordinary power to issue a writ of mandamus only by proving the co-existence of three elements: '(1) the petitioner has shown a clear right to the relief sought; (2) the respondent has a clear duty to do the particular act requested by the petitioner; and (3) no other adequate remedy is available.'" *Est. of Michael ex rel. Michael v. Lullo*, 173 F.3d 503, 512–13 (4th Cir. 1999). Defendants cannot make the case that they are entitled to summary judgment on the mandamus claim. At this point, it is not clear whether any remedy other than mandamus is available to Ms. Comans, so Defendants cannot establish that prong of the mandamus test as a matter of law. Ms. Comans can meet the first two prongs as, for the reasons explained above, Article II did not give the President authority to fire Ms. Comans in violation of the CSRA. That said, Ms. Comans has not moved for summary judgment on her mandamus claim because she recognizes that she is not entitled to mandamus until the Court holds that she is entitled to no other remedy. At this point, the Court need only deny summary judgment to Defendants on this claim.

## CONCLUSION

This Court should grant partial summary judgement in favor of the Plaintiff and deny summary judgment to the Defendants.

Respectfully submitted

*(signature page to follow)*

30

DKolansky@lowellandassociates.com
IOishi@lowellandassociates.com

/s/ Kevin T. Carroll
Kevin T. Carroll, VSB# 95292
Mark S. Zaid (D.C. Bar #440532)
Bradley P. Moss (D.C. Bar #975905)
LAW OFFICES OF MARK S. ZAID, P.C.
1250 Connecticut Avenue, N.W., Suite 700
Washington, D.C. 20036
T: (202) 498-0011
Kevin@markzaid.com
Mark@MarkZaid.com
Brad@MarkZaid.com

/s/ Heidi R. Burakiewicz
Heidi R. Burakiewicz (D.C. Bar #473973)
BURAKIEWICZ & DEPRIEST, PLLC
1120 Connecticut Avenue, N.W., Suite 600
Washington, D.C. 20036
T: (202) 856-7500
HBurakiewicz@bdlawdc.com

/s/ Abbe David Lowell
Abbe David Lowell (D.C. Bar #358651)
David A. Kolansky (D.C. Bar #7680722)
Isabella M. Oishi (D.C. Bar #7680428)
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, D.C. 20005
T: (202) 964-6110
F: (202) 964-6116
ALowellpublicoutreach@lowellandassocates.com

/s/ Kevin Byrnes
Kevin Byrnes, VSB 47623
Patriots Law Group
5819 Allentown Road
Suitland, Maryland 20746
T: 301-952-9000
KevinByrnes@patriotslaw.com

/s/ Harold Craig Becker
Harold Craig Becker  (D.C. Bar #371239)
Taryn Wilgus Null (D.C. Bar #985724)
Norman L. Eisen (D.C. Bar #435051)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue, S.E., No. 15180
Washington, D.C. 20003
T: (202) 594-9958
craig@democracydefenders.org
taryn@democracydefenders.org
norman@democracydefenders.org

/s/ Margaret M. Donovan
Margaret M. Donovan (pro hac vice)
KOSKOFF, KOSKOFF & BIEDER, PC
350 Fairfield Ave., Suite 501
Bridgeport, CT 06604
Tel: (203) 336-4421
Fax: (203) 368-3244
mdonovan@koskoff.com

Counsel for Plaintiff

**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing Memorandum in Support of Plaintiff's Motion for

Partial Summary Judgment on June 25, 2026 with the Clerk of Court using the CM/ECF

system, which will send a notification of filing to all counsel of record.

/s/ *Kevin T. Carroll*
Kevin Carroll, VSB 95292