**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| MARY COMANS,<br><br>      *Plaintiff,*<br><br>     v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT<br>*et al.*,<br><br>      *Defendants.* | No. 1:25-cv-01237-MSN-WEF |

## <u>SECOND DECLARATION OF MARY COMANS</u>

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct:

1. The FEMA CFO is not a policy making position. I was a financial advisor to the FEMA Administrator and Deputy Administrator. My primary duty and responsibility as CFO was to provide oversight concerning FEMA executives' compliance with federal government financial policies when administering the money allocated to their programmatic and operational divisions pursuant to decisions made by Congress, DHS, and the FEMA Administrator. Even then, I did not have unilateral authority over this oversight. Rather, FEMA's Principals Executive Panel ("PEP"), the governance body that oversaw the entire Planning, Programming, Budgeting, and Execution ("PPBE") process, voted on decisions. Even after the PEP voted, the Administrator had the final say on decisions. As CFO, my role was to raise concerns if the PEP or Administrator wanted to do anything that I thought might violate acquisitions or appropriations law. I had no authority to reverse their decisions.

2. The PEP was chaired by the FEMA Administrator and comprised of a mix of career and political leadership. As CFO, I ensured the PEP had financial materials, analysis, and other

information available to evaluate its options and make informed decisions. The PEP met whenever a significant financial decision needed to be addressed. I facilitated the meetings and discussions. For example, FEMA often had unspent funds at the end of each fiscal year. Each program office presented proposals for how best to use the remaining resources before the fiscal year closed, and the PEP debated and voted on how to use those funds with the Administrator retaining authority to overrule the vote when necessary. We faced similar governance decisions during urgent or unplanned events. For example, if the Department of Homeland Security alerted FEMA that other Agency components, such as Immigration and Customs Enforcement or Customs and Border Protection, needed supplemental funding because of unexpected shortfalls, my team gathered information regarding available balances, assessed what funds could be used based on appropriations, and presented options to the PEP. The DHS Secretary would assess and tell each operational component how much they needed to contribute to the estimated shortfall. DHS, the Office of Management and Budget and Congress would approve the reallocation/transfer of funds.

3.      The PEP met quarterly to review FEMA's financial health. I presented information so that it could perform a line-by-line review that funds were used in accordance with federal government requirements and the Administration's objectives. While I supported the PEP by providing it with information and raising concerns about whether suggestions complied with acquisition and appropriations law, the PEP and then the Administrator made final decisions

4.      Any advice that I gave or decisions that I made could be reviewed and reversed by the Administrator, Deputy Administrator, or the DHS CFO.

5.      While I evaluated internal financial management systems and operations, I had no unilateral authority to implement new systems. I could recommend changes, but the decision to implement them would be made by the Administrator or Deputy Administrator or FEMA's Chief Information Officer ("CIO"), who had to issue the Authority to Operate within the FEMA IT

Enterprise Architecture. For example, during my tenure, FEMA took steps to modernize its financial systems. The DHS CFO and DHS CIO were primarily responsible for that process. FEMA's Associate Administrator Mission Support, Chief Procurement Officer, Chief Information Officer, the Associate Administrator Policy and Program Analysis, and I participated in an Acquisition Review Board to provide oversight of this process and other FEMA acquisitions. As the CFO, I provided the technical information needed to make decisions regarding what FEMA's financial system required, but the members of the Acquisition Review Board shared responsibility for making recommendations to the DHS CFO, who made the final decisions.

6.      I and others at FEMA had mandatory reporting requirements if we believed a violation of appropriation law took place. I had no authority to initiate any form of civil or criminal actions in court or before any form of tribunal or to unilaterally stop a transaction, to adjudicate any form of dispute, to make rules binding on the public, to bind the public in any way, or to enter into contracts on behalf of FEMA.

7.      Many of FEMA's presidential appointees do not have experience with the United States government or a large bureaucracy. As such, I advised them regarding how to function within the government, including, but not limited to, about how the federal budget process works, who their external partners were, and how to interact with DHS headquarters. For example, the person selected to serve as U.S. Fire Administrator was usually a former Fire Chief from a municipal fire department who did not have experience working for the federal government. I did not advise the U.S. Fire Administrators how to do their job. Rather, I assisted them in learning how to navigate the federal bureaucracy and advising them how to comply with federal laws and regulations pertaining to financial issues.

8.      I had no say in how FEMA grants were awarded or the criteria used when making those decisions. Rather, grant making decisions were made at the DHS Secretary level. If Congress had questions about FEMA grants, the Assistant Administrator for Grants, who was a

political appointee and headed FEMA grant making, would respond. As CFO, I helped to facilitate and coordinate these discussions, but I did not advise the Assistant Administrator for Grants or anyone involved in the grant making process. Again, my only involvement was to provide oversight, report concerns, and make recommendations on how to remediate findings to ensure financial integrity and compliance with accounting standards.

