**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| MARY COMANS,<br><br>*Plaintiff*,<br><br>v.<br><br>EXECUTIVE OFFICE OF THE PRESIDENT *et al.*,<br><br>*Defendants*. | No. 1:25-cv-01237-MSN-WEF |

**PLAINTIFF MARY COMANS' PROPOSED FINDINGS OF FACT**

1. Mary Comans ("Ms. Comans") started her employment with the federal government in 2004 as a Presidential Management Fellow, first at the U.S. Food and Drug Administration, and then at the U.S. Department of Homeland Security's ("DHS") headquarters, where she moved in 2005. In that capacity, Ms. Comans started as a GS-11 Budget Analyst and earned promotions to the GS-14 level.

2. In 2009, Ms. Comans left DHS headquarters and took a GS-14 position as a Senior Advisor to the Budget Director at the Transportation Security Administration.

3. Ms. Comans held the Senior Advisor to the Budget Director position for approximately one year before she was promoted to the GS-15 level as Branch Chief.

4. In that Branch Chief position, Ms. Comans attended the National Defense University, where she earned a master's degree in national security and resource strategy, and had a detail assignment as the Chief of Staff of the Joint Requirements Council at DHS headquarters.

5. In 2016, Ms. Comans applied for and was selected as the Deputy Chief Financial Officer at the Federal Emergency Management Agency ("FEMA"), which is part of DHS. This was her first position within the Senior Executive Service ("SES").

6. In approximately March 2017, the Chief Financial Officer ("CFO") left FEMA and the Acting Deputy Administrator asked Ms. Comans to fill the position in an acting capacity.

7. Ms. Comans submitted an application after FEMA advertised the vacant CFO position in approximately May 2017 and participated in a panel interview with career SES employees.

8. Had FEMA's Deputy Administrator position not been vacant in May 2017, the person in that position would have been the selecting official for the CFO position.

9. Because the Deputy Administrator position was vacant, the FEMA Administrator selected Ms. Comans for the CFO position in December 2017, and she formally occupied the position as of January 2018.

10. From January 2018 until February 2025, Ms. Comans served as the CFO for FEMA.

11. As CFO, Ms. Comans served under three different Senate-confirmed Administrators.

12. As CFO, Ms. Comans was the principal financial advisor to the FEMA Administrator and reported directly to the FEMA Deputy Administrator.

13. The FEMA CFO has no statutory authority over FEMA's Grant Programs Directorate ("GPD").

14. Under Title VI of Public Law 109-295, also known as the Post-Katrina Emergency Management Reform Act ("PKEMRA"), the GPD was led by an Assistant Administrator, a Presidential appointee requiring Senate confirmation.

15. Although the Senate confirmation requirement was subsequently eliminated by the Presidential Appointment Efficiency and Streamlining Act of 2011 (Public Law 112-166), the Assistant Administrator for GPD position remains a Presidential appointment.

16. PKEMRA granted GPD the sole authority to develop risk-benefit formulas, set grant criteria, and distribute billions of dollars in state, local, tribal, and territorial ("SLTT") funding, which includes administering specific non-disaster portfolios such as the Shelter and Services Program ("SSP").

17. The Assistant Administrator for GPD reports to the Deputy Administrator for Resilience who reports to the FEMA Administrator.

18. DHS established the SSP following the Emergency Supplemental Appropriations for Humanitarian Assistance and Security at the Southern Border Act, 2019 (Public Law 116-26), where Congress directed funding support for families and individuals encountered by DHS.

19. The SSP program administered by FEMA is a DHS grant program that makes federal funds available to non-federal entities to offset allowable costs incurred for certain services provided to noncitizens who have been processed by DHS and are awaiting the outcome of their immigration proceedings. *See* Shelter and Services Program (SSP) FY2024 Funding (2026), https://www.congress.gov/crs-product/IN12349.