9.     Decisions regarding whether disaster relief funds should be paid to state governments are made at the Presidential level. Once a disaster takes place, the appropriate Regional Administrator and Associate Administrator of Response and Recovery provided notification that funds were to be disbursed. After subject matter experts from the Office of Response and Recovery and/or one of the ten Regional Offices identified the amount needed to respond to each disaster, the CFO staff would work with the finance team deployed to that disaster to prepare and maintain a Spend Plan addressing how the funds would be allocated. My role was not to decide how to spend the funds to address the disaster, but to advise those who were making those decisions about how to do so in accordance with federal government financial policies and ensure funds were available to be obligated. I then tracked expenditures to ensure the team on the ground complied with the Spend Plan and stayed within fiscal target. Additionally, before FEMA could disburse disaster funds to a state or locality, it was required to submit line-item accounting and project work detail to the White House's Office of Management and Budget ("OMB") for approval. OMB had final decision authority on all disaster funding disbursements as the President alone has the authority to declare a Stafford Act event (aka a FEMA reimbursed disaster event).

10.     At the start of each FEMA Administrator's tenure, they prepared a five-year strategic plan. I had no role in writing that document nor was I considered a primary contributor. Again, I had a supporting role to advise on financial integrity and compliance with accounting standards.

11.     The FEMA budget process was scripted and controlled. Pursuant to FEMA Directive 259-3, its Planning, Programming, Budgeting, and Execution ("PPBE") process links the Agency's strategy, resources, and performance to achieve its mission effectively. Attach. @ (FEMA Directive 259-3) at 1 ("The PPBE cycle is integral to every aspect of FEMA's operations and requires the participation of leadership and management at every level of the Agency."). The Administrator and the Principals Executive Panel ("PEP") serve as the primary decision makers, setting strategic priorities and approving major plans, budgets, and performance targets. The Office of Policy and Program Analysis ("OPPA") facilitates strategic planning and resource alignment, ensuring decisions are data driven and coordinated across FEMA. The CFO's role is to provide assistance to leadership regarding the best way to use resources responsibly and in direct support of the Administrator's strategic intent and the decisions of the PEP.

12.     The White House, DHS Secretary, and FEMA Administrator provided formal guidance each year regarding FEMA's priorities for the following year. OPPA translated that guidance into the Strategic Plan and Annual Planning Guidance, which outlined goals, objectives, and performance expectations. FEMA components then prepared budget proposals aligned with those goals, objectives, and performance expectations. The PEP reviewed and refined these proposals before elevating them to the Administrator for approval. Once leadership decided what to request, my office prepared the documents memorializing the budget submissions. FEMA then sent those documents to the DHS Secretary for review and approval. After DHS's changes were incorporated , the budget was sent to OMB for modification and approval before it was submitted to Congress.

13.     My only interactions on the Hill were with congressional staffers. Any engagements with members of Congress were primarily handled by political appointees.

14.     FEMA contracted with an external independent auditor to perform a financial audit of its business processes to assess whether there were any gaps or vulnerabilities making it

susceptible to internal fraud. The auditor's findings were sent to the CFO and the appropriate Program Executive. While the CFO engaged in oversight to address the logistics surrounding the changes recommended by the auditor, such as how quickly a change could be made, the head of the affected program made the decisions regarding whether to take corrective action and what corrective action would be taken. The FEMA Administrator had final decision-making authority and responsibility.

15.    As CFO, I prepared proposed financial guidance and policies addressing FEMA's adherence to fiscal federal statute and regulations. I did not have final authority to adopt such guidance or policies. FEMA policy directed that FEMA's Chief Counsel, the Office of Policy and Program Analysis, and the Office of External Affairs reviewed, edited, and approved all policies and guidance before they were sent to the FEMA Administrator for final approval and review. The FEMA Administrator was the final decision maker.

16.    On the same day that FEMA terminated me, it terminated three other employees asserting only Article II authority. One of the employees was a GS-13 Program Analyst and another employee was a GS-9 Grants Management Analyst. I do not know the title of the third employee who worked at the GS-13 level.

17. I had no prosecutorial authority, no authority to initiate any form of civil or criminal action, no authority to conduct hearings or pre-hearing proceedings, no authority to adjudicate disputes, and no authority to make rules binding the public.

18. A true and correct copy of the form SF-50 appointing me to the position of CFO is attached hereto as Exhibit 1. I was not appointed by the Secretary of DHS or the President.

_6/24/26_
Date

_Mary Comans_
Mary Comans

6