20. On January 20, 2025, President Trump issued an Executive Order ("EO") entitled *Protecting the American People Against Invasion.* The EO instructed federal agencies, *inter alia*, to:

(a) Immediately review and, if appropriate, audit all contracts, grants, or other agreements providing Federal funding to non-governmental organizations supporting or providing services, either directly or indirectly, to removable or illegal aliens, to ensure that such agreements conform to applicable law and are free of waste, fraud, and abuse, and that they do not promote or facilitate violations of our immigration laws;

(b) Pause distribution of all further funds pursuant to such agreements pending the results of the review in subsection (a) of this section.

21. On January 24, 2025, FEMA Chief Counsel Adrian Sevier sought, via email, legal guidance from Joseph Mazzara, Acting DHS General Counsel, on the application of the Executive Order to SPP and the Case Management Pilot Program ("CMPP").

22. In the January 24, 2025 email, Mr. Sevier informed Mr. Mazzara that FEMA had paused all payments under those programs despite regulations requiring payment within 30 calendar days of a payment request thus creating some litigation risk.

23. On January 30, 2025, having yet to receive a response to his initial request for guidance, Mr. Sevier again emailed Mr. Mazzara after receiving a memo dated January 28, 2025, issued by DHS Secretary Kristi Noem entitled *Direction on Grants to Non-governmental Organizations*.

24. Secretary Noem in the *Direction on Grants to Non-governmental Organizations* memo directed "all Department grant disbursements . . . that (a) go to non-profit organizations or for which non-profit organizations are eligible, and (b) touch in any way on immigration, are on hold pending review, except to the extent required by controlling legal authority."

25. As the *Direction on Grants to Non-governmental Organizations* memo only referred to nongovernmental organizations ("NGOs"), Mr. Sevier sought clarification on whether the funding hold should apply to all SSP and CMPP recipients or just NGOs.

26. Mr. Mazzara responded via e-mail on January 30, 2025 that "[m]oney for state/locals should keep flowing to state and local governments."

27. FEMA GPD was informed of this direction to keep money flowing to state and local governments and, based on this specific instruction, lifted the payment hold on state and local governments.

28. On January 31, 2025, FEMA GPD approved three SSP payments in its Grant Management system.

29. These three approved payments flowed through FEMA's financial system and were included on the payment schedule delivered to the Department of Treasury.

30. None of these three approved payments required Ms. Comans' review or approval.

31. Of the three approved SSP payments, two were issued to the New York City Office of Management and Budget ("NYC OMB") in the amounts of $59 million and $22 million.

32. The third approved SSP payment, $2 million, was issued to Colorado's Office of Public Safety.

33. On February 5, 2025, FEMA GPD submitted a *Summary and Status of Grants to Non-governmental Organizations* to DHS' Undersecretary for Management, as required by Secretary Noem's memo, and reported that FEMA had frozen funding to NGOs under SPP and CMPP.

34. On February 5, 2025, Ms. Comans was on leave but received a call from Troup Hemenway, DHS Deputy Chief of Staff.

35. Mr. Hemenway told Ms. Comans that DHS was starting to onboard a team from the Department of Government Efficiency ("DOGE") and they needed information related to grant programs.

36. Ms. Comans told Mr. Hemenway that she was not the subject matter expert on grant programs, but that she would put him in touch with the career civil service employees who managed those programs.

37. Ms. Comans connected Mr. Hemenway via email to Pamela Williams, Assistant Administrator, GPD; and Robert Farmer, Deputy Assistant Administrator, GPD.

38. Shortly after the call from Mr. Hemenway, Ms. Comans was informed that there would be a meeting at 5:00 p.m. that day in the FEMA Administrator's conference room.

39. Despite being on leave, Ms. Comans came into the office to attend the February 5 meeting.

40. At the February 5 meeting, two DOGE team members attended in person: Brad Smith and John Burham. Kyle Schutt, also from DOGE, attended by phone. Also attending in person or remotely were members of FEMA and DHS leadership, including Mr. Mazzara; Mr. Hemenway; James Percival, DHS Senior Advisor to Secretary Noem; Joseph Guy, DHS Senior Advisor to Secretary Noem; Mary Ann Tierney, Senior Official Performing the Duties of the FEMA Deputy Administrator; Adrian Sevier; Ms. Williams; Mr. Farmer; Cameron Hamilton, Senior Official Performing the Duties of FEMA Administrator; Julia Moline, Acting FEMA Chief of Staff; and Chris Logan, Senior Official Performing the Duties of FEMA Deputy Administrator for Resilience.

41. A DOGE team member said the DOGE representatives were embedded at the U.S. Department of Health and Human Services and were there to help onboard the DHS DOGE team members, including Mr. Schutt who would be onboarded the next day.

42. A DOGE team member stated the purpose of the February 5, 2025 meeting was to get "plugged into" the SSP review process to ensure grants were appropriately reviewed and that funding could continue to flow expeditiously.

43. During the meeting, DOGE team member Brad Smith asked the FEMA team to confirm that FEMA was not sending money to NGOs that aided undocumented immigrants through the SSP.

44. During the meeting, Mr. Smith specifically asked Mr. Farmer whether all payments to NGOs had been stopped.

45. Mr. Farmer confirmed that the payments to NGOs had been stopped.

46. Mr. Smith then asked about the status of payments to state and local governments.

47. Mr. Farmer stated that those payments to state and local governments were still being made.

48. Mr. Smith responded by saying "that's the right answer," and he pointed his finger at Mr. Farmer for emphasis.

49. After the February 5, 2025, 5:00 p.m. meeting ended, DOGE and DHS officials met the FEMA subject matter experts in GPD and the OCFO to obtain more in-depth information about SSP and CMPP, as well as to discuss data collection and the process flow between two FEMA systems, FEMA's Grant Management system and FEMA's financial system, that were involved in processing the payments.

50. Around 5:00 p.m. on February 9, 2025, a DOGE team member embedded at the U.S. Treasury Department flagged that FEMA had recently provided New York City tens of millions of dollars under the SSP program.

51. The payment was to reimburse New York City for eligible expenses incurred for care and sheltering services the City provided to migrants after their release from DHS custody.

52. DOGE officials alleged that this payment to New York City violated the President's and the Secretary's direction.

53. On February 9, 2025, at approximately 7:30 p.m., Ms. Comans spoke with Ms. Tierney who reported that DOGE and the President were aware of a payment made through U.S. Treasury to New York City under the SSP.

54. That evening Mr. Hamilton emailed Ms. Comans to investigate the payment to determine what had occurred.

55. In the interim, at approximately 8:00 p.m., on February 9, 2025, Mr. Hamilton sent an email to DHS senior leadership, including Mr. Mazzara, Mr. Guy, and Mr. Hemenway, providing an initial timeline of events from January 27, 2025 through February 7, 2025. Mr. Mazzara then added Mr. Percival and Corey Lewandowski, then a Special Government Employee, to the email chain.

56. The timeline provided by Mr. Hamilton stated that on February 6, 2025, "FEMA leadership met with DOGE personnel to clarify the status regarding payments . . . . DOGE personnel confirmed that payment to state/local should remain and continue."

57. The timeline also included the names of FEMA employees who reviewed grant documentation and processed the eligible payment based on DOGE's confirmation that payments to state and local governments should continue.

58. Of the FEMA employee names listed, neither Ms. Comans' nor that of anyone that worked for the FEMA CFO was listed as having a role in making the payment.

59. Mr. Percival replied to all recipients on the email and stated "I agree with that characterization of the DOGE meeting. I was there. The EO said NGOs only and we thought that was the policy decision from the White House."

60. On February 10, 2025, at approximately 5:00 a.m., Elon Musk, then a Special Government Employee, posted on X, stating, "The @DOGE team just discovered that FEMA sent $59M LAST WEEK to luxury hotels in New York City to house illegal migrants. Sending this money violated the law and is in gross insubordination to the President's executive order. That money is meant for American disaster relief and instead is being spent on high end hotels for illegals! A clawback demand will be made today to recoup those funds." A screen shot of the post follows.[1]




[1] Elon Musk (@elonmusk), X (Feb. 10, 2025, 5:03 AM), https://x.com/elonmusk/status/1888891512303263815.

61. At approximately 9:30 a.m. on February 10, 2025, Ms. Comans had a meeting with Mr. Hamilton and Troy Edgar, Special Advisor to DHS Secretary, about the payments and steps to recoup the funding.

62. Before the February 10 meeting began, Mr. Hamilton verbally told Ms. Comans that the people who would be held accountable for the payments were not FEMA employees, but DHS employees who issued the guidance to continue the payments.

63. The meeting with Mr. Edgar, was joined by three other DHS officials: Clark Barrow, Senior Advisor to the DHS Deputy Secretary; Randolph Alles, DHS Deputy Undersecretary for Management; and Stacy Marcott, Acting DHS CFO.

64. Mr. Hamilton was the primary briefer at the February 10 meeting and he walked Mr. Edgar through what had happened and the steps FEMA would take to recoup the three payments.

65. Mr. Edgar asked FEMA to provide him an after-action report summarizing the actions leading to the SSP payment to NYC OMB by close of business.

66. Mr. Hamilton signed and sent the requested after-action memo to Mr. Edgar at approximately 3:45 p.m. on February 10, 2025.

67. Ms. Moline forwarded the after-action memo by email to Mr. Sevier; Ms. Tierney; Michael Plostock, Acting FEMA Deputy Chief of Staff; Mr. Alles; and Ms. Comans.

68. The Hamilton memo stated in its Conclusion that, "In the days leading up to the payment to NYC OMB FEMA officials believed they were acting in good faith and in line with intent and direction from the White House, OMB, DHS, DOJ, and DOGE."

69. As Ms. Comans left Mr. Hamilton's office on February 10, Mr. Hamilton verbally thanked her for all the work she had done to fix the matter, hugged her, and once again reassured her that no one in FEMA was getting fired.

70. That same day Ms. Comans worked to claw back the money, which totaled $80 million dollars, that had been sent to New York City.

71. That afternoon, Mr. Hamilton sent an email to DHS confirming that the process to claw back the funding was underway.

72. At around 5:30 p.m., Ms. Comans reported to leadership that she had successfully coordinated with U.S. Treasury, and the funds were being returned.

73. Mr. Hamilton called Ms. Comans to thank her for all that she and the CFO team had done to recoup the payments and informed her he would relay the good news to the DHS leadership.

74. At approximately 5:50 p.m. on February 10, Mr. Hamilton emailed Mr. Edgar, Mr. Barrow, Mr. Hemenway, Mr. Mazzara, Mr. Guy, and Mr. Percival, along with a number of other senior U.S. Treasury officials, that "per Mary Comans…the 2 payments that were issued to the NYC OMB via their Citibank account are in the process of being returned by Citibank to Fiscal Services. Additionally, Wells Fargo has just indicated they will be returning the third payment in the amount of $1,897,347.00 to Fiscal Service. Fiscal Service should receive the returned payment within the next 24 hours."

75. On Tuesday, February 11, 2025, at approximately 9:10 a.m., Ms. Tierney sent Ms. Comans a Teams message asking if Ms. Comans was in the office.

76. Ms. Comans responded, letting her know she was.

77. At approximately 9:15 a.m., Ms. Tierney came to Ms. Comans' office, closed the door, and told Ms. Comans she was being fired.

78. Ms. Tierney said she didn't know why, but that Ms. Comans had to be out of the building by 9:30 a.m.

79. Ms. Comans began to pack up the contents of her office and told Ms. Tierney that she wouldn't leave without a termination letter.

80. After Ms. Comans brought her belongings to her vehicle in the garage, Ms. Tierney escorted Ms. Comans to Mr. Sevier's office, who also stated he didn't know why Ms. Comans was being fired.

81. Ms. Tierney provided Ms. Comans with a "Notice of Termination" digitally signed and dated February 11, 2025, that said she was being terminated under Article II of the Constitution "at the direction of the President." It did not state any cause for the termination.

82. On February 11, 2025, DHS issued a press release stating that FEMA's Chief Financial Officer had been fired "for circumventing leadership to unilaterally make egregious payments for luxury NYC hotels for migrants."

83. It was a matter of public record at the time, including on the FEMA website, that the Chief Financial Officer was Ms. Comans.

a. The quoted statement in paragraph 82 from the February 11 press release was false.

b. At a minimum, Mr. Mazzara, Mr. Sevier, Mr. Hemenway, Mr. Percival, Mr. Guy, Ms. Tierney, Ms. Williams, Mr. Farmer, Mr. Edgar, Mr. Alles, Ms. Marcott, Mr. Plostock, Mr. Logan, Mr. Hamilton, Ms. Moline, and Mr. Lewandowski ("Responsible officials at DHS and FEMA") knew the statement "for

circumventing leadership to unilaterally make egregious payments for luxury NYC hotels for migrants" was false.

c. The press release implied Ms. Comans was a "deep state activist" who had "undermine[d] the will and safety of the American people."

d. The statement that Ms. Comans was a "deep state activist" was false.

e. The statement that Ms. Comans, or any actions she had taken, had "undermine[d] the will and safety of the American people" was false.

f. Responsible officials at DHS and FEMA knew the statements in (d) and (e) were false.

84. On or about February 11, 2025, DHS spokesperson Tricia McLaughlin provided *The New York Times* an on-the-record statement that was published that four FEMA employees, including Ms. Comans, had been fired "for circumventing leadership to unilaterally make egregious payments for luxury N.Y.C. hotels for migrants."

a. The entire statement in paragraph 84 made by Ms. McLaughlin was false.

b. Responsible officials at DHS and FEMA knew the statement was false.

c. The statement that Ms. Comans had been fired for "circumventing leadership" was false.

d. Responsible officials at DHS and FEMA knew the statement in (c) was false.

e. The statement that Ms. Comans "unilaterally ma[de] . . . payments" was false.

f. Responsible officials at DHS and FEMA knew the statement in (e) was false.

85. On or about February 11, 2025, a DHS spokesperson provided an on-the-record statement to Fox News that was published that "four employees are being fired today for circumventing leadership and unilaterally making the egregious payment for hotels for

migrants in New York City" and that "Firings include FEMA's Chief Financial Officer, two program analysts and a grant specialist." *See* Greg Norman-Diamond, *4 FEMA employees fired for paying for hotels for migrants in New York City*, FOX NEWS (Feb. 11, 2025), www.foxnews.com/us/4-fema-employees-fired-over-egregious-payments-migrants-dhs-says.

a. The entire statement in paragraph 85 was false.

b. Responsible officials at DHS and FEMA knew the statement was false.

c. The statement that Ms. Comans had been fired for "circumventing leadership" was false.

d. Responsible officials at DHS and FEMA knew the statement in (c) was false.

e. The statement that Ms. Comans "unilaterally ma[de] . . . payments" was false.

f. Responsible officials at DHS and FEMA knew the statement in (e) was false.

86. On or about February 11, 2025, a DHS spokesperson provided an on-the-record statement to CNN that was published that Ms. Comans was fired for having "effectively laundered . . . forbidden funding" and "knowingly hid this information from legal counsel to manipulate the funding process and undermine the Secretary's order." The statement was published by CNN. *See* Gabe Cohen, *"We're not preparing": As Trump officials vow to eliminate FEMA, the agency is already in turmoil*, CNN POLITICS (2025), https://www.cnn.com/2025/03/26/politics/fema-payments-staffing-stalled-turmoil.

a. The quoted statements made by the DHS spokesperson in paragraph 86 were false.

b. Responsible officials at DHS and FEMA knew the quoted statements were false.

c. The statement that Ms. Comans "effectively laundered . . . forbidden funding" was false.

d. Responsible officials at DHS and FEMA knew the statement (c) was false.

e. The statement that Ms. Comans "knowingly hid . . . information from legal counsel" was false.

f. Responsible officials at DHS and FEMA knew the statement in (e) was false.

g. The statement that Ms. Comans "manipulate[d] the funding process" was false.

h. Responsible officials at DHS and FEMA knew the statement in (g) was false.

i. The statement that Ms. Comans "undermine[] the Secretary's order" was false.

j. Responsible officials at DHS and FEMA knew the statement in (i) was false.

87. On February 11, 2026, a DHS spokesperson told Benny Johnson that "FEMA's Chief Financial Officer Mary Comans was just fired for illegally funding migrant luxury hotels in NYC against the orders of President Trump." Johnson posted the statement on X. *See* Benny Johnson (@BennyJohnson) X (Feb 11, 2025, 10:37 AM), https://x.com/bennyjohnson/status/1889337877894771042.

a. Except for the statement that "Mary Comans was just fired, the quoted statements made by the DHS spokesperson in paragraph 87 were false.

b. Responsible officials at DHS and FEMA knew the quoted statements were false.

c. The statement that Ms. Comans was "illegally funding migrant luxury hotels in NYS" was false.

d. Responsible officials at DHS and FEMA knew the statement in (c) was false.

e. The statement that Ms. Comans acted "against the orders of President Trump" was false.

f. Responsible officials at DHS and FEMA knew the statement in (e) was false.

88. On February 11, 2025, then- Special Government Employee Elon Musk retweeted on X a photo of Ms. Comans along with the statement, “FEMA CFO Mary Comans was just fired for funneling $58M to illegal migrant hotels in Manhattan” and he called it a “criminal action.” A screen shot of the post is below.[2]




a. Except for the statement that “Mary Comans was just fired,” the statement by Mr. Musk was false.

b. Mr. Musk knew the statement was false.

c. The statement that Ms. Comans had engaged in a “criminal action” was false.

d. Mr. Musk knew the statement in (c) was false.

e. The statement that Ms. Comans was “funneling $58M” was false.

f. Mr. Musk knew the statement in (e) was false.

g. The statement that Ms. Comans had transmitted money to “illegal migrant hotels” was false.

h. Mr. Musk knew the statement in (g) was false.

---

[2] Elon Musk (@elonmusk), X (Feb 11, 2025, 11:05 AM), https://x.com/elonmusk/status/1889375112001892414.

i. Responsible DHS and FEMA knew the statements in (c), (e) and (g) were false.

89. On or about February 11, 2025, a federal officer, employee or agent of the federal government stated to Laura Loomer that Ms. Comans was fired for illegally transmitting funds for illegal aliens to stay in luxury hotels in New York City in violation of President Trump's Executive Order.

a. Mr. Lewandowski made the statement to Ms. Loomer.

b. Then-DHS Secretary Kristi Noem made the statement to Ms. Loomer.

c. On February 11, 2025, Ms. Loomer posted on X that "FEMA's Chief Financial Officer Mary Comans was just fired for illegally funding over $59 MILLION for illegal Aliens to stay in luxury hotels in NYC last week in violation of President Trump's Executive Order." A screen shot of the post is below.[3]


Laura Loomer
@LauraLoomer
Subscribe

BREAKING:

FEMA's Chief Financial Officer Mary Comans was just fired for illegally funding over $59 MILLION for illegal Aliens to stay in luxury hotels in NYC last week in violation of President Trump's Executive Order.

Meanwhile, hurricane and flood victims in North Carolina are freezing and starving in TENTS with zero FEMA money.

10:54 AM · 11 Feb 25 · 226K Views

3,861 Reposts 172 Quotes 15.7K Likes

204 Bookmarks

d. Except for the statement that "Mary Comans was just fired," the statement posted by Ms. Loomer was false.

e. Responsible officials at DHS and FEMA knew the statement was false.

f. Mr. Lewandoski knew the statement was false.

---

[3] Laura Loomer (@LauraLoomer), X (Feb 11, 2025, 10:54 AM), https://x.com/LauraLoomer/status/1889342176082927704.

g. Secretary Noem knew the statement was false.

h. The statement that Ms. Comans was "illegally funding over $59 MILLION" was false.

i. Responsible officials at DHS and FEMA knew the statement in (h) was false.

j. Mr. Lewandoski knew the statement in (h) was false.

k. Secretary Noem knew the statement in (h) was false.

l. The statement that Ms. Comans was in "violation of President Trump's Executive Order" was false.

m. Responsible officials at DHS and FEMA knew the statement in (l) was false.

n. Mr. Lewandoski knew the statement in (l) was false.

o. Secretary Noem knew the statement in (l) was false.

90. Ms. Comans was not terminated from her position at FEMA for any actual misconduct.

91. Ms. Comans did not engage in any actual misconduct in relation to the payments to New York City described in the statements quoted above.

92. Ms. Comans did not authorize the payments to New York City described in the statements quoted above.

93. Ms. Comans played no role in authorizing or making the payments to New York City described in the statements quoted above.

94. Ms. Comans did not have unilateral authority to authorize the payments to New York City described in the statements quoted above.

95. Ms. Comans did not have unilateral authority to stop the payments to New York City described in the statements quoted above.

96. Ms. Comans did not have access to either of the systems used to execute the payments to New York City described in the statements quoted above.

97. No Executive Order issued by President Trump forbade the SSP payment to New York City.

98. Before the payments to New York City were made, Ms. Comans was never instructed by an officer or employee of DHS or FEMA or by the White House not to make the SSP payment to New York City.

Dated: August 18, 2026

Respectfully submitted,

*/s/ Kevin T. Carroll*
Kevin T. Carroll, VSB# 95292
Mark S. Zaid (D.C. Bar #440532)
Bradley P. Moss (D.C. Bar #975905)
LAW OFFICES OF MARK S. ZAID, P.C.
1250 Connecticut Avenue, N.W., Suite 700
Washington, D.C. 20036
T: (202) 498-0011
Kevin@markzaid.com
Mark@MarkZaid.com
Brad@MarkZaid.com

*/s/ Heidi R. Burakiewicz*
Heidi R. Burakiewicz (D.C. Bar #473973)
BURAKIEWICZ & DEPRIEST, PLLC
1120 Connecticut Avenue, N.W., Suite 600
Washington, D.C. 20036
T: (202) 856-7500
HBurakiewicz@bdlawdc.com

*/s/ Abbe David Lowell*
Abbe David Lowell (D.C. Bar #358651)
David A. Kolansky (D.C. Bar #7680722)
Isabella M. Oishi (D.C. Bar #7680428)
LOWELL & ASSOCIATES, PLLC
1250 H Street, N.W., Suite 250
Washington, D.C. 20005
T: (202) 964-6110
F: (202) 964-6116
ALowellpublicoutreach@lowellandassocates.com
DKolansky@lowellandassociates.com
IOishi@lowellandassociates.com

*/s/ Harold Craig Becker*
Harold Craig Becker (D.C. Bar #371239)
Taryn Wilgus Null (D.C. Bar #985724)
Norman L. Eisen (D.C. Bar #435051)
DEMOCRACY DEFENDERS FUND
600 Pennsylvania Avenue, S.E., No. 15180
Washington, D.C. 20003
T: (202) 594-9958
craig@democracydefenders.org
taryn@democracydefenders.org
norman@democracydefenders.org

*/s/ Margaret M. Donovan*
Margaret M. Donovan (*pro hac vice*)
KOSKOFF, KOSKOFF & BIEDER, PC
350 Fairfield Ave., Suite 501
Bridgeport, CT 06604
Tel: (203) 336-4421
Fax: (203) 368-3244
mdonovan@koskoff.com

*/s/ Kevin Byrnes*
Kevin Byrnes, VSB 47623
Patriots Law Group
5819 Allentown Road
Suitland, Maryland 20746
T: 301-952-9000
KevinByrnes@patriotslaw.com

*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I certify that I filed the foregoing Proposed Findings of Fact on August 18, 2026 with the Clerk of Court using the CM/ECF system, which will send a notification of filing to all counsel of record.

*/s/ Kevin T. Carroll*
Kevin Carroll, VSB 95